**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF NORTH CAROLINA**
**CIVIL ACTION NUMBER 1:13-CV-00255-WO-JLW**

| | |
|---|---|
| THOMAS BROWN and MONICA JOHNSON, on behalf of themselves and a class of persons similarly situated,<br><br>        Plaintiffs,<br><br>     v.<br><br>WESTERN SKY FINANCIAL, LLC, 24 SEVEN SOLUTION, LLC, 24-7 CASH DIRECT, LLC, ADVANCE WIRELESS, LLC, DEKAKE RANCH, LLC, FINANCIAL SOLUTIONS, LLC, GREAT PLAINS LENDING, LLC, GREAT SKY FINANCE, LLC, GREEN BILLOW, LLC, HIGH COUNTRY VENTURES, LLC, HORIZONS CONSULTING, LLC, INTERIM HOLDING COMPANY, MANAGEMENT SYSTEMS, LLC, NATIVE IMAGINATION, LLC, NEW HOLDING COMPANY, PAYDAY FINANCIAL, LLC, RED RIVER VENTURES, LLC, RED STONE FINANCIAL, LLC, WEBB RANCH, LLC, WESTERN CAPITAL, LLC, MARTIN A. WEBB, CASHCALL, INC., JOHN PAUL REDDAM, WS FUNDING, LLC and DELBERT SERVICES CORPORATION.<br><br>        Defendants. | **FIRST AMENDED CLASS ACTION COMPLAINT** |

Plaintiffs, on behalf of themselves and all others similarly situated, file this First Amended Complaint against Defendants and respectfully allege as follows.

1

## I. NATURE OF THE ACTION

1.     Plaintiffs bring this lawsuit on behalf of North Carolinians who have borrowed money from Defendants under "payday loan" arrangements at usurious interest rates. Payday loans are loans of relatively small amounts of money carrying high interest rates. Under North Carolina law, these loans are unlawful. Plaintiffs also allege putative class action claims on behalf of consumers in other states who have had their rights violated by these loans.

2.     Defendants are participants in an enterprise to make unlawful loans in North Carolina and to avoid liability for doing so. Defendants advertise their loans in North Carolina via television, radio, and the internet. Defendants also advertise and make their loans in other states.

3.     Plaintiffs bring this claim on behalf of a class of all persons who obtained loans in North Carolina from Defendants to recover all amounts collected by the Defendants and for actual and treble damages, attorneys' fees, and such other relief as may be allowed by law. Plaintiffs also bring a putative class claim on behalf of individuals in other states as well.

4.     Aware of the law in North Carolina, Defendants have sought to insulate themselves from liability, first by declaring that they are protected from the application of any State or Federal law under tribal immunity afforded to the Cheyenne River Sioux Tribe of South Dakota (the "Tribe"). However, the Tribe does not own or operate the Defendants' payday lending enterprise, and Defendants do not make loans to tribal members but rather to North Carolina residents. Accordingly, Defendants' enterprise is

2

not protected by tribal immunity. Furthermore, the entire Western Sky/Webb enterprise involved herein is actually just a "front" for CashCall, Inc. as alleged below. CashCall, Inc. is a California corporation with no Tribal connection which is controlled by its owner, Defendant Reddam.

5.     Second, Defendants have sought to avoid liability by including a purported arbitration agreement that would require individual arbitration under arbitration rules of the Tribe which do not exist, and under Tribal law regulating the loans which upon information and belief also does not exist. The arbitration agreement is otherwise void and unenforceable. Defendants claim in their agreement that "[n]either this Agreement nor Lender is subject to the laws of the United States." (See **Exhibit 1**, Western Sky Consumer Loan Agreement for Plaintiff Monica Johnson). Under the circumstances, Defendants are barred and estopped from claiming any right to arbitration under the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* ("FAA").

## II. JURISDICTION AND VENUE

6.     This is a class action to recover monies unlawfully collected by Defendants in violation of the North Carolina Consumer Finance Act, N.C.G.S. § 53-164 *et seq.* ("CFA"); the usury statutes, N.C.G.S. § 24-2 *et seq.*; Unfair and Deceptive Trade Practices Act, N.C.G.S. § 75-1 *et seq.* ("NC UDAP"); and North Carolina common law as alleged below; and alleging claims under other law as discussed below.

7.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) in that the matter in controversy

exceeds the sum of $5,000,000, exclusive of interest and costs, and is a class action in which Plaintiffs and class members include one or more citizens of a State different from that of any Defendant. The Court also has federal question jurisdiction given Plaintiffs' federal law claims raised below.

8.    This Court has personal jurisdiction over Defendants because they marketed, offered and made loans in North Carolina.

9.    Venue is proper in this district under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this District.

**III. PARTIES**

A. <u>**Plaintiffs.**</u>

10.    Plaintiff Thomas Brown is a citizen and resident of Kernersville, Forsyth County, North Carolina. He entered into the payday loan with Defendants from his home in North Carolina using his Internet connection and phone, and funds from the loan were deposited to his bank account in North Carolina.

11.    Plaintiff Monica Johnson is a citizen and resident of Clemmons, Forsyth County, North Carolina. She entered into the payday loan with Defendants from her home in North Carolina using her Internet connection and phone, and funds from the loan were deposited to her bank account in North Carolina.

4

**B. Defendants.**

12.     Upon information and belief, Defendant Western Sky Financial, LLC ("Western Sky") is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota. Upon information and belief, Western Sky has employed individuals at facilities located at 612 East Street and 602 East Street, Timber Lake, South Dakota.

13.     Upon information and belief, Defendant 24 Seven Solution, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

14.     Upon information and belief, Defendant 24-7 Cash Direct, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

15.     Upon information and belief, Defendant Advance Wireless, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

16.     Upon information and belief, Defendant Dekake Ranch, LLC is a limited liability company chartered under the law of and with a principal place of business in

5

South Dakota and may be served with process at its office at 605 Ponderosa Blvd., Isabel, South Dakota.

17.   Upon information and belief, Defendant Financial Solutions, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

18.   Upon information and belief, Defendant Great Plains Lending, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

19.   Upon information and belief, Defendant Great Sky Finance, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

20.   Upon information and belief, Defendant Green Billow, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

21.   Upon information and belief, Defendant High Country Ventures, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

22. Upon information and belief, Defendant Horizons Consulting, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

23. Upon information and belief, Defendant Interim Holding Company is a company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 803 Main St., Timber Lake, South Dakota.

24. Upon information and belief, Defendant Management Systems, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

25. Upon information and belief, Defendant Native Imagination, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

26. Upon information and belief, Defendant New Holding Company is a company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 803 Main St., Timber Lake, South Dakota.

27. Upon information and belief, Defendant Payday Financial, LLC is a limited liability company chartered under the law of and with a principal place of business in

7

South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

28. Upon information and belief, Defendant Red River Ventures, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

29. Upon information and belief, Defendant Red Stone Financial, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

30. Upon information and belief, Defendant Webb Ranch, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 605 Ponderosa Blvd., Isabel, South Dakota.

31. Upon information and belief, Defendant Western Capital, LLC is a limited liability company chartered under the law of and with a principal place of business in South Dakota and may be served with process at its office at 612 East St., Timber Lake, South Dakota.

32. Upon information and belief, Defendant Martin A. "Butch" Webb is a citizen and resident of South Dakota and may be served with process at his address at 612 East St., Timber Lake, South Dakota; and during the pertinent times was the organizer, owner and/or manager, and/or otherwise personally directed, dominated and controlled

8

the following Defendant companies: 24 Seven Solution, LLC; 24-7 Cash Direct, LLC; Advance Wireless, LLC; Dekake Ranch, LLC; Financial Solutions, LLC; Great Plains Lending, LLC; Great Sky Finance, LLC; Green Billow, LLC; High Country Ventures, LLC; Horizons Consulting, LLC; Interim Holding Company; Management Systems, LLC; Native Imagination, LLC; New Holding Company; Payday Financial, LLC; Red River Ventures, LLC; Red Stone Financial, LLC; Webb Ranch, LLC; Western Capital, LLC; and Western Sky Financial, LLC (collectively "the Western Sky Entities").

33.     Upon information and belief, Defendant CashCall, Inc. ("CashCall") is a California corporation with a principal place of business at 1600 S. Douglass Road, Anaheim, California 92806 and may be served with process at that address. Upon information and belief, CashCall has been assigned numerous of the loans made by the Western Sky Entities.

34.     Upon information and belief, Defendant John Paul Reddam is a citizen and resident of California and may be served with process at his address at his alter ego Western Sky at 612 East St., Timber Lake, South Dakota; and during the pertinent times in material respects personally directed, dominated and controlled Webb and the Western Sky Entities.  In addition Reddam is or was President and CEO of Defendant CashCall and owns or owned 100% of its corporate stock and may be served at its principal place of business at 1600 S. Douglass Road, Anaheim, California 92806.   In addition during the pertinent times Reddam in material respects personally directed, dominated and controlled CashCall, WS Funding, LLC, and Delbert Services Corporation (collectively the "CashCall Entities").

9

35.     Upon information and belief, Defendant WS Funding, LLC has been held out by Reddam and CashCall as being a "wholly-owned subsidiary" of CashCall.[1] Accordingly if this is true, it can be served at CashCall's principal place of business at 1600 S. Douglass Road, Anaheim, California 92806.  Reddam was and is the sole member and 100% owner of WS Funding, LLC.

36.     CashCall claims that WS Funding, LLC buys notes executed between Western Sky Financial, LLC and consumers from Western Sky Financial, LLC and assigns the note service to CashCall.[2]

37.     "Western Sky is nothing more than a front to allow CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators"[3] and by consumers.

---

[1] *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc., and WS Funding LLC*, Case No. 12-308, Cease and Desist Order by the State of New Hampshire Banking Department, dated June 4, 2013, p. 2 ¶ 3 (**Exhibit 16**). *See also* Massachusetts Commissioner of Banks, "Cease Order" dated March 21, 2013, in *In re CashCall, Inc. and WS Funding, LLC,* Docket No. 2013-010 (states "WS Funding is a wholly owned subsidiary of CashCall," that "at all relevant times John P. Reddam was and is the sole director and 100% owner of CashCall" and that "Reddam was and is the sole member and 100% owner of WS Funding." Order, ¶¶ 3-7) (**Exhibit 17**).

[2] *Agnes Scott v. Delbert Services Corporation et al.,* E.D. Wisc. Case No. 12-C-0871, Declaration of CashCall employee Sean Bennett filed therein at Doc. 9, averring at Bennett Dec. ¶ 2: "WS Funding, LLC bought the note executed between Western Sky Financial, LLC and Agnes Scott ... from Western Sky Financial, LLC on October 17, 2011 and assigned the Note service to CashCall."

[3] *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc., and WS Funding LLC*, Case No. 12-308, Cease and Desist Order by the State of New Hampshire Banking Department, dated June 4, 2013, p. 10.

38.     Upon information and belief, Defendant Delbert Services Corporation ("Delbert") is a corporation which may be served c/o Reddam at 1600 S. Douglass Road, Anaheim, California 92806. Delbert can also be served at an office located at 7125 Pollock Drive, Las Vegas, Nevada 89119. Delbert regularly seeks to collect on purported debts on loans consumers owe to CashCall.

39.     None of the Defendants are registered to do business in the State of North Carolina, nor do any hold a license of any type to make loans to North Carolina residents.

## IV. CLASS ACTION ALLEGATIONS

40.     Plaintiffs bring suit on behalf of themselves and on behalf of all others similarly situated under the provisions of Rule 23 of the Federal Rules of Civil Procedure with respect to violations alleged herein. Plaintiffs request certification of the following classes herein:

a.      North Carolina Class: All persons who borrowed money from Defendants, or any of them, in North Carolina.

b.      National Class: All persons who borrowed money from Defendants, or any of them, in the United States.

41.     The requirements for maintaining this action as a class action are satisfied in that there are too many class members for joinder of all of them to be practicable. Upon information and belief, there are thousands of members of the proposed class.

42.     There are issues of fact or law that are common to all members of the class, including but not limited to:

11

a.     whether Defendants marketed unlawful loans to consumers in North Carolina and elsewhere by advertising on television, radio and the Internet in North Carolina and elsewhere;

b.     whether Defendants made usurious loans to North Carolinians and to residents of other states;

c.     whether Defendants unlawfully collected sums from class members and took money from class members' North Carolina bank accounts and bank accounts of class members in other states;

d.     Whether Defendants' uniform business methods in marketing and making loans to class members in North Carolina violate the CFA, because they constitute loans at unlawful interest rates and/or because they violate G.S. § 53-166(b)'s prohibition against persons seeking to avoid application of the CFA "by any device, subterfuge or pretense whatsoever;"

e.     Whether Defendants' uniform business methods in marketing and making loans to class members in North Carolina constitute unfair and deceptive trade practices in violation of the UDAP;

f.     Whether Defendants' practices constitute void contracts illegal *ab initio* and entitling class members to refunds pursuant to the CFA;

g.     Whether Defendants are liable for violations of the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA");

h.     Whether Defendants are liable for violations of the Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.*;

i.     Whether Defendants are liable for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*;

j.     Whether Defendants are liable to putative class members in other states besides North Carolina that have usury and other consumer protection statutes similar to North Carolina law under which the Defendants' loans were usurious, violated consumer finance laws and/or violated state UDAP statutes;

k.     whether Plaintiffs and class members can recover actual, double and/or treble damages and other common-law and statutory damages; and

l.     whether Plaintiffs are entitled to an award of attorneys' fees and costs.

12

43. Plaintiffs' claims are typical of the claims of class members. Plaintiffs are members of the Class, will adequately represent the class and do not have any interest adverse to that of class members. Plaintiffs have retained counsel who are experienced in North Carolina lending law and have litigated class action cases against payday and subterfuge lenders, and who have litigated class actions in other jurisdictions as well.

44. Pursuant to Rule 23(a) of the Federal Rules of Civil Procedure, the class meets all requirements for class certification.

45. The class meets the requirements of Rule 23(b)(1) because adjudications with respect to individual members of the class would, as a practical matter, be dispositive of the interests of other members of the class not parties to the adjudications or would substantially impair or impede their ability to protect their interests. The proposed class may be properly certified under Rule 23(b)(1) because an adverse decision by the Court against an individual claimant might contain precedent that could be used against other claimants.

46. The class is also properly maintainable under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the class. Defendants have made loans on substantially the same terms to all class members. Plaintiffs seek a declaration as to all class members that the loans were illegal and class members do not owe any money pursuant to these loans. Accordingly, injunctive or declaratory relief would be appropriate.

47.     In addition, the class meets the requirements of Rule 23(b)(3) because the questions of law or fact common to members of the class predominate over any questions affecting only individual class members. The determinative common questions all apply to all class members. As such, common issues predominate over individual issues. Additionally, a class action is superior to any other available methods to obtain a fair and efficient adjudication. Given that nearly all of the class members in the North Carolina class are current or former North Carolina residents, concentrating the litigation in this forum would not present undue burdens for absent members. Further, as to class members in other states, it is useful to them to see their rights vindicated in this matter. Finally, Plaintiffs do not foresee any difficulties in managing the case as a class action.

## V. FACTUAL ALLEGATIONS

### A. Background on Payday Lending in North Carolina.

48.     Prior to 1997, payday lending was illegal in North Carolina. A 1992 North Carolina Attorney General's opinion concluded that payday lending violated the North Carolina Consumer Finance Act (N.C.G.S. § 53-164, *et seq.*) and the criminal law (N.C.G.S. § 14-107(b)). This opinion, 60 N.C.A.G. 86 (1992), was reflected as an annotation to N.C.G.S. § 53-166 in the published North Carolina General Statutes (West Publishing Company/Lexis).

49.     On August 7, 1997, the North Carolina General Assembly enacted into law Chapter 391 of the 1997 Session Laws, authorizing and regulating the payday "Check-Cashing Businesses." Former N.C.G.S. § 53-281 was one of the statutes enacted by

14

Chapter 391, and allowed the practice of payday lending, otherwise known as deferred deposit check cashing.

50.     Former N.C.G.S. § 53-281 became effective on October 1, 1997. The law was enacted on an experimental basis to determine how payday companies offered their services and how it affected customers. Chapter 391 of the 2001 Session Laws provided that § 53-281 was subject to an expiration or "sunset" date of July 31, 2001.

51.     Under the 1997 Session Law enacting it, N.C.G.S. § 53-281 was to expire on July 31, 2001. On July 31, 2001, the General Assembly enacted, and Governor Easley approved, a one-month extension of the expiration date or "sunset" of N.C.G.S. § 53-281.

52.     On July 31, 2001, the North Carolina Commissioner of Banks released an "Urgent Memo" addressed to "[a]ll check-cashing business licensees who are engaged in 'payday lending.'" This memorandum advised the licensees that the sunset of N.C.G.S. § 53-281 had been extended by one month and advised licensees that they should "prepare to cease all payday loans after August 31, 2001, if the law is not re-enacted." On August 30, 2001, the Commissioner of Banks released a second "Urgent Memo" to "[a]ll check-cashing business licensees now engaged in 'payday lending.'" This memorandum stated in part that "N.C.G.S. § 53-281 will expire on Friday, August 31, 2001, and there is no lawful basis for 'payday lending' without such a law."

53.     The payday lending industry lobbied the General Assembly extensively seeking action from it that would re-enact N.C.G.S. § 53-281 or extend its expiration date to some date after August 31, 2001. However, N.C.G.S. § 53-281 was not re-enacted nor was its expiration date further extended. No other law authorizing payday lending or

15

"delayed deposit" check cashing was enacted, or has since been enacted, in North Carolina.

54.     With the expiration of the law authorizing delayed deposit checks and fees for such arrangements, payday lending came to be unlawful under the North Carolina statutes that had formerly prohibited payday lending.

55.     After the law allowing payday lending expired, some companies sought to evade the law by entering into purported partnerships or "rent-a-charter" arrangements with out-of-state banks. However, these arrangements were found unlawful. *See In re Advance America*, docket no. 05:008:CF (North Carolina Commissioner of Banks, Dec. 22, 2005); *In re Advance America*, case no. 06-CVS-9099 (Wake County Superior Court, March 29, 2010). As a result, payday lenders operating "brick and mortar" stores in North Carolina have closed their stores.

56.     More recently, some companies have sought to evade North Carolina law by offering loans over the internet, either from undisclosed, offshore or other locations that are difficult to locate, or by entering into purported partnerships or "rent-a-tribe" arrangements with Native American tribes. Defendants chose the latter course.

**B. Defendants' Payday Lending in North Carolina.**

57.     Defendants have organized and instituted a sophisticated business enterprise in an effort to evade the fact that payday loans are now illegal under North Carolina law.

58.     Upon information and belief, each of the Western Sky Entities is registered in South Dakota; none are registered in North Carolina; none has a license or registration

16

from the North Carolina Commissioner of Banks to make loans to residents; and both the North Carolina Attorney General and the Federal Trade Commission have received complaints about Defendants' enterprise with regard to their improper lending practices.

59.     Defendants falsely claim to consumers that they are entitled to tribal sovereignty as an Indian-owned business operating "within the exterior boundaries" of the Tribe.

60.     None of the Defendant companies are tribal entities, a fact they have admitted to in their websites and advertisements. For example, Western Sky has held out that it is "owned wholly by an individual Tribal Member of the Cheyenne River Sioux Tribe and is **not** owned or operated by the Cheyenne River Sioux Tribe or any of its political subdivisions." (**Exhibit 5**, website, emphasis added).

61.     Defendants place television advertisements that are seen by North Carolina residents and maintain various websites, in which they offer loans in North Carolina to North Carolina consumers. North Carolina residents are permitted to apply for loans directly through the websites. The websites state that they do not offer loans to consumers in "California, Colorado, Connecticut, Maryland, Missouri, New York, South Dakota, Washington and West Virginia" (**Exhibit 5**) but do not exclude North Carolina, though the loans are unlawful here, as they are, upon information and belief, in some or all of these other states.

62.     The Western Sky Entities have made and continue to make loans to borrowers outside of South Dakota. The Western Sky Entities market loans over the Internet and through television advertising designed to reach potential borrowers who

17

reside off the reservation and outside of South Dakota. The borrowers are not members of the Tribe. All borrowers reside off the reservation and outside of South Dakota. During the entirety of a loan transaction and the entirety of the relationships between borrowers and these companies, the borrowers are located off the reservation and outside of South Dakota. All communications between these companies and borrowers occur via mail or over the telephone or the internet.

63.    In a typical loan transaction, a potential borrower contacts one of the Western Sky Entities over the telephone or the internet to apply. A potential borrower sends his or her application and background information to the company, which then considers the application to determine whether to approve it. Borrowers' decisions are made off the reservation. The approval or denial of a loan application is communicated to a potential borrower over the telephone or the internet. If a potential borrower's application is approved and the borrower accepts the loan, the funds are transferred to the borrower's bank located off the reservation.

64.    When Defendants make withdrawals from borrowers' bank accounts for repayment of loans, those withdrawals are taken from the accounts at banks located off the reservation. If borrowers miss payments or fail to repay their loans, the Defendants may initiate collection procedures off the reservation and outside of South Dakota.

65.    The Defendants in their business enterprise, by running advertisements on media outlets and the internet in North Carolina, soliciting business from and electronically communicating with North Carolina residents, entering into contracts with them and debiting their bank accounts in North Carolina, engaged in conduct off the

18

reservation which is not protected by tribal immunity, as several courts and agencies have

held.[4]

---

[4] Proceedings in which Western Sky and/or CashCall loan enterprises have been shut down or sanctioned and/or alleged to have violated usury law include: **Missouri:** *State of Missouri ex rel. Chris Koster, Attorney General v. Martin A. Webb, aka Butch Webb, et al.*, case no. 4:11-cv-01237-AGF (District of Missouri, remand order dated March 27, 2012, at p. 8 noting that "Webb, as an enrolled member of the Tribe, is not individually entitled to immunity, nor does his membership in the Tribe confer such immunity upon the Lending Companies") (**Exhibit 6**); **Maryland:** *Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC et al.*, no. CFR-FY-2011-182 (Maryland Commissioner of Financial Regulation, cease and desist order dated Feb. 15, 2011, at p. 13 finding that "the Respondents themselves are not entitled to the Cheyenne River Sioux's tribal sovereign immunity") (**Exhibit 7**); *Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC et al.*, case no. 1:11-cv-00735 (District of Maryland, remand order dated Oct. 12, 2011, declining to find complete preemption) (**Exhibit 8**); *Western Sky Financial LLC, et al. v. Maryland Commissioner of Financial Regulation*, case no. 1:11-cv-01256 (District of Maryland, order dismissing declaratory judgment action brought by Western Sky, filed July 31, 2012, at p. 8, noting that courts have found that "Webbs' companies conducted the lending business off-reservation and were, therefore, not protected by reservation immunity") (**Exhibit 9**); *Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC et al.*, case no. CFR-FY2011-182, Opinion and Final Order dated May 22, 2013 (Defendants were Western Sky Financial, Great Sky Finance, Payday Financial, Webb, and others. Court found that "all consumer loans made by the Respondents to Maryland consumers are illegal and unenforceable." Order, p. 2. The Court rejected the argument that Tribal law applied. *Id.* at p. 8. "The fact that his businesses have a physical location on the Reservation is purely incidental to the type of business they transact." *Id.* at p. 10) (**Exhibit 23**); **Colorado:** *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial*, case no. 1:11-cv-887 (District of Colorado, remand order dated Dec. 27, 2011, at p. 4 ("Defendants argue that Congress has completely preempted the regulation of Indian affairs on a reservation. However, even if that were so, it begs the question of whether the conduct of which plaintiffs complain involved regulation of Indian affairs on a reservation. I find and conclude that it did not.") (**Exhibit 10**); *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial*, case no. 11-cv-638 (District Court, Denver County, State of Colorado, order denying motion to dismiss dated April 17, 2012, at p. 7, finding that while Western Sky defendants "assert that they are entitled to rely on this [tribal] immunity … The Court disagrees.") (**Exhibit 11**); *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial*, case no. 11-cv-638 (District Court, Denver County, State of Colorado, order granting plaintiff's motion for summary

19

judgment dated April 15, 2013; Amended Order dated May 23, 2013 (**Exhibit 20**); **West Virginia:** *State of West Virginia ex rel. McGraw v. Payday Loan Resource Center, LLC, et al.,* case no. 10-MISC-372 (Circuit Court of Kanawha County, W. Va., order to enforce the state's investigative subpoena dated Oct. 24, 2011, at p. 10, finding that "Payday Financial, LLC, is not entitled to tribal sovereign immunity or tribal immunity") (**Exhibit 12**); *West Virginia v. CashCall, Inc.,* Case No. 08-C-1964, Trial Court Orders dated Sept. 10, 2012 by Judge Louis Bloom (after bench trial, awarded over $15 million for violations of the West Virginia Consumer Credit Protection Act and other law) (**Exhibits 27-28**); **New Hampshire:** *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc., and WS Funding LLC,* Case No. 12-308, Cease and Desist Order by the State of New Hampshire Banking Department, dated June 4, 2013 ("Western Sky is nothing more than a front to allow CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators." *Id.* at p. 10) (**Exhibit 16**); *In re Impact Cash, LLC,* "Order to Show Cause and Cease and Desist," New Hampshire Banking Department, No. 10-011, dated Sept. 23, 2011 (alleges Webb founded "interconnected business entities" including Impact Cash, LLC, Payday Financial, LLC, a/k/a Lakota Cash, a/k/a Big Sky Cash, a/k/a Big $ky Cash, a/k/a Great Sky Finance, LLC, a/k/a Great Sky Cash, a/k/a GSky, a/k/a Western Sky Financial, LLC, a/k/a Red Stone Financial, LLC, a/k/a Red Stone Cash, a/k/a Management Systems, LLC, a/k/a 24-7 Cash Direct, LLC, a/k/a Financial Solutions, LLC, a/k/a PDL Ventures d/b/a Spot on Loans, a/k/a High Country Ventures, LLC, a/k/a PDL Technologies, and a/k/a Red River Ventures, LLC) (**Exhibit 24**); **Massachusetts:** Massachusetts Commissioner of Banks, "Cease Order" dated March 21, 2013, in *In re CashCall, Inc. and WS Funding, LLC,* Docket No. 2013-010 (**Exhibit 17**); **California:** *The People of the State of California v. CashCall, Inc., a California Corporation,* No. BC420115, "Final Judgment and Permanent Injunction," dated August 24, 2009 (**Exhibit 19**); **Georgia:** Attorney General press release dated May 18, 2012 (**Exhibit 21**); **Illinois:** *In re Western Sky Financial, LLC,* No. 13-CC-265, "Cease and Desist Order," dated March 8, 2013, State of Illinois Department of Financial and Professional Regulation, Division of Financial Institutions (**Exhibit 22**); **Oregon:** *In re Western Sky Financial, LLC,* No. I-12-039, before the Director of the Department of Consumer and Business Services for the State of Oregon, Order dated Dec. 13, 2012 ("Western Sky violated ORS 82.010(3)(b) by making loans to Oregon residents at an annual rate of interest exceeding the greater of 12 percent....") (**Exhibit 25**); **Washington State:** Washington Department of Financial Institutions, November 6, 2012 Statement of Charges against Martin Webb d/b/a Western Sky Financial, LLC: Payday Financial, LLC, d/b/a Big Sky Cash; Lakota Cash; Great Sky Finance, LLC, d/b/a Great Sky Cash; Green Billow, LLC, d/b/a Four Seasons Cash; and Red Stone Financial, LLC, d/b/a Red Stone Cash (**Exhibit 26**).

66.  Defendants have regularly engaged in soliciting, making and collecting loans to and from North Carolina consumers, in amounts varying from approximately $300 to $3,000. The loans are payable in monthly installments and have terms ranging from approximately 12 to 84 months. The loans have annual percentage rates ("APRs") of approximately 90% to over 300%.

67.  Defendants maintain a website, www.westernsky.com, in which they offers loans to North Carolina consumers (see **Exhibit 5**). The website shows the following table of loans:

| Loan Product | Borrower Proceeds | Loan Fee | APR | Number of Payments | Payment Amount |
|---|---|---|---|---|---|
| $10,000 | $9,925 | $75 | 89.68% | 84 | $743.49 |
| $5,075 | $5,000 | $75 | 116.73% | 84 | $486.58 |
| $2,600 | $2,525 | $75 | 139.22% | 47 | $294.46 |
| $1,500 | $1,000 | $500 | 234.25% | 24 | $198.19 |
| $850 | $500 | $350 | 342.86% | 12 | $150.72 |

68.  Consumers apply for loans directly through Western Sky's website. As part of obtaining a loan, consumers enter into a purported form loan agreement with Western Sky electronically via the website. This loan agreement is called "Western Sky Consumer Loan Agreement" ("Agreement") (See **Exhibits 1 & 2**). The Agreement is not signed by the customer by hand, nor is it provided to the customer in a printed, paper copy. The Agreement is not signed by the company.

69.  Western Sky disburses the loan's proceeds by electronically depositing the proceeds directly into the consumer's checking or other bank account.

70.     The Agreement recites that the consumer authorizes Western Sky to debit and withdraw electronically funds from the consumer's bank account for the scheduled monthly installments due under the loan. By this authorization, the consumer also purportedly authorizes Western Sky to withdraw electronically other funds from the consumer's account for payment of other additional fees or charges as may be due.

71.     The Agreement purports to subject the consumer to a $29.00 late fee if an installment is not paid within 15 days of its due date, to entitle Western Sky to collect this late fee by electronically debiting the consumer's bank account; and to subject the consumer to a $29.00 insufficient funds fee if any of the payments are returned for insufficient funds.

72.     The version of the Agreement purportedly binding Monica Johnson dated August 17, 2011 states on page one that "[n]either this Agreement nor Lender is subject to the laws of the United States." (**Exhibit 1**, p. 1).

73.     Western Sky's website states that it "is a Native American-owned business operating within the boundaries of the Cheyenne River Sioux Reservation, a sovereign nation located within the United States of America." (**Exhibit 5**). However, upon information and belief, the Tribe is not involved in making these loans. Defendant companies are not tribal entities, although Webb may be a tribal member. None of the Defendants are a federally-recognized Native American tribe; none are a tribal entity or corporation; and none have been created, owned, operated or managed by any federally-recognized Native American tribe.

74. The Tribe has an ordinance process by which a tribal entity can be created. Upon information and belief, the Defendants have not sought nor obtained such process. Defendants have not sought nor obtained certification from the Tribe to become a tribal entity. Upon information and belief, the Tribe does not operate or manage any of the Defendant organizations.

75. Even the payday lending industry has decried "rent-a-tribe" lending as improper. In February 2011, the Community Financial Services Association of America, which represents the payday lending industry, condemned the practice of affiliating with tribes to circumvent state regulation. *See* Press Release, Community Financial Services Association of America, Storefront Payday Lenders Reject Native American Partnerships (Feb. 10, 2011) (**Exhibit 4**).

76. Any provisions contained in the loan contracts for the Defendants that purport to state that the transactions are governed by tribal law are unenforceable because the contracts bear no substantial relationship with any tribe and because application of tribal law would violate and offend North Carolina's legislatively expressed strong public policies against usury and for protection of North Carolina consumers.

77. Western Sky continues to make loans to North Carolina residents.

C. **Involvement of Defendant CashCall.**

78. Upon information and belief, CashCall has advertised consumer loans on television and over the internet including in North Carolina; and North Carolina consumers have applied for loans through the CashCall web site.

23

79.     Upon information and belief, during the loan application process when some consumers have obtained loans from CashCall or other Defendants herein, the consumers' computers were communicating with a server located in California (not on any Indian reservation) owned or operated by CashCall; and this was the case even when loans were purportedly issued by Western Sky.

80.     Upon information and belief, the Western Sky Entities after making loans routinely assign them to CashCall. Upon information and belief, after each Plaintiff herein entered into their loan, Western Sky assigned the loan to CashCall. CashCall has made collection calls and directed other collection efforts to and at North Carolina residents and has filed proofs of claim in bankruptcy proceedings brought by North Carolina residents.

81.     CashCall is not owned or operated by any tribe and is not subject to any tribal immunity.

82.     As found in *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc., and WS Funding LLC*, Case No. 12-308, Cease and Desist Order by the State of New Hampshire Banking Department, dated June 4, 2013 (**Exhibit 16**), "Western Sky is nothing more than a front to allow CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators." *Id.* at p. 10.

83.     CashCall provides the website hosting services for Western Sky Financial, LLC. (See Order, Ex. 16, at p. 3).

84.     CashCall reimburses Western Sky for costs associated with the server.  (See Order, Ex. 16, at p. 3).

85.     CashCall reimburses Western Sky for its office, personnel and postage. (See Order, Ex. 16, at p. 3).

86.     CashCall provides Western Sky with a toll-free number and fax number and provides an array of marketing services including TV and radio and internet ads. (See Order, Ex. 16, at p. 3).

87.     CashCall reviews loan applications to the "Western Sky" website. (See Order, Ex. 16, at p. 3).

88.     CashCall funds a reserve account for Western Sky from which Western Sky ostensibly funds the loans. (See Order, Ex. 16, at p. 3).

**D.  Facts Regarding Loans to the Named Plaintiffs.**

89.     On or about July 5, 2012, Plaintiff Thomas Brown, who was in a situation of economic duress and hardship, was loaned $2,600 by Defendants. (See **Exhibit 2**). Defendants retained $75 of that amount as a "Prepaid Finance Charge/Origination Fee," so that the amount actually sent to Plaintiff was $2,525.  In return, Plaintiff was to make 48 monthly payments at a nominal APR of 139% / effective APR of 273%, resulting in total payments of $14,102.87, more than five times the amount borrowed.

90.     Plaintiff Brown informed Defendants when he initially spoke with them that he only wanted to borrow about $1,500.  Nevertheless, Defendants sent $2,525. When Plaintiff complained that Defendants loaned more than he wanted, Defendants told him to just send back $1,000.  He did so.  Plaintiff received no statement acknowledging

25

the repayment or modifying his repayment schedule and was sent no new contract reflecting the new agreed-upon terms for a loan of $1,500.

91.     Plaintiff Brown is a United States Army veteran. He was injured while in service and is now disabled. He lives on a fixed income that he receives because of his disability. Attempting to pay the subject loan has severely impaired his ability to manage his personal finances and he has had to forego necessities such as healthy food and home utilities in order to try to make payments.

92.     Plaintiff Brown intended to pay off the entire loan after one month, but consistent with Defendant's business model, he was unable to do so and for a significant length of time was trapped into making payments of nearly $300 per month that he could not afford on his income.

93.     Mr. Brown's military disability income is direct-deposited into his bank account.   On one or more occasions, Defendants Western Sky and/or Cashcall automatically debited loan payments from his bank account.

94.     On or about August 17, 2011, Plaintiff Monica Johnson was loaned $2,600 by Defendants. (See loan agreement at **Exhibit 1**).  Defendants retained $75 of that amount as a "Prepaid Finance Charge/Origination Fee," so that the amount actually sent to Plaintiff was $2,525.  In return, Plaintiff was to make 48 monthly payments at a nominal APR of 139% / effective APR of 273%, resulting in total payments to Defendants of $13,985.87, more than five times the amount borrowed.

95.     The $75 "Prepaid Finance Charge[s]/Origination Fee[s]" that were charged for making these loans were illegal pursuant to N.C.G.S. § 53-176(b).

96. It is the paramount public policy of North Carolina to forbid and criminalize the making of loans of less than $10,000 principal at interest rates that violate the provisions of North Carolina General Statutes Chapters 24 and 53. Payday loans frequently trap low-income borrowers in a cycle of debt which can devastate their finances for years, impairing borrowers' ability to support themselves and repay other, non-predatory lenders. Payday loans to military personnel and their families create financial hardship and exhaust resources that could be better allocated elsewhere, and have a negative impact on military readiness. *See* **Exhibit 3**, letter from Admiral Steve Abbott, Navy-Marine Corps Reserve Society.

97. Making a loan of less than $3,000 principal at an interest rate greater than 36% on the first $600 plus 15% on the remainder (i.e., in violation of the CFA) is a criminal act in North Carolina. "Any person [...] who [...] violates any of the provisions of this Article [...] shall be guilty of a Class 1 misdemeanor." N.C.G.S. § 53-166(c).

98. Because both the nominal APR and effective APR of these loans substantially exceeded 36%, there is no need to consider whether the CFA refers to nominal or effective APR.

99. Under the CFA, payday lenders may not recover the principal amount of a payday loan. "[T]he licensee or any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan." N.C.G.S. § 53-166(d). North Carolina law further prohibits "any person who seeks to avoid [the CFA's] application by any device, subterfuge, or pretense whatsoever." N.C.G.S. § 53-166(b).

27

100.    North Carolina law explicitly states that the foregoing CFA and consumer credit provisions are applicable to any lender who comes into this state to solicit or otherwise conduct activities, N.C.G.S. § 53-190(b), and forbids enforcement of any noncomplying loan contract made outside this State. N.C.G.S. § 53-190(a) ("No loan contract made outside this State in the amount or of the value of ten thousand dollars ($10,000) or less, for which greater consideration or charges than are authorized by Gen. Stat. 53-173 and Gen. Stat. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State.").

101.    N.C.G.S. § 24-1.1, the usury statute, limits interest rates on small loans to rates less than what Defendants charged. In addition, N.C.G.S. § 24-2.1 provides:

> "[...] (b) Any solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State, shall be deemed to be an offer or agreement to lend in this State.
>
> (c) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.
>
> [...]
>
> (g) It is the **paramount** public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws. Any provision of this section which acts to interfere in the attainment of that public policy shall be of no effect."

(emphasis added). Regardless of the recitations in the Agreement regarding the situs and governing law, these contracts are deemed to be made in North Carolina.

102.    In an attempt to avoid liability, Defendants send paperwork to borrowers that contain multiple recitations that the loans are made "as if" the borrower "were

28

physically present within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation; and that this Loan Agreement is fully performed within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation." (**Exhibit 2**, p. 1). These recitations are pretenses. Nowhere in North Carolina falls within any boundary of the Cheyenne River Indian Reservation. Defendants cannot avoid liability for making criminal loans in North Carolina by mandating borrowers' assent to a fiction that the loans were made outside North Carolina.

103. Because the statement that the loan takes place on the reservation is included in boilerplate text that is forced on borrowers by Defendants, who are parties of vastly superior bargaining power and knowledge, as evidenced by the extremely unfavorable terms of these "VERY HIGH INTEREST RATE" loans, it is an unconscionable contract of adhesion and therefore unenforceable. *See* **Exhibit 2**, p. 4.

104. Because the statement that the loan takes place on the reservation is a "device, subterfuge, or pretense" whereby Defendants seek to avoid application of the CFA, it is unenforceable per N.C.G.S. § 53-166.

105. Because the statement that the loan takes place on the reservation would, if enforced, effectively constitute the class members' consent to become victims of a crime, it is void as against public policy.

106. In an attempt to avoid liability for making criminal payday loans in North Carolina, the loan agreements contain choice of law provisions which recite that the contract shall be governed by the laws of the Tribe and that no law of the United States or

29

any State shall apply. Defendants cannot avoid liability for making criminal loans by mandating borrowers' agreement that North Carolina law shall not apply to the criminal transaction.

107. Because the choice of law provision is included in boilerplate text forced on borrowers by Defendants, who are parties of vastly superior bargaining power and knowledge, it is an unconscionable provision of a contract of adhesion and therefore unenforceable.

108. Because the choice of law provision is a "device, subterfuge, or pretense" whereby Defendants seek to avoid application of the CFA, it is unenforceable per N.C.G.S. § 53-166. Because the choice of law provision would, if enforced, effectively constitute the class members' consent to become victims of a crime, it is void as against public policy.

### FIRST CLAIM FOR RELIEF: CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF FINDING THAT THE ARBITRATION CLAUSE IS UNENFORCEABLE

109. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

110. Pursuant to 28 U.S.C. § 2201, in a case of actual controversy, this Court may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

111. Plaintiff Monica Johnson's arbitration agreement is part of her loan agreement dated August 17, 2011. (**Exhibit 2**). At page one of the Johnson Agreement, it states that "[n]either this Agreement nor Lender is subject to the laws of the United

States" and accordingly Defendants should be deemed barred and estopped from any attempt to rely on the FAA as a basis for requiring arbitration.

112.     Plaintiff Johnson's agreement purports to state that it is governed by the "laws of the Cheyenne River Sioux Tribe." (**Exhibit 2**, p. 4). The undersigned has researched that law. The law of the Tribe is not readily available to a consumer.

113.     After considerable effort, the undersigned located what purports to be the "Cheyenne River Sioux Tribe Commercial Code" dated February 5, 1997, however, it does not appear to contain any law governing small loans or governing arbitration or any consumer dispute rules. (**Exhibit 13**, excerpts).

114.     The undersigned also located what purports to be the "South Dakota Tribal Court Handbook" dated revised March 2006, however, it does not appear to contain any law governing small loans or governing arbitration or any consumer dispute rules. (**Exhibit 14**, excerpts). This document states, inconsistently with Defendants' assertions, that "the Cheyenne River Sioux Tribal Code asserts jurisdiction over all actions where the persons are present or residing within the boundaries of the Cheyenne River Sioux Reservation" (p. 18); "The tribal courts shall have jurisdiction over claims and disputes arising on the reservation," (id.); and as to "subject matter jurisdiction," that "The Cheyenne River Sioux Tribal Code asserts jurisdiction over all civil claims arising on the reservation." (p. 19).  The claims herein did not arise "on the reservation." The arbitration agreement fails because the Tribal Nation lack jurisdiction.

115.     The undersigned also located a "Law and Order Code, Cheyenne River Sioux Tribe, 1978 Revision." However, it does not appear to contain any law governing

31

small loans or governing arbitration or any consumer dispute rules. (**Exhibit 15**, excerpts).

116. The purported arbitration agreement is captioned, "WAIVER OF JURY TRIAL AND ARBITRATION." However, rather than constituting a "waiver" of arbitration, the agreements go on to purport to impose arbitration in unenforceable provisions.

117. Ms. Johnson's arbitration agreement in the paragraph entitled, "Arbitration Defined," defines "Dispute" broadly to include, *inter alia*, "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement."

118. Ms. Johnson's arbitration agreement states, in part:

> "**Agreement to Arbitrate**. You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement."

119. Upon information and belief, the purported arbitration facility of the Cheyenne River Sioux Tribal Nation is not a real arbitration organization but a sham.

120. Upon information and belief, the Cheyenne River Sioux Tribal Nation has no "consumer dispute rules." After research was conducted, no Tribal Nation arbitration or consumer dispute rules have been located.

121. The Cheyenne River Sioux Tribal Nation is a biased and improper arbitral forum.

122. Defendants have contended that the tribe and the reservation benefit financially from Defendants' payday lending operations, making it a biased arbitrator.

32

123. Defendants do not make their loans to tribal members or to South Dakota residents, but rather to consumers who are not members of the Tribal Nation and are located far from South Dakota.

124. Ms. Johnson's arbitration agreement further states, in part:

> "**Choice of Arbitrator** .... Arbitration shall be conducted in the Cheyenne River Sioux Tribal Nation by a panel of three Tribal Elders and shall be conducted in accordance with the Cheyenne River Sioux Tribal Nation's consumer dispute rules and the terms of this agreement."

125. The arbitration agreement thus impermissibly seeks to limit the choice of the arbitrator to Native American members of the Tribe, a race-based selection which is unlawful.

126. It is impossible for an ordinary consumer to reasonably access and locate the purported consumer rules, arbitration rules or other purportedly applicable laws of the Tribe.

127. The arbitration clause seeks to deter claims by including a "loser pays" attorney fee provision. (**Exhibit 1**, page 4). In addition, the agreement purports to provide that the consumer must pay Western Sky's attorney fees incurred in collecting on the debt. (**Exhibit 1**, p. 2).

128. The arbitration agreement is one-sided in purporting to offer a "small claims exception" which as a practical matter only Defendants can use. The small claims exception purportedly allows either party to bring a small claim action in the "Cheyenne River Sioux Small Claims Court." (**Exhibit 1**, p. 4). Western Sky is situated in South Dakota and can readily use this Court (assuming it exists) but a North Carolina consumer

33

cannot without great expense and inconvenience. Further, the "Law and Order Code" does not reflect the existence of a small claims court in its "Courts Established" provisions. (**Exhibit 15**, pp. 1-2).

129.     The agreement nowhere recites the FAA or that it is governed by the FAA. To the contrary, it is repeatedly stated that "federal law does not apply to this Agreement." (**Exhibit** 1, p. 2).

130.     Upon information and belief, Defendants subsequently modified the arbitration agreement because of the illegality of the above provisions particularly in their purporting to limit the arbitrator to "Tribal Elders." Plaintiff Mr. Brown, whose loan Agreement is dated July 5, 2012, received the revised version of the arbitration agreement. (**Exhibit 2**).

131.     In purporting to revise the arbitration agreement, Defendants created a fatal contradiction since Defendant in one section left in the statement that arbitration of any dispute would be conducted by the purported arbitration facility of the Cheyenne River Sioux Tribal Nation, but then in another section purported to change the agreement to require arbitration before the American Arbitration Association, JAMS, or a party-agreed arbitrator.

132.     In the purported arbitration agreement for Mr. Brown, the paragraph entitled, "Arbitration Defined," defines "Dispute" as a defined term broadly to include, *inter alia*, "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement."

34

133. In the paragraph entitled, "Agreement to Arbitrate," the arbitration agreement for Mr. Brown states that "You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." This provision is unenforceable for the same reasons as for Ms. Johnson.

134. Another paragraph in the arbitration agreement, entitled "Choice of Arbitrator," states that "you shall have the right to select any of the following arbitration organizations to administer the arbitration" and lists AAA, JAMS, or an arbitration organization agreed to by the parties. The purported arbitration provision is self-contradictory in that in one place it states that the Tribal Nation is the arbitrator, while in another place it states that the arbitrator shall be AAA, JAMS, or an arbitrator agreed on by the parties.

135. The arbitration agreement further states that "[t]he validity, effect and enforceability of this waiver of class action lawsuit and class wide Arbitration is to be determined solely by a court of competent jurisdiction located within the Cheyenne Rivers Sioux Tribal Nation, and not by the arbitrator." This provision contradicts the earlier provisions that define "Dispute" to include "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement" and state that a Tribal Nation arbitrator must hear the dispute.

136. There is also a purported "Small Claims Exception" which specifies as the forum, the "Cheyenne River Sioux Tribal Small Claims Court." Thus the agreement has

35

specified six (6) different purported forums in which to resolve controversies: (1) arbitration by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules; (2) AAA; (3) JAMS; (4) an arbitration organization agreed on by the parties; (5) a court of competent jurisdiction located within the Cheyenne Rivers Sioux Tribal Nation; and (6) the Cheyenne River Sioux Tribal Small Claims Court.

137. Based on the above fatal defects in the arbitration provision, the parties to the agreement failed to have a meeting of the minds and the Court should declare the arbitration agreement to be unenforceable and unconscionable.

138. Neither Plaintiff signed any contract with Defendants with any actual handwritten signature.

139. A review of the bankruptcy court dockets in North Carolina reveals that Cashcall has brought numerous purported claims in consumer bankruptcies across the State, and that indeed, usurious debts claimed by Defendants have led North Carolina consumers to have to declare bankruptcy. As of the date of this action, according to PACER records, Cashcall has filed approximately 105 proofs of claim in bankruptcy cases filed in the Eastern District of North Carolina Bankruptcy Court and 7 in the Western District of North Carolina Bankruptcy Court.

140. Cashcall is not a party to the loan agreements or the arbitration agreements and should not be entitled to claim any right to require individual arbitration.

141. The purported arbitration agreement is one-sided and unconscionable in that Cashcall may avail itself of recourse including automatic debits of class member

36

bank accounts and the filing of bankruptcy proofs of claim, while class members are blocked from recourse by the arbitration clause.

142. The arbitration clause would, if enforced, deprive borrowers of the ability to pursue the claims enumerated herein against Defendants because the individual amounts in controversy are too small to warrant any one class member paying an attorney for representation, the claims are too complex for class members to successfully present their claims in a *pro se* case, and because the arbitration agreement would purport to require a North Carolina consumer to travel to South Dakota to arbitrate the controversy.

143. Defendants cannot avoid and exculpate themselves from liability for making criminal loans in North Carolina by mandating that borrowers agree that disputes under the loan contract will be resolved in individual arbitration.

144. The arbitration clause is included in a set of terms which Defendants present to borrowers. Defendants require that borrowers agree to all of the terms. Borrowers cannot negotiate the terms. Defendants are parties of vastly superior bargaining power and knowledge.

145. The Defendants seek, via the arbitration clause, to block Plaintiffs' access to a just forum for the resolution of disputes. The arbitration clause is an unconscionable provision of a contract of adhesion and therefore unenforceable.

146. Because the arbitration clause is a "device, subterfuge, or pretense" whereby Defendants seek to avoid application of the CFA, it is unenforceable per N.C.G.S. § 53-166. Because the arbitration clause would, if enforced, effectively

constitute the class members' consent to become victims of a crime, it is void as against public policy.

147. Under North Carolina law, a consumer lender in violation of the CFA has the obligation to disclose that its loans violate the Consumer Finance Act.[5]

148. If the lender has the obligation to disclose "this loan is a violation of the Consumer Finance Act," then the lender must also have a duty to disclose that the arbitration proceeding called for by this arbitration agreement will be ineffective in connection with a claim for violation of the CFA. This duty of disclosure relates specifically to the arbitration clause. North Carolina law requires consumer lenders to disclose CFA violations, and only by Defendants disclosing the violation would the borrower know what it is that the arbitration proceeding would concern. A duty to disclose arises also from Defendants' false statements in the agreement that somehow, no state or federal law whatsoever applies to the agreement and other false representations in the agreement.

149. Plaintiff Brown's purported arbitration agreement is also unenforceable because the contractual agreement that Plaintiff actually entered into with Defendants was for a loan in the amount of only $1,500, however this loan was only agreed to orally and never documented in any written agreement containing any arbitration clause.

---

[5] *Odell v. Legal Bucks, LLC*, 192 N.C. App. 298, 319-20, 665 S.E.2d 767, 781 (2008); *State ex rel. Cooper v. NCCS Loans, Inc.*, 174 N.C. App. 630, 641, 624 S.E.2d 371, 378 (2005).

38

150. The arbitration, choice of law and forum selection clauses in the purported loan agreement are also invalid because Defendants have misused the dispute resolution process against customers.

151. CashCall has used illegal and abusive dispute resolution practices which include excessive and verbally abusive phone calls at all hours, causing borrowers in incur bank fees by trying to collect repeatedly even while know the consumer did not have the funds in the bank, threatening to call the police and garnish wages without basis to do so, discussing private financial information with consumer's friends and co-workers, and failing to cancel automatic withdrawals once the consumer had made the request. (*See The People of the State of California v. CashCall, Inc., a California Corporation*, No. BC420115, "Final Judgment and Permanent Injunction," dated August 24, 2009, **Exhibit 19**).

152. Western Sky has used abusive dispute resolution practices which include contacting consumers' employers and telling them it had the right to garnish the customer's wages, even though this was false, and by continuing to try to collect on loans after cease and desist orders were entered. (*See Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC et al.*, case no. CFR-FY2011-182, Opinion and Final Order dated May 22, 2013, **Exhibit 23**).

153. CashCall has also misused the dispute resolution process by setting up an ostensibly separate debt collection company, Delbert Services Corporation, which in fact Reddam owns and which has been found to be "conducting its business in an unsafe and unsound manner." (*See* Massachusetts Commissioner of Banks, "Cease Order" dated

39

March 21, 2013, *In re CashCall, Inc. and WS Funding, LLC*, Docket No. 2013-010, **Exhibit 17**).

154.    Defendants' arbitration, choice of law and forum selection clauses in the purported loan agreement are also invalid because Western Sky is nothing more than a "front" for CashCall. (*See In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc., and WS Funding LLC*, Case No. 12-308, Cease and Desist Order by the State of New Hampshire Banking Department, dated June 4, 2013, **Exhibit 16**).

155.    CashCall has abused its purported rights under arbitration clauses in other of its payday loan agreements in the past by threatening customers with arbitration, sending written threats that it was going to or had started an arbitration against customers, making "false threats of arbitration," and making threats of litigation which were in bad faith since ostensibly under the arbitration clause the parties were supposed to arbitrate not litigate. (*See West Virginia v. CashCall, Inc.*, Case No. 08-C-1964, Trial Court Order #1 dated Sept. 10, 2012, **Exhibit 27**).

156.    After the FTC sued Western Sky alleging they were sending false garnishment papers on customers and their employers, Western Sky became bound by an order to stop the conduct. *See* Stipulated Preliminary Injunction, in *Federal Trade Commission v. Payday Financial, LLC*, Case 3:11-cv-03017-RAL, filed Sept. 7, 2011. The Preliminary Injunction enjoined them from misrepresenting that they could garnish consumers' wages. *Id.*, p. 5. This is additional evidence why the arbitration clause should be voided since it demonstrates how Western Sky was using the small claims court provision in the agreement to carry out false garnishment procedures.

40

157.    To date, Plaintiffs are only aware of one (1) arbitration involving one of the Western Sky/CashCall loans.    This arbitration concerns Abraham Inetianbor, who received a loan from them in Florida.  Upon information and belief:

A.    In his matter, CashCall, working through Webb, approached Tribal member Mr. Robert Chasing Hawk to be the arbitrator.  Mr. Inetianbor states that he never agreed with CashCall for Mr. Chasing Hawk to be the arbitrator.

B.    Mr. Inetianbor asked CashCall how much they are paying Mr. Chasing Hawk to be the arbitrator.  They would not tell him.  They have also not sent him a copy of the contract they have with Mr. Chasing Hawk.

C.    Mr. Inetianbor found out that Mr. Chasing Hawk's daughter works for Western Sky.  Mr. Chasing Hawk had previously said in a May 1, 2013 letter that he had no prior connection to the parties.

D.    The May 1 letter was ghostwritten for Mr. Chasing Hawk to pretend was his own. The way Mr. Inetianbor found out was because Mr. Chasing Hawk emailed him the letter but when Mr. Inetianbor clicked to open the letter, it was not signed.  It was simply a Microsoft Word document.  Then Mr. Inetianbor noticed that Mr. Chasing Hawk was actually forwarding Mr. Inetianbor an email that someone at a Lakota Cash email address had sent to Mr. Chasing Hawk. (**Exhibit 29**).  Mr. Chasing Hawk has admitted that Tawny Lawrence wrote the letter. Ms. Lawrence works for Western Sky as a manager. (**Exhibit 30**).

E.    Neither CashCall nor Mr. Chasing Hawk has provided Mr. Inetianbor with any rules that are supposedly governing his arbitration.  Mr. Inetianbor's loan agreement says the tribe's "consumer dispute rules" apply. (**Exhibit 31**).  There are no such rules.

F.    Mr. Inetianbor sued CashCall for false information on his credit report.  However, the demand CashCall sent to the arbitrator claims that he still owes CashCall more money.  (**Exhibit 32**).  CashCall has not informed Mr. Inetianbor or the arbitrator that under Florida law, the loan is illegal and void.

G.    The amount of money the company sent Mr. Inetianbor for the loan came to $2,525.00 (loan amount of $2,600 minus "fee" of $75). By December 2011, Mr. Inetianbor had paid back more than the amount they loaned. He paid back $3,252.65 on the loan.

H. A "preliminary hearing" in Mr. Inetianbor's arbitration occurred by telephone on Friday, June 21, 2013. Mr. Inetianbor with the arbitrator's consent tape-recorded the hearing and Mr. Chasing Hawk said he tape-recorded it as well. The contents of this hearing raise numerous concerns regarding the proceedings.

158. For the various reasons enumerated herein, Plaintiffs and class members are entitled to entry of an Order declaring that the arbitration clause contained in the Agreement is unenforceable.

## SECOND CLAIM FOR RELIEF: VIOLATION OF THE CONSUMER FINANCE ACT

159. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

160. N.C.G.S. § 53-166(a) prohibits persons from being engaged in the "business of lending" loans of less than $10,000 except pursuant to a license issued by the North Carolina Commissioner of Banks, and except as permitted by N.C.G.S. § 53-164, *et seq.* Defendants have been engaged in the "business of lending" within the meaning of N.C.G.S. § 53-166(a). They have offered and made loans of less than $10,000 to persons in North Carolina via their websites.

161. Pursuant to N.C.G.S. § 24-2.1(b) and (c), Defendants' payday loans to persons in North Carolina are deemed to have been made in North Carolina.

162. Defendants have not been licensed by the North Carolina Commissioner of Banks. In the course of making loans to Plaintiffs and members of the class, Defendants repeatedly made loans at interest rates that exceed the rate of interest they would be permitted by law to charge if they were licensed by the North Carolina Commissioner of Banks.

163. N.C.G.S. § 53-166(b) is titled "Evasions" and provides: "The provisions of subsection (a) of this section shall apply to any person who seeks to avoid its application by any device, subterfuge or pretense whatsoever."

164. Defendants have sought to avoid the application of N.C.G.S. § 53-166(a) and the CFA by falsely representing to borrowers that the loans are legal and are made on an Indian reservation, and by inserting an unenforceable arbitration clause.

165. Plaintiffs and the members of the class have been damaged by these violations of N.C.G.S. § 53-164, *et seq.* in that Defendants charged illegal fees and interest rates and otherwise violated CFA. Persons in violation of N.C.G.S. § 53-164, *et seq.* may not retain "any principal or charges whatsoever with respect to such loan."

166. Pursuant to N.C.G.S. § 24-2.1, contracts in violation of North Carolina interest rate laws made to borrowers in North Carolina are deemed made in North Carolina, regardless of the purported situs of formation. Lending contracts in violation of the CFA, regardless of purported situs of formation, are unenforceable in North Carolina.

167. N.C.G.S. § 53-190(a) provides that "[n]o loan contract made outside this State in the amount or of the value of ten thousand dollars ($10,000) or less, for which greater consideration or charges than are authorized by G.S. 53-173 and G.S. 53-176 of this Article have been charged, contracted for, or received, shall be enforced in this State." Defendants made loans to Plaintiffs and class members of less than $10,000 at interest rates and fees greater than authorized by the CFA.

168. N.C.G.S. § 53-190(b) provides that "[i]f any lender or agent of a lender who makes loan contracts outside this State in the amount or of the value of ten thousand

43

dollars ($10,000) or less, comes into this State to solicit or otherwise conduct activities in regard to such loan contracts, then such lender shall be subject to the requirements of this Article." Defendants advertised and solicited their payday loans in North Carolina, made payday loan contracts with persons in North Carolina, sent loaned funds to North Carolina bank accounts, and otherwise came into North Carolina and conducted activities here in regard to their payday loans.

169. Plaintiffs and class members owe no money to Defendants. The payday lending contracts described herein are void. Defendants cannot collect in this State any debt alleged upon the payday lending contracts described herein.

170. Plaintiffs and the members of the class are entitled pursuant to N.C.G.S. § 1-253, to declaratory relief with regard to the payday loan transactions. Plaintiffs and the members of the class are further entitled to and request an injunction, barring Defendants from continuing to operate in violation of N.C.G.S. § 53-164, *et seq.*

171. Plaintiffs and the members of the class are entitled to recover all amounts which were received by Defendants in connection with transactions in North Carolina during the class period pursuant to N.C.G.S. § 53-166(d)'s provision that any party in violation "shall have no right to collect, receive or retain any principal or charges whatsoever with respect to such loan."

### THIRD CLAIM FOR RELIEF: USURY

172. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

44

173.   Defendants engaged in efforts to circumvent and evade the laws forbidding usury in North Carolina.  Defendants are subject to Chapter 24 of the North Carolina General Statutes, and charged interest at rates in excess of the maximum rate permitted by Chapter 24 of the North Carolina General Statutes.

174.   The subject loans were extensions of credit deemed to have been made in this State pursuant to N.C.G.S. § 24-2.1. Defendant exceeded the maximum interest rate allowed by N.C.G.S. § 24-1.1.  Under N.C.G.S. § 24-2.1 Defendants entered into, or caused others to enter into, loans of money, with an understanding that the money loaned shall be returned, with payment or an agreement to pay, a greater rate of interest than that allowed by law, and with a corrupt intent to take more than the legal rate for the use of the money loaned.  Therefore Plaintiffs and class members are entitled to recover back twice the amount of interest paid and   forfeiture of the entire interest.

175.   Plaintiff and the members of the class are entitled to recover from Defendants twice the amount of interest paid on all payday loans made by them, and to a release from any further obligation to make payments on those loans.

### FOURTH CLAIM FOR RELIEF: UNFAIR AND DECEPTIVE TRADE PRACTICES

176.   Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

*177.*   Defendants' business operations in North Carolina are contrary to the public policy of North Carolina, are substantially injurious to consumers, and constitute unfair trade practices under the UDTPA, N.C.G.S. § 75-1.1 *et seq.*

178.   Defendants' unfair and deceptive practices have included:

a. Making illegal payday loans;

b. Requiring that consumers provide bank account details as security for, or as the basis for obtaining a payday loan;

c. Soliciting customers to obtain a payday loan, knowing they are not in a financial position to repay the loan; and

d. Engaging in violations of the specific consumer protection statutes alleged elsewhere herein, the violations of which constitute unfair trade practices.

179. With the sunset of N.C.G.S. § 53-281, payday lending is no longer authorized under North Carolina law, and this business is contrary to North Carolina's public policy.

180. Defendants violated North Carolina consumer protection statutes including N.C.G.S. § 53-164, *et seq.* (CFA), and § 24-1, *et seq.* (usury); and such violations constitute violations of § 75-1.1.

181. Plaintiffs and members of the class have been damaged by these violations of the UDTPA. They were charged fees that were impermissible and are subject to refund.

182. Defendants willfully caused the transactions hereinabove described to take place in North Carolina. Such transactions occur and have occurred in commerce in North Carolina.

183. Defendants, by failing to disclose the illegal nature of the payday loans they were making, engaged in deceptive transactions with Plaintiffs and Class members. Defendants' representations that the payday loans are legal, that no United States state or

46

federal law applies, and that they are made within the boundaries of an Indian reservation are deceptive.

184. Plaintiffs and the members of the class are entitled to recover from Defendants actual damages, all fees or interest paid in connection with transactions in North Carolina during the class period, treble damages and attorneys' fees.

## FIFTH CLAIM FOR RELIEF: UNJUST ENRICHMENT, RESCISSION AND RESTITUTION

185. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

186. Defendants engaged in unconscionable transactions and/or contracts in violation of public policy, void *ab initio* or voidable at the consumer's option, and/or unenforceable.

187. Plaintiffs provided a benefit to the Defendants in the form of loan payments, Defendants have retained the benefit unlawfully and have been unjustly enriched, and Defendants are obligated to refund any monies obtained from the Plaintiffs.

188. Because the loan agreements are void under the law, including under the general law of unconscionability, and under the law of North Carolina and other states that deem usurious and unlicensed loans void, Defendants are obligated to refund all monies they have received.

189. Defendants were unjustly enriched through their unlawful practices and class members are entitled to restitution and other equitable relief.

47

## SIXTH CLAIM FOR RELIEF: ALTER EGO LIABILITY
## AND INDIVIDUAL LIABILITY OF WEBB AND REDDAM

190. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

191. Defendant Webb, at all pertinent times has been the organizer, owner, and manager of the Western Sky Entities. Webb and Reddam have dominated and controlled the Western Sky Entities and Webb and Reddam had sole control over whether the Western Sky Entities engaged in payday lending in North Carolina and other States. Webb exercised complete dominion and control over the Western Sky Entities which were among other things used as a "front" for CashCall and Reddam. Reddam exercised complete dominion and control over the CashCall Entities.

192. All of the Western Sky Entities' actions in connection with the loans to Plaintiffs and class members were taken pursuant to the express authorization and direction of defendant Webb, the companies' chief executive and/or owner, and/or Reddam, who used Webb and the Western Sky Entities as a front to engage in illegal internet lending in North Carolina and in other States. Webb and Reddam specifically decided that Western Sky would make loans to people in North Carolina and other states at usurious interest rates. As a direct and proximate result of Mr. Webb's and Mr. Reddam's supervisory actions and decisions, Western Sky made usurious loans to Plaintiffs and class members.

193. Webb has testified that he is personally and directly involved in all aspects of the business of his companies, including analysis daily of cost, of charge-off figures, collection figures, phone calls made, infrastructure, buildings, internet, telephones, IT,

48

dealing with employees and supervisors, procedure, policy, underwriting, default rates, advertising, and other activities reflecting his dominance and control of the Western Sky Entities. He has testified that he personally has final say over all hiring and firing, and that he has reviewed consumer complaints. Western Sky Entity employees including Megan Swan have testified under oath that Webb is the ultimate supervisor of their work.

194. Webb is not an official of the Tribe, and Webb does not represent or act on behalf of the Tribe. The Western Sky Entities are all wholly owned by Webb. None of the Companies is chartered by, or an agency of, the Tribe. The Western Sky Entities herein were organized and formed and have been controlled by Webb as for-profit businesses for his personal benefit and not for the benefit of the Tribe or reservation, and the entity Defendants were not formed as nor are they operated as arms of the Tribe.

195. Defendants' enterprise is intentionally fragmented to avoid liability and Defendants operate under a variety of fictitious names. Payday Financial, LLC does business under the fictitious name "Lakota Cash." The name "Lakota Cash" is registered as a fictitious name in South Dakota as belonging to Payday Financial, LLC. Payday Financial, LLC also does business under the fictitious name "Big Sky Cash." The name "Big Sky Cash" is registered as a fictitious name in South Dakota as belonging to Payday Financial, LLC.

196. Upon information and belief, 24 Seven Solution, LLC and 24-7 Cash Direct, LLC were organized by Payday Financial, LLC, and Webb is the manager and registered agent for both entities. Upon information and belief, Great Sky Finance, LLC

49

was organized by Payday Financial, LLC. Webb is the manager and registered agent for Great Sky Finance, LLC.

197. Upon information and belief, Financial Solutions, LLC was organized by Webb. Webb is the manager and registered agent for Financial Solutions, LLC. Financial Solutions, LLC does business under the fictitious name "Lakota Cash."

198. Upon information and belief, High Country Ventures, LLC was organized by Payday Financial, LLC. Webb is the manager and registered agent for High Country Ventures, LLC. Upon information and belief, Management Systems, LLC was organized by Payday Financial, LLC. Webb is the manager and registered agent for Management Systems, LLC.

199. During some or all of the pertinent times, Management Systems, LLC provided accounting and payroll services for the other entity Defendants herein, including Western Sky, Financial Solutions, LLC, Payday Financial, LLC, Great Sky Finance, LLC, Red Stone Financial, LLC and Green Billow, LLC. Upon information and belief, the name "GSky" is registered as a fictitious name in South Dakota as belonging to Management Systems, LLC.

200. Upon information and belief, Red River Ventures, LLC was organized by Payday Financial, LLC. Webb is the manager and registered agent for Red River Ventures, LLC. Upon information and belief, Red Stone Financial, LLC was organized by Payday Financial, LLC. Webb is the manager and registered agent for Red Stone Financial, LLC.

50

201. Upon information and belief, Western Capital, LLC was organized by Webb and another individual named John Templer, of Palmer, Texas. Webb is the manager and registered agent of Western Capital, LLC. Upon information and belief, Western Sky was organized by Payday Financial, LLC. Webb is the manager and registered agent of Western Sky.

202. Upon information and belief, the funds of the Western Sky Entities and Webb were commingled. Some or all of the Western Sky entities shared the same physical address and had overlapping owners, organizers, officers and/or directors.

203. The numerous Western Sky Entities are excessively fragmented; so many different business entities are not necessary to engage in the business of making payday loans. Upon information and belief, Defendant Webb fragmented the Western Sky Entities in an attempt to avoid liability, and the business entity Defendants are undercapitalized. The Western Sky Entities should be deemed alter egos of each other and of Webb.

204. Defendant Webb is personally liable for the payday lending activities of the Western Sky Entities due to his direct personal involvement in the business enterprise and/or on alter ego grounds. The purportedly separate corporate form of the Western Sky Entities should be disregarded and the companies should be deemed alter egos of each other and of Webb and Defendants should be held jointly and severally liable. Further, Reddam used Webb and the Western Sky Entities as a front for Reddam and CashCall's internet lending business. Western Sky and Webb should be deemed mere instrumentalities used by Reddam for his internet lending enterprise.

## SEVENTH CLAIM FOR RELIEF: FRAUDULENT CONVEYANCE

205. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

206. Upon information and belief, Defendant Webb and/or entities under his control, and Defendant Reddam and/or entities under his control, have received funds from the operations of the enterprise in North Carolina. The Defendants are liable for the return of all such funds.

207. Such liability arises under the Uniform Fraudulent Transfer Act, N.C.G.S. § 39-23.1 *et seq.*, and because defendants are "part[ies] in violation" under N.C.G.S. § 53-166(d), which provides that "any other party in violation shall have no right to collect, receive or retain any principal or charges whatsoever with respect to such loan." The "violation" by the Defendants arises from their control over, participation in, direction of and implementation of the acts and actions described in this complaint.

208. Liability also arises because funds transferred to or through the Defendants, and/or entities under their control, constitute transfers made during a time at which the entities operating or purporting to operate were "insolvent" within the meaning of that term as used in N.C.G.S. § 39-23.2, after taking into consideration the amount of the liability represented by the duty to make refunds to customers. Defendants and/or entities under their control, have received transfers of funds that constitute "fraudulent transfers" under N.C.G.S. § 39-23.5(a) and did not provide reasonably equivalent value in exchange for such transfers. Plaintiffs are creditors of the individuals and/or entities operating or purporting to operate the enterprise whose claims arose prior to such transfers.

52

209. Such transfers were made with the intent to hinder creditors under N.C.G.S. § 39-23.4(a), and that the fragmentation of the enterprise into chains of purportedly separate entities and the transfers of funds among those entities were done with the intent to insulate Defendants against the risk of having to refund to borrowers the funds that had been unlawfully derived.

210. In addition, to the extent transfers by the entities operating or purporting to operate Defendants or entities under their control occurred, Plaintiffs challenge such transfers a preferences under N.C.G.S. § 39-21.5(b).

## EIGHTH CLAIM FOR RELIEF: WRONGFUL ACTS COMMITTED PURSUANT TO CIVIL CONSPIRACY

211. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

212. All Defendants named in this complaint share liability because they entered into a conspiracy to violate North Carolina law and other law by agreeing to perform acts in violation of North Carolina law as hereinabove alleged.

213. Upon information and belief, the Defendants entered into an agreement to do an unlawful act, i.e., engage in unlawful lending in North Carolina and other states, which agreement resulted in injury to the Plaintiffs and class members.

214. The actions hereinabove alleged were taken in furtherance of such conspiracy, and Plaintiffs and class members were injured as a proximate cause thereof.

## NINTH CLAIM FOR RELIEF: TRUTH IN LENDING ACT

215. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

216. Plaintiff Thomas Brown seeks relief for a violation of the Truth In Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), against all Defendants.

217. TILA requires lenders to provide accurate disclosures to borrowers of the annual percentage rate for every loan. 12 C.F.R. §§ 226.18(e) & 226.22(a)(1)&(2). The disclosure must be based on the actual legal obligation, 12 C.F.R. §§ 226.5(c) & 226.17(c)(1), so the disclosure of a usurious rate that is unenforceable under state law is inaccurate and violates the act.

218. Defendants are creditors as defined by TILA. 15 U.S.C. § 1602(g). Defendants disclosed to Plaintiffs interest rates of approximately 139% A.P.R. even though the actual legal rate Defendants could charge Plaintiffs was only 36% on the first $600 plus 15% on the remainder, the maximum allowable interest rate for a loan less than $10,000 under North Carolina law.

219. In addition, the disclosed interest rates are otherwise miscalculated, such that the Agreement makes improper and inaccurate TILA disclosures. Further, the Defendants' Agreement falsely states that neither TILA nor any other Federal or State law applies to the loan.

220. This claim is brought in compliance with TILA's one-year statute of limitations by Plaintiff Brown. *See* 15 U.S.C. § 1640(e).

221. Under 15 U.S.C. § 1640(a)(2)(A)(i), Plaintiffs and class members are entitled to an award of statutory damages in the amount of twice the finance charge, actual damages, and/or other relief allowed under TILA. Under TILA, Defendants are also liable to the Plaintiffs for their costs and reasonable attorney's fees. 15 U.S.C. §1640(a)(2)-(3). Defendants are also liable in relation to the Plaintiffs' class action claim, for such amount as the Court may allow, subject to, the total amount of recovery not being more than $1 million or 1 percent of the creditor's net worth, whichever is less. 15 U.S.C. §1640(a)(2)(B).

## TENTH CLAIM FOR RELIEF: ELECTRONIC FUND TRANSFER ACT, 15 U.S.C. § 1693 *ET SEQ.*

222. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

223. The Electronic Fund Transfer Act ("EFTA"), 15 U.S.C. § 1693 *et seq.* states that its "primary objective … is the provision of individual consumer rights." 15 U.S.C. § 1693(b).

224. Under the EFTA, a "preauthorized electronic fund transfer from a consumer's account may be authorized by the consumer only in writing, and a copy of such authorization shall be provided to the consumer when made." 15 U.S.C. § 1693e(a). Defendants violated this statute because the void unsigned purported loan agreement did not constitute a proper written signed preauthorization in accordance with this statute and because Defendants did not provide a copy.

55

225. Under the EFTA, 15 U.S.C. § 1693k, " No person may ... condition the extension of credit to a consumer on such consumer's repayment by means of preauthorized electronic fund transfers...." Defendants violated this statute because they conditioned their loans on repayment by means of preauthorized electronic fund transfers.

226. Under the EFTA, any action may be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1693m(g). Mr. Brown got his loan on July 5, 2012 and made payments for about 3 months. (See his loan agreement at Doc. 1-2, and his Affidavit at Doc. 37-3). Therefore his claim is within the EFTA statute of limitations since Defendants wrongfully took money from his bank account within the last year.

227. Under the EFTA, 15 U.S.C. § 1693m(a), generally any defendant who fails to comply with any provision of the EFTA with respect to any consumer, is liable to such consumer in an amount equal to the sum of "any actual damage sustained by such consumer as a result of such failure;" plus "in the case of an individual action, an amount not less than $100 nor greater than $1,000; or ... in the case of class action, such amount as the court may allow, except that (i) as to each member of the class no minimum recovery shall be applicable, and (ii) the total recovery under this subparagraph in any class action or series of class actions arising out of the same failure to comply by the same person shall not be more than the lesser of $500,000 or 1 per centum of the net worth of the defendant...." *See* 15 U.S.C. § 1693m(a)(2)(A)-(B). Defendants are liable to said damages herein due to their violations of the EFTA.

228. In addition, under 15 U.S.C. § 1693m(a)(3), "in the case of any successful action to enforce the foregoing liability," the defendant is liable for "the costs of the action, together with a reasonable attorney's fee as determined by the court." Plaintiffs are entitled to their costs and attorney fees under this statute.

## ELEVENTH CLAIM FOR RELIEF: RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1961 *ET SEQ.*

229. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

230. The Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") at 18 U.S.C. § 1962 provides:

> (a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity <u>or through collection of an unlawful debt</u> in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce....

> (b) It shall be unlawful for any person through a pattern of racketeering activity <u>or through collection of an unlawful debt</u> to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity <u>or collection of unlawful debt</u>.

> (d) It shall be unlawful for any person <u>to conspire to violate any of the provisions of subsection (a), (b), or (c)</u> of this section.

231. An "unlawful debt" is defined by 18 U.S.C. § 1961(6) as:

57

a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

232.    During the pertinent times, N.C. Gen.Stat. § 24-1.1, entitled "Contract rates and fees," described the types of transactions subject to usury restrictions and specifies the maximum interest rate allowed by law. This statute provides in part that parties to a loan for $25,000 or less must use an interest rate of 16% or less. The interest rates herein were far more than two times this limit. N.C. Gen.Stat. § 24-1.1(a)-(c). It is undisputed in this case that the rates of interest provided for in the form agreements used by Defendants far exceeded two times that permitted by § 24-1.1.

233.    During the pertinent times, Defendants' interest rates were at least twice the interest permitted under laws of State of North Carolina. The internet payday loans between Plaintiffs and Defendants were incurred in connection with the business of lending money at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate. Defendants are in the business of lending money at a rate usurious under State or Federal law and the interest rate charged in their loans was at least twice the interest permitted under laws of the State of North Carolina.

234.    During the pertinent times, Defendants' interest rates were at least twice the interest permitted under laws of one or more other States in which the Defendants made their loans. Defendants violated state usury laws and state small loan and consumer loan

58

laws which provide for criminal penalties and liability and accordingly Defendants'
violations of these state laws provide additional predicates to RICO liability. The fact
that Defendants have been violating state usury laws has been known to Defendants for
years as they have been banned and sanctioned in multiple states, however this has not
deterred Defendants from continuing their enterprise.

235. Defendants' violations of the EFTA included criminal acts which provide
predicates to RICO liability. Under the EFTA, 15 U.S.C. § 1693n, a defendant who
knowingly and willfully gives false or inaccurate information or fails to provide
information which he is required to disclose by the EFTA or its implementing regulation ,
or who otherwise fails to comply with the EFTA, shall be fined not more than $5,000 or
imprisoned not more than one year, or both. Defendants in their lending practices
violated this statute.

236. An "enterprise" is defined by 18 U.S.C.A. § 1961(4) as "any individual,
partnership, corporation, association, or other legal entity, and any union or group of
individuals associated in fact although not a legal entity." Defendants entered into an
enterprise with each other and with other persons to make illegal internet payday loans.

237. Defendants' enterprise is engaged in, and conducts activities which affect,
interstate commerce.

238. Defendants received income derived, directly or indirectly, from a pattern
of racketeering activity including the deliberate use by Reddam and CashCall of Western
Sky as a front organization for their illegal lending. Defendants have collected unlawful
debts for the furtherance of the enterprise. Defendants aided, abetted, counseled,

59

commanded, induced, procured its commission, or willfully caused acts to be done that furthered the objectives of the enterprise described herein.

239. During the pertinent times, through Defendants' organization, ownership, control, and operation of the companies and various payday loan trade names alleged herein, Defendants received income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which they participated as principals to use the income for their illegal enterprise.

240. During the pertinent times, through Defendants' organization, ownership, control, and operation of the various internet payday loan trade names alleged herein, Defendants have acquired or maintained, directly or indirectly, an interest in or control of an enterprise with each other and other persons to make illegal internet loans, which activities affect interstate commerce, in violation of 18 U.S.C. § 1962 and .were employed by or associated with said enterprise, with each other and other persons to make the unlawful loans.

241. During the pertinent times, through Defendants' organization, ownership, control, and operation of the various payday loan trade names alleged herein, Defendants have conspired to violate the provisions of 18 U.S.C. § 1962(a)-(c), in violation of 18 U.S.C. § 1962(d), as further alleged herein.

242. The trade names and websites which upon information and belief the Defendants have used in furtherance of their enterprise have included:  CashCall, Western Sky, Big $ky Cash, Big Sky Cash, BigSky Cash.Com, BigSkyCash.Com, GS Finance, GSKY, Great Sky, Great Sky Cash, Great Sky Finance, Great Sky Finance,

LLC, GreatSky Cash.com, Greatskycash.com, Lakota Cash, LakotaCash.com, PayDay Financial, WS Funding, Western Sky Funding, WesternSky.com, Impact Cash, impactcashusa.com, GSky, Red Stone Cash, 24-7 Cash Direct, PDL Ventures, Spot on Loans, Four Seasons Cash, and others.

243. Upon information and belief, Defendants also committed multiple acts of mail and wire fraud, by their communications and purported loan agreements and collection efforts with customers, given that the Western Sky business was a "front" for CashCall, the loan agreement contains false statements on its face, and the business was a scheme to defraud consumers and evade State usury statutes.

244. If Defendants had disclosed the loans were illegal under state law as they were required to do, the Plaintiffs would not have taken the loans. Accordingly, Plaintiffs detrimentally relied on Defendants' misrepresentations and omissions.

245. 18 U.S.C. § 1964(c) provides a private right of action for those aggrieved by violations of 18 U.S.C. § 1962: "Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee...." Plaintiffs have been injured in each Plaintiff's business or property as a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962.

246. Plaintiffs and class members are entitled to an award of treble damages and attorney's fees and costs pursuant to 18 U.S.C. § 1964(c).

## TWELFTH CLAIM FOR RELIEF: NORTH CAROLINA RICO ACT, N.C. GEN. STAT. § 75D

247.    Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs as though fully set forth herein.

248.    The North Carolina RICO Act states that no person shall: (1) engage in a pattern of racketeering activity or, through a pattern of racketeering activities or through proceeds derived therefrom, acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money; or (2) conduct or participate in, directly or indirectly, any enterprise through a pattern of racketeering activity whether indirectly, or employed by or associated with such enterprise; or (3) conspire with another or attempt to violate any of the provisions of subdivision (1) or (2). N.C. Gen. Stat. § 75D-4(a).

249.    "Racketeering activity" is defined as a violation of one of various specified state and federal statutes, regardless of a person's criminal intent. N.C. Gen. Stat. § 75D-3(b)-(c). The Act provides a private right of action, and recovery of treble damages and reasonable attorney's fees, to "[a]ny innocent person who is injured or damaged in his business or property by reason of any violation of G.S. 75D-4 involving a pattern of racketeering activity." N.C. Gen. Stat. § 75D-8(c).

250.    Here, Defendants committed actionable conduct within the meaning of the NC RICO statute. Specifically, Defendants engaged in criminal acts of usury, and made usurious and criminal loans to North Carolina residents, using loan agreements containing false and fraudulent statements and omissions. Defendants through their

conduct engaged in activity subject to liability under the statute. Wherefore, Plaintiffs are entitled to recovery of damages under NC RICO.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray, on behalf of themselves and all other similarly situated individuals, for judgment finding and ordering as follows:

A.    certifying the class under Rule 23;

B.    finding that the subject loans violated the North Carolina Consumer Finance Act and other law as alleged herein;

C.    declaring that no money may be collected by Defendants from the class members on the subject loans pursuant to the North Carolina Consumer Finance Act and other law alleged herein;

D.    ordering Defendants to pay to class members all amounts collected by Defendants pursuant to the subject loans;

E.    awarding Class members actual and treble damages;

F.    awarding reasonable attorneys' fees and expenses;

G.    awarding pre-judgment interest as allowable by law; and

H.    awarding such other and further relief as this Court may deem just and proper.

PLAINTIFFS DEMAND A TRIAL BY JURY.

This the 13th day of August, 2013.

/s/ Aaron F. Goss

Aaron F. Goss (N.C. Bar No. 41250)
Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
Tel: 704-633-5244
agoss@wallacegraham.com
mwallace@wallacegraham.com
jhughes@wallacegraham.com

# EXHIBITS TO FIRST AMENDED COMPLAINT

**Exhibit 1** -- Western Sky Consumer Loan Agreement for Plaintiff Monica Johnson.

**Exhibit 2** -- Western Sky Consumer Loan Agreement for Plaintiff Thomas Brown.

**Exhibit 3** -- letter from Admiral Steve Abbott, Navy-Marine Corps Reserve Society.

**Exhibit 4** -- Press Release, Cmty. Fin. Servs. Ass'n. of America, Storefront Payday Lenders Reject Native American Partnerships (Feb. 10, 2011).

**Exhibit 5** – Excerpts from current Western Sky website.

**Exhibit 6** – *State of Missouri ex rel. Chris Koster, Attorney General v. Martin A. Webb, aka Butch Webb, et al.*, case no. 4:11-cv-01237-AGF (District of Missouri, remand order dated March 27, 2012).

**Exhibit 7** – *Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC et al.*, no. CFR-FY-2011-182 (Maryland Commissioner of Financial Regulation, cease and desist order dated Feb. 15, 2011).

**Exhibit 8** – *Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC et al.*, case no. 1:11-cv-00735 (District of Maryland, remand order dated Oct. 12, 2011).

**Exhibit 9** – *Western Sky Financial LLC, et al. v. Maryland Commissioner of Financial Regulation*, case no. 1:11-cv-01256 (District of Maryland, order dismissing declaratory judgment action brought by Western Sky, filed July 31, 2012).

**Exhibit 10** – *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial*, case no. 1:11-cv-887 (District of Colorado, remand order dated Dec. 27, 2011).

**Exhibit 11** – *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial*, case no. 11-cv-638 (District Court, Denver County, State of Colorado, order denying motion to dismiss dated April 17, 2012).

**Exhibit 12** – *State of West Virginia ex rel. McGraw v. Payday Loan Resource Center, LLC, et al.*, case no. 10-MISC-372 (Circuit Court of Kanawha County, W. Va., order to enforce the state's investigative subpoena dated Oct. 24, 2011).

**Exhibit 13** – "Cheyenne River Sioux Tribe Commercial Code" dated February 5, 1997 (excerpts).

**Exhibit 14** – "South Dakota Tribal Court Handbook" dated revised March 2006 (excerpts).

**Exhibit 15** – "Law and Order Code, Cheyenne River Sioux Tribe, 1978 Revision" (excerpts).

**Exhibit 16** – *In re CashCall, Inc., John Paul Reddam, President and CEO of CashCall, Inc., and WS Funding LLC*, Case No. 12-308, Cease and Desist Order by the State of New Hampshire Banking Department, dated June 4, 2013.

**Exhibit 17** – Massachusetts Commissioner of Banks, a "Cease Order" dated April 4, 2013, in *In re CashCall, Inc. and WS Funding, LLC,* Docket No. 2013-010.

**Exhibit 18** – Complaint in *CashCall, Inc. v. CIGPF I Corp.*, Case No. 1:07-cv-07332-JGK, S.D.N.Y., filed August 16, 2007.

**Exhibit 19** – *The People of the State of California v. CashCall, Inc., a California Corporation*, No. BC420115, "Final Judgment and Permanent Injunction," dated August 24, 2009.

**Exhibit 20** – *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial,* case no. 11-cv-638 (District Court, Denver County, State of Colorado, order granting plaintiff's motion for summary judgment dated April 15, 2013; Amended Order dated May 23, 2013.

**Exhibit 21**: Georgia Attorney General press release dated May 18, 2012.

**Exhibit 22:** *In re Western Sky Financial, LLC*, No. 13-CC-265, "Cease and Desist Order," dated March 8, 2013, State of Illinois Department of Financial and Professional Regulation, Division of Financial Institutions.

**Exhibit 23:** *Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC et al.*, case no. CFR-FY2011-182, Opinion and Final Order dated May 22, 2013.

**Exhibit 24:** *In re Impact Cash, LLC*, "Order to Show Cause and Cease and Desist," New Hampshire Banking Department, No. 10-011, dated September 23, 2011.

**Exhibit 25**: *In re Western Sky Financial, LLC*, No. I-12-039, before the Director of the Department of Consumer and Business Services for the State of Oregon, Order dated Dec. 13, 2012.

**Exhibit 26**: Washington Department of Financial Institutions, Oct. 18, 2012 Statement of Charges against Martin Webb d/b/a Western Sky Financial, LLC: Payday Financial, LLC, d/b/a Big Sky Cash; Lakota Cash; Great Sky Finance, LLC, d/b/a Great Sky Cash; Green Billow, LLC, d/b/a Four Seasons Cash; and Red Stone Financial, LLC, d/b/a Red Stone Cash.

**Exhibit 27**: *West Virginia v. CashCall, Inc.,* Case No. 08-C-1964, Trial Court Orders dated Sept. 10, 2012 by Judge Louis Bloom – Order #1.

**Exhibit 28**: *West Virginia v. CashCall, Inc.,* Case No. 08-C-1964, Trial Court Orders dated Sept. 10, 2012 by Judge Louis Bloom – Order #2.

**Exhibit 29:** Letter dated May 1, signed May 3, 2013, and May 3, 2013 email.

**Exhibit 30:** news articles regarding Tawny Lawrence.

**Exhibit 31:** Inetianbor loan agreement.

**Exhibit 32:** CashCall arbitration demand dated April 23, 2013.

## CERTIFICATE OF SERVICE

I hereby certify that on 13th of August, 2013, I electronically filed the foregoing

First Amended Class Action Complaint with the Clerk of the Court using the CM/ECF

system, which will send notification of such filing to all counsel of record.

/s/ Aaron F. Goss
Aaron F. Goss (N.C. Bar No. 41250)
Mona L. Wallace (N.C. Bar No. 09021)
John S. Hughes (N.C. Bar No. 22126)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
agoss@wallacegraham.com
mwallace@wallacegraham.com
jhughes@wallacegraham.com