IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:13-CV-00255-WO-JLW

|  |  |
|---|---|
| THOMAS BROWN, *et al.*, | ) |
|  | ) |
| Plaintiffs, | ) |
| v. | ) |
|  | ) |
| WESTERN SKY FINANCIAL, LLC, *et al.*, | ) |
|  | ) |
| Defendants. | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
OMNIBUS MOTION TO DISMISS OR STAY**

WOMBLE CARLYLE SANDRIDGE & RICE, LLP
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 755-2188
Fax: (919) 755-6099

JENNER & BLOCK LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1629
Fax: (212) 891-1699
*Attorneys for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iv

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF FACTS ................................................................................ 3

    A.    The Parties .......................................................................... 3

    B.    The Western Sky Application Process ........................................... 5

    C.    The Western Sky Loan Agreements ............................................. 5

    D.    The Final Underwriting Process ................................................. 9

    E.    Plaintiffs' Second Amended Complaint ....................................... 9

ARGUMENT ................................................................................................ 11

I.    The Agreements' Forum-Selection Clause Requires Dismissal under the Doctrine of *Forum Non Conveniens* ........................................................................ 11

    A.    The Doctrine of *Forum Non Conveniens* Controls Enforcement of the Forum Selection Clause ..................................................... 12

    B.    The Forum-Selection Clause Is Enforceable ................................. 13

        1.    Plaintiffs Have Not Plausibly Alleged that the Forum-Selection Clause Was Induced by Fraud or Overreaching .............. 14

        2.    Whether the Chosen Forum Deprives Plaintiffs of an Opportunity To Participate Is Now Irrelevant ................................. 16

        3.    Plaintiffs Cannot Show Fundamental Unfairness of CRST Law .................................................................................. 16

        4.    North Carolina Public Policy Does Not Void the Forum-Selection Clause .............................................................. 18

II.    Alternatively, the Tribal Exhaustion Doctrine Requires Dismissal ....................... 18

    A.    The CRST Tribal Courts Have Jurisdiction Over Disputes Arising from Western Sky's On-Reservation Conduct ............................................. 19

i

|   |   | 1. | Plaintiffs Entered a Consensual Commercial Relationship with Western Sky | 20 |
|---|---|---|---|---|
|   |   | 2. | Western Sky Possesses the Rights and Attributes of a CRST Member | 21 |
|   |   | 3. | Western Sky Engaged in On-Reservation Conduct | 24 |
|   | B. | | Tribal Jurisdiction Is, At Minimum, Colorable | 25 |
| III. | | | Alternatively, the Arbitration Provision Requires Dismissal | 27 |
|   | A. | | This Action Is Covered by the Agreements' Arbitration Provisions | 27 |
|   |   | 1. | The Elements Necessary To Compel Arbitration Are Satisfied | 28 |
|   |   | 2. | The Enforceability and Scope of the Arbitration Provision Are Delegated to Arbitration | 29 |
|   | B. | | The Plaintiffs' Arbitration Agreements Must Otherwise Be Enforced | 31 |
|   |   | 1. | Plaintiff Brown's Agreement Requires Arbitration Before AAA, JAMS, or a Mutually Agreeable Arbitration Administrator | 31 |
|   |   | 2. | The Non-Brown Plaintiffs' Agreement Requires Arbitration Before a Tribal Elder or a Panel of Three Tribal Council Members | 32 |
|   | C. | | The Non-Brown Plaintiffs' Allegations Regarding the Availability of CRST Arbitration Are Irrelevant Under FAA Section 5 | 34 |
|   | D. | | The Court Should Otherwise Refrain from Entertaining a Pre-Arbitration Attack on Arbitrator Bias and Corruption | 38 |
| IV. | | | Alternatively, Several of Plaintiffs' Causes of Action Fail to State A Claim Upon Which Any Relief Can Be Granted | 39 |
|   | A. | | Plaintiffs Fail to State Any Claim Against Payday Financial | 40 |
|   | B. | | Plaintiffs' State Law Claims Are Based On Inapplicable Law | 41 |
|   |   | 1. | North Carolina's Choice-of-Law Rules Apply | 41 |
|   |   | 2. | The Choice-of-Law Clause Is Enforceable | 42 |

3.      As to the Usury Claim, the CRST's Interest in this Case Outweighs North Carolina's ........................................................... 44

C.     Plaintiffs Otherwise Fail to State Claims under North Carolina Law ......... 47

1.      The Fraudulent Conveyance Claim Fails Because Plaintiffs Are Not Creditors and Their Claim Does Not Comply with Rule 9 ......................................................................................... 47

2.      Plaintiffs Fail to State a Claim for Civil Conspiracy ....................... 48

3.      Plaintiffs Fail to State a North Carolina RICO Claim ..................... 50

D.     Plaintiffs' Federal Claims Are Deficient ..................................................... 52

1.      Plaintiffs Fail to State a Federal RICO Claim .................................. 52

a.     Plaintiffs Inadequately Allege Predicate Racketeering Acts ................................................................................... 53

b.     Plaintiffs Inadequately Allege Unlawful Collection of a Debt ............................................................................... 54

c.     Plaintiffs Inadequately Allege a RICO Conspiracy .............. 57

2.      Plaintiffs Fail to State a TILA Claim ............................................... 58

3.      The Non-Brown Plaintiffs Fail to State an EFTA Claim ................. 59

CONCLUSION ............................................................................................................. 60

iii

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*A Society Without a Name v. Virginia,*
  655 F.3d 342 (4th Cir. 2011) ...................................................... 39

*Albermarle Corp. v. AstraZeneca UK Ltd.,*
  628 F.3d 643 (4th Cir. 2010) ...................................................... 13, 14, 18

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) .................................................................. 39, 40, 53

*AT&T Mobility LLC v. Concepcion,*
  131 S. Ct. 1740 (2011) .............................................................. 38

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W.D. Tex.,*
  134 S. Ct. 568 (2013) ................................................................ 12, 13, 16

*Attorney's Process & Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa,*
  609 F.3d 927 (8th Cir. 2010) ...................................................... 45

*Bank of Hoven v. Long Family Land & Cattle Co.,*
  32 Indian L. Rep. 6001 (CRST Ct. App. 2004) .......................... 17

*Bank of Oklahoma v. Muscogee (Creek) Nation,*
  972 F.2d 1166 (10th Cir. 1992) .................................................. 19

*Basil Cook Enters. v. St. Regis Mohawk Tribe,*
  117 F.3d 61 (2d Cir. 1997) ......................................................... 45

*Bassett Seamless Guttering, Inc. v. GutterGuard, LLC,*
  No. 1:05CV00184, 2006 WL 156874 (M.D.N.C. Jan. 20, 2006) ......................... 14, 17

*Behr v. Behr,*
  46 N.C. App. 694 (1980) ............................................................ 41

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) .................................................................. 40, 58

*Benezra v. Zacks Inv. Research, Inc.,*
  No. 1:11-CV-596, 2012 WL 1067559 (M.D.N.C. Mar. 30, 2012) ........................ 30

iv

*Boland v. Consol. Multiple Listing Serv., Inc.*,
    868 F. Supp. 2d 506 (D.S.C. 2011) ............................................................................ 11

*Boykin Anchor Co., Inc. v. AT&T Corp.*,
    No. 5:10-CV-591, 2011 WL 1456388 (E.D.N.C. Apr. 14, 2011) ............................... 40

*Brandenburg v. Seidel*,
    859 F.2d 1179 (4th Cir. 1988) .................................................................................... 56

*Broadway & Seymour, Inc. v. Wyatt*,
    944 F.2d 900 (4th Cir. 1991) ...................................................................................... 42

*Brown v. ITT Consumer Fin. Corp.*,
    211 F.3d 1217 (11th Cir. 2000) .................................................................................. 36

*Buckeye Check Cashing, Inc. v. Cardegna*,
    546 U.S. 440 (2006) ..................................................................................................... 30

*Bundy v. Commercial Credit Co.*,
    157 S.E. 860 (1931) ...................................................................................................... 43

*Burlington Ins. Co. v. Trygg-Hansa Ins. Co., AB*,
    No. 1:99CV334, 2002 WL 855911 (M.D.N.C. Apr. 19, 2002) ................................... 39

*Cable Tel. Servs., Inc. v. Overland Contracting, Inc.*,
    154 N.C. App. 639 (2002) ...................................................................................... 42, 45

*California v. Cabazon Band of Mission Indians*,
    480 U.S. 202 (1987) ..................................................................................................... 47

*California v. Miami Nation Enters.*,
    -- Cal. Rptr. 3d --, 2014 WL 216318 (Ct. App. 2d Dist. 2014) ................................... 45

*Carnival Cruise Lines, Inc. v. Shute*,
    499 U.S. 585 (1991) ..................................................................................................... 14

*Casey v. Grantham*,
    239 N.C. 121 (1954) ..................................................................................................... 49

*Chisolm v. TranSouth Fin. Corp.*,
    95 F.3d 331 (4th Cir. 1996) ......................................................................................... 54

*Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*,
    252 F.3d 707 (4th Cir. 2001) ....................................................................................... 27

v

*Chubirko v. Better Bus. Bureau*,
    No. 3:09-CV-502-FDW-DLH, 2011 WL 446888 (W.D.N.C. Feb. 10, 2011) ........... 41

*Cocke v. Duke Univ.*,
    260 N.C. 1 (1963) ......................................................................................... 43

*Cole v. Champion Enters., Inc.*,
    496 F. Supp. 2d 613 (M.D.N.C. 2007) ........................................................ 24

*Confederated Tribes of Chehalis Reservation v. Thurston Cnty. Bd. of*
    *Equalization*,
    724 F.3d 1153 (9th Cir. 2013) .................................................................... 22

*Cropmate Co. v. Indian Res. Int'l, Inc.*,
    840 F. Supp. 744 (D. Mont. 1993) .............................................................. 26

*Cullen v. Emanuel & Dunn, PLLC*,
    No. COA11–921, 731 S.E.2d 274 .............................................................. 51

*Dale v. Comcast Corp.*,
    498 F.3d 1216 (11th Cir. 2007) .................................................................. 49

*Davis v. Wilmington Fin., Inc.*,
    Civil No. PJM 09-1505, 2010 WL 1375363 (D. Md. Mar. 26, 2010) ........................ 53

*Dean Witter Reynolds, Inc. v. Byrd*,
    470 U.S. 213 (1985) .................................................................................. 28

*Delumen v. One West Bank FSB*,
    No. WMN-10-2758, 2011 WL 256195 (D. Md. Jan. 26, 2011) ................................. 40

*Deo v. Meier*,
    No. 5:11-CV-602-FL, 2012 WL 7078039 (E.D.N.C. July 8, 2012) ............................. 4

*Dickens v. Puryear*,
    302 N.C. 437 (1981) . Civil .................................................................... 48, 49

*Dish Network Corp. v. Tewa*,
    No. CV 12-8077-PCT-JAT, 2012 WL 5381437 (D. Ariz. Nov. 1, 2012) ..................... 4

*DISH Network Serv. L.L.C. v. Laducer*,
    725 F.3d 877 (8th Cir. 2013) .................................................................. 24, 26

*Diversicare Leasing Corp. v. Nowlin*,
    No. 11-CV-1037, 2011 WL 5827208 (W.D. Ark. Nov. 18, 2011) ............................. 36

*Dolgencorp, Inc. v. Miss. Band of Choctaw Indians*,
　　732 F.3d 409 (5th Cir. 2013) ................................................................ 20

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*,
　　755 F.2d 239 (2d Cir. 1985) ........................................................... 55, 56

*E. Band of Cherokee Indians v. N. Carolina Wildlife Res. Comm'n*,
　　588 F.2d 75 (4th Cir. 1978) ................................................................. 47

*Elliott v. Elliott*,
　　200 N.C. App. 259 (2009) ............................................................. 48, 49

*Fast v. Gulley*,
　　271 N.C. 208 (1967) ........................................................................... 43

*Fellerman v. Am. Ret. Corp.*,
　　No. 03:09-CV-803, 2010 WL 1780406 (E.D. Va. May 3, 2010) ................................ 37

*First Specialty Ins. Corp. v. Confederated Tribes of Grand Ronde Cmty. of Or.*,
　　Civil No. 07-05-KI, 2007 WL 3283699 (D. Or. Nov. 2, 2007) .................................. 11

*FMC v. Shoshone-Bannock Tribes*,
　　905 F.2d 1311 (9th Cir. 1990) ............................................................. 21

*Foster v. Wintergreen Real Estate Co.*,
　　363 Fed. App'x 269 (4th Cir. 2010) ........................................................ 54

*Gibson v. America's Servicing Co.*,
　　No. 5:10-CV-342-FL, 2010 WL 4974552 (E.D.N.C. Nov. 30, 2010) ............................. 41

*Giedosh v. Little Wound School Bd., Inc.*,
　　995 F. Supp. 1052 (D.S.D. 1997) ........................................................... 23

*Gila River Indian Community v. Waddell*,
　　967 F.2d 1404 (9th Cir. 1992) ............................................................. 46

*Gita Sports, Ltd. v. SG Sensortechnik GmbH & Co. KG*,
　　560 F. Supp. 2d 432 (W.D.N.C. 2008) ................................................... 16, 17

*Godfredson v. JBC Legal Grp. P.C.*,
　　387 F. Supp. 2d 543 (E.D.N.C. 2005) ...................................................... 57

*Goldman v. Brannon*,
　　No. 5:11-CT-3051, 2013 WL 4454638 (E.D.N.C. Aug. 16, 2013) .............................. 27

vii

*Grand Canyon Skywalk Dev., LLC v. Sa' Nyu Wa Inc.*,
715 F.3d 1196 (9th Cir. 2013), *cert. denied*, 134 S. Ct. 825 (2013) ........................... 21

*Green Tree Fin. Corp.-Ala. v. Randolph*,
531 U.S. 79 (2000) ....................................................................................... 29

*Green v. U.S. Cash Advance Ill., LLC*,
724 F.3d 787 (7th Cir. 2013) ............................................................. 34, 35, 36

*Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*,
295 F.3d 1065 (10th Cir. 2002) ................................................................... 22

*Hall St. Assocs., LLC v. Mattel, Inc.*,
552 U.S. 576 (2008) ..................................................................................... 27

*Havrick v. Am. Home Mortg. Servicing, Inc.*,
No. 2:12-cv-3077, 2013 WL 3283523 (E.D. Cal. June 27, 2013) ............................... 59

*Hooters of Am., Inc. v. Phillips*,
173 F.3d 933 (4th Cir. 1999) ....................................................................... 34

*Howard Sec. Svcs. v. Johns Hopkins Hosp.*,
516 F. Supp. 508 (D. Md. 1981) ................................................................... 23

*Hudson Valley Freedom Theater, Inc. v. Heimbach*,
671 F.2d 702 (2d Cir. 1982) ......................................................................... 22

*IHFC Properties, LLC v. APA Marketing, Inc.*,
850 F. Supp. 2d 604 (M.D.N.C. 2012) .......................................................... 4

*Inetianbor v. CashCall, Inc.*,
-- F. Supp. 2d --, 2013 WL 4494125 (S.D. Fla. Aug 19, 2013) ............................. 9, 33

*Iowa Mut. Ins. Co. v. LaPlante*,
480 U.S. 9 (1987) ............................................................... 18, 19, 20, 25

*Ivey v. First–Citizens Bank & Trust Co. (In re Whitley)*,
No. 12-02028, 2013 WL 486782 (Bankr. M.D.N.C. Feb. 7, 2013) ........................... 48

*J.L. Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd.*,
842 F. Supp. 2d 1163 (D.S.D. 2012) ............................................................ 22

*Jackson v. Payday Financial, LLC*,
No. 11-C-9288, 2012 WL 2722024 (N.D. Ill. July 9, 2012) ................................... 33

viii

*Jeske v. Brooks,*
    875 F.2d 71 (4th Cir. 1989) ....................................................... 31

*Jones v. GGNSC Pierre LLC,*
    684 F. Supp. 2d 1161 (D.S.D. 2010) ................................... 37, 38

*Khan v. Dell Inc.,*
    669 F.3d 350 (3d Cir. 2012)................................................ 35, 36, 37

*Klaxon Co. v. Stentor Elec. Mfg. Co.,*
    313 U.S. 487 (1941) .................................................................... 41

*Liberty Fin. Co. v. N. Augusta Computer Store, Inc.,*
    100 N.C. App. 279 (1990)........................................................... 43

*M/S Bremen v. Zapata Off-Shore Co.,*
    407 U.S. 1 (1972).................................................................. 13, 18

*Madewell v. Harrah's Cherokee Smokey Mountains Casino,*
    730 F. Supp. 2d 485 (W.D.N.C. 2010) ....................................... 19

*Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.,*
    792 F.2d 341 (3d Cir. 1986)........................................................ 55

*Marmet Health Care Cntr., Inc. v. Brown,*
    132 S. Ct. 1201 (2012) ................................................................ 27

*Marquette Nat'l Bank v. First of Omaha Serv. Corp.,*
    439 U.S. 299 (1978).................................................................... 59

*May v. Nationstar Mortg. LLC,*
    No. 3:12-CV-43, 2012 WL 3028467 (N.D. W. Va. July 25, 2012) ........................... 31

*McGuire v. Aberle,*
    826 N.W.2d 353 (S.D. 2013) ...................................................... 22

*McLaughlin v. Inmar, Inc.,*
    No. 1:11-cv-983, 2012 WL 7176855 (M.D.N.C. Feb. 13, 2012) ................................. 27

*McNeil v. Haley South, Inc.,*
    No. 3:10cv192, 2010 WL 3670547 (E.D. Va. Sept. 13, 2010)..................................... 35

*Menasco, Inc. v. Wasserman,*
    886 F.2d 681 (4th Cir. 1989) .................................................... 39, 52

*Mercury Coal & Coke, Inc. v. Mannesmann Pipe & Steel Corp.*,
    696 F.2d 315 (4th Cir. 1982) ................................................................. 16

*Metro. Regl. Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
    722 F.3d 591 (4th Cir. 2013) ................................................................. 29

*Montgomery v. Applied Bank*,
    848 F. Supp. 2d 609 (S.D. W. Va. 2012) ............................................... 35

*Morley v. Cohen*,
    888 F.2d 1006 (4th Cir. 1989) ............................................................... 53

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) .................................................................................. 32

*Murray v. United Food and Commercial Workers Int'l Union*,
    289 F.3d 297 (4th Cir. 2002) ................................................................. 34

*Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*,
    471 U.S. 845 (1985) .............................................................................. 19

*NC Contracting, Inc. v. Munlake Contractors, Inc.*,
    No. 5:11-CV-766, 2012 WL 5303295 (E.D.N.C. Oct. 25, 2012) ...... 17, 18

*Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*,
    207 F.3d 21 (1st Cir. 2000) ................................................................... 26

*O'Neal v. Cheyenne River Sioux Tribe*,
    482 F.2d 1140 (8th Cir. 1973) ............................................................... 17

*Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*,
    342 F.3d 871 (8th Cir. 2003) ................................................................. 22

*Phillips Elec. Co. of Durham, Inc. v. Hirani Eng'r & Land Surveying, P.C.*,
    No. 1:08-CV-197, 2009 WL 3787213 (M.D.N.C. Nov. 10, 2009) .......... 15

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ................................................................... 3

*Pourier v. South Dakota Department of Revenue*,
    658 N.W.2d 395 (S.D. 2003)…... ..................................................... 22, 23

*R.J. Williams Co. v. Ft. Belknap Hous. Auth.*,
    719 F.2d 979 (9th Cir. 1983) ................................................................. 45

*Reddam v. KPMG, LLP*,
    457 F.3d 1054 (9th Cir. 2006) ............................................................ 35, 36

*Rent-A-Cntr., W., Inc. v. Jackson*,
    130 S. Ct. 2772 (2010) ........................................................................ 30

*Risse v. Meeks*,
    585 S.D. 875 (1998) ............................................................................. 18

*Rota-McLarty v. Santander Consumer USA, Inc.*,
    700 F.3d 690 (4th Cir. 2012) ............................................................... 27

*Sage v. Sicangu Oyate Ho, Inc.*,
    473 N.W.2d 480 (S.D. 1991) ............................................................. 22, 23

*Santa Clara Pueblo v. Martinez*,
    436 U.S. 49 (1978) .............................................................................. 18

*Selby v. Deutsche Bank Trust Co. Americas*,
    No. 12cv1562, 2013 WL 1315841 (S.D. Cal. Mar. 28, 2013) .................... 36

*Silo Point II LLC v. Suffolk Const. Co., Inc.*,
    578 F. Supp. 2d 807 (D. Md. 2008) ....................................................... 4

*Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*,
    549 U.S. 422 (2007) ............................................................................. 11

*Southwood v. The Credit Card Solution et al.*,
    No. 7:09-CV-81-F, 2012 U.S. Dist. LEXIS 152146 (E.D.N.C. Oct. 23, 2012) .......... 50

*Sterling v. Ourisman Chevrolet of Bowie, Inc.*,
    943 F. Supp. 2d 577 (D. Md. 2013) ....................................................... 55

*Stewart Org., Inc. v. Ricoh Corp.*,
    487 U.S. 22 (1988) .............................................................................. 13

*Sundance Land Corp. v. Community First Fed. Savings & Loan Assoc.*,
    840 F.2d 653 (1988) .......................................................................... 54, 55

*Synergy Fin., L.L.C. v. Zarro*,
    329 F. Supp. 2d 701 (W.D.N.C. 2004) ................................................... 52

*Tanglewood Land Co., Inc. v. Byrd*,
    299 N.C. 260 (1980) ............................................................................ 41

*Tetrev v. Pride Int'l, Inc.*,
    444 F. Supp. 2d 524 (D.S.C. 2006) .......................................................... 15

*Thimbler, Inc. v. Unique Solutions Design, Ltd.*,
    No. 5:12-CV-695-BR, 2013 WL 4854514 (E.D.N.C. Sept. 11, 2013) ................ 39, 47

*Torres v. McClain*,
    140 N.C. App. 238 (2000) ....................................................................... 42

*UBS Fin. Servs., Inc. v. Carilion Clinic*,
    706 F.3d 319 (4th Cir. 2013) .................................................................... 12

*United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*,
    525 F.3d 370 (4th Cir. 2008) .................................................................... 40

*United States v. Giovanelli*,
    945 F.2d 479 (2d Cir. 1991) ..................................................................... 55

*United States v. Norris*,
    749 F.2d 1116 (4th Cir. 1984) .................................................................. 58

*United States v. Pyrba*,
    900 F.2d 748 (4th Cir. 1990), *cert. denied*, 498 U.S. 924 (1990) ................. 58

*Veney v. Wyche*,
    293 F.3d 726, 730 (4th Cir. 2002) ............................................................. 3

*Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*,
    515 U.S. 528, 541 (1995) ........................................................................ 38

*Wake Cnty. Bd. of Educ. v. Dow Roofing Sys., LLC*,
    792 F. Supp. 2d 897 (E.D.N.C. 2011) ...................................................... 29

*Walters v. McMahen*,
    795 F. Supp. 2d 350 (D. Md. 2011) .......................................................... 57

*White Mountain Apache Tribe v. Bracker*,
    448 U.S. 136 (1980) ............................................................................... 46

*Whiteside v. Teltech Corp.*,
    940 F.2d 99 (4th Cir. 1991) ..................................................................... 28

*Wike v. Vertrue, Inc.*,
    566 F.3d 590 (6th Cir. 2009) ................................................................... 60

*Williams v. Lee,*
  358 U.S. 217, 222 (1959) ................................................................... 25

*Wolf v. Richmond Cnty. Hosp. Auth.,*
  745 F.2d 904 (4th Cir. 1984) ................................................................ 3

*Wolverine Fire Prot. Co. v. Atl. Marine Constr. Co.,*
  No. 2:08cv75, 2008 WL 1847 512, at *2 (E.D. Va. Apr. 24, 2008) ............ 35

*Yost v. City of Charleston,*
  No. 2:09-2024-PMD, 2009 WL 4162274 (D.S.C. Nov. 24, 2009) .............. 40

CONSTITUTIONS, STATUTES, REGULATIONS AND RULES

12 C.F.R. § 204.10(e) ....................................................................... 61

12 C.F.R. § 226.1 ("Regulation Z") ...................................................... 60

25 C.F.R. § 286.3 ............................................................................. 23

9 U.S.C. § 1, *et seq.* ..................................................................*passim*

12 U.S.C. § 85 ................................................................................. 60

15 U.S.C. § 1601, *et seq.* ........................................................... 10, 61

15 U.S.C. § 1693, *et seq.* ........................................................... 54, 61

18 U.S.C. § 1341 .............................................................................. 52

18 U.S.C. § 1343 .............................................................................. 52

18 U.S.C. § 1961, *et seq.* ............................................................*passim*

25 U.S.C. § 1302 .............................................................................. 17

25 U.S.C. § 1521 .............................................................................. 23

28 U.S.C. § 1404(a) .......................................................................... 13

28 U.S.C. § 2201 .............................................................................. 10

Colo. Rev. Stat. § 5-5-201 .................................................................. 58

CRST Code §§ 1-4-1, 1-4-3, 1-4-5 ...................................................... 25

CRST UCC § 16-1-103 ....................................................................... 17

CRST UCC § 16-3-112 ............................................................................ 45

CRST Constitution and By-Laws, Art. V.................................................. 25, 26

Fed. R. Civ. P. 9.....................................................................................*passim*

Fed. R. Civ. P. 10(c) ................................................................................... 11

Fed. R. Civ. P. 12(b)(3) ............................................................................. 13

Fed. R. Civ. P. 12(b)(6) ......................................................................... 2, 39

Haw. Rev. Stat. §§ 478-5, 412:9-303 ........................................................ 58

N.C. Gen. Stat. § 24-1, *et seq.* .......................................................... 10, 45

N.C. Gen. Stat. § 24-12 .............................................................................. 52

N.C. Gen. Stat. § 39-23.1, *et seq.* ................................................. 10, 48, 49

N.C. Gen. Stat. § 53-164, *et seq.* ...................................................... 10,51, 52

N.C. Gen. Stat. § 75D, *et seq.*......................................... 10, 50, 51, 52

OTHER AUTHORITIES

Comptroller of the Currency, Truth in Lending Act: Comptroller's Handbook
(Dec. 2010)........................................................................................ 59

CRST Tribal Resolution No. 350-2013-CR (Nov. 12, 2013) ................... 26, 46

FDIC General Counsel's Op. No. 11, Interest Charges by Interstate State Banks,
63 Fed. Reg. 27,282, 27,286 (May 18, 1998) ................................... 24

Frank Pommersheim, South Dakota Tribal Court Handbook (rev. ed. 2006). ................ 17

Gregory P. Joseph, Civil RICO: A Definitive Guide (3d ed. 2010)................................. 55

OCC Interpretive Ltr. No. 822, Feb. 17, 1998, *reprinted in* Fed. Banking L. Rep.
(CCH) P 81-209 ................................................................................. 24

Restatement (Second) of Conflict of Laws § 187 ..................................... 41, 42

Western Sky Financial, LLC ("Western Sky"), Payday Financial, LLC ("Payday Financial"), CashCall, Inc. ("CashCall"), John Paul Reddam ("Mr. Reddam"), WS Funding, LLC ("WS Funding") and Delbert Services Corporation ("Delbert") (collectively, "Defendants"), by and through their attorneys, respectfully submit this memorandum of law in support of their omnibus motion to dismiss the Second Amended Complaint ("SAC") or, in the alternative, to stay pending exhaustion of tribal remedies.[1]

## PRELIMINARY STATEMENT

This is a putative class action brought by seven North Carolina residents who entered into consumer installment loan agreements with a lender operating on a tribal reservation of the Cheyenne River Sioux Tribe ("CRST") that is wholly owned by an enrolled member of the CRST. Under each of the written agreements that governs the loans (collectively, the "Agreements"), Plaintiffs agreed that any disputes arising from the loans would fall within the exclusive jurisdiction of the CRST's courts, be governed by the CRST's laws and be resolved through binding arbitration.

Plaintiffs now disregard these contractual commitments by bringing suit to invalidate the loans in a North Carolina federal court pursuant to North Carolina and federal law. They sue their CRST-based lender, Western Sky; its loan assignee, WS Funding; two entities that service the loans, CashCall and Delbert; the owner of CashCall and Delbert, Mr. Reddam; and Payday Financial, whose only link to this lawsuit is that it

---

[1] Defendants move to set aside all claims against Mr. Reddam and Payday Financial in a separate motion to dismiss for lack of personal jurisdiction filed alongside this motion.

was once the sole member of Western Sky. Both the law and plain language of the Agreements require that the SAC be disposed of for several, independent reasons:

*First*, pursuant to recent Supreme Court precedent, Plaintiffs' flouting of a forum-selection clause that mandates a non-federal forum requires dismissal based on the doctrine of *forum non conveniens*. Plaintiffs have failed to demonstrate any of the rare "extraordinary circumstances" necessary to void the clause because they allege no plausible facts suggesting that the clause itself is unreasonable.

*Second*, this case must be stayed or dismissed on account of Plaintiffs' failure to seek relief in a CRST tribal court before filing suit in federal court. Plaintiffs' suit, at minimum, implicates tribal court jurisdiction because they sue an entity that is wholly owned by a member of the CRST and upon loans that are subject to CRST law. Under these circumstances, the tribal exhaustion doctrine compels this Court to defer in the first instance to CRST courts to evaluate Plaintiffs' tribal jurisdiction challenge.

*Third*, dismissal is warranted because the parties broadly agreed to delegate all disputes arising from the Agreements to arbitration—including threshold questions of arbitrability. Plaintiffs do not and cannot allege any plausible facts that cast doubt on the validity of the parties' "delegation" provision. To the extent, as Plaintiffs may argue, any designated arbitral forum is unavailable for any reason, arbitration must still be compelled because the Federal Arbitration Act ("FAA") requires the Court to appoint a substitute arbitral forum whenever there is a lapse in naming one.

*Fourth*, if the Court reaches the merits of Plaintiffs' claims, it must dismiss most of them under Rule 12(b)(6) and/or Rule 9(b). The Agreements' choice-of-law clause,

specifying CRST law, forecloses all of Plaintiffs' North Carolina law claims. Plaintiffs' RICO and TILA claims do not satisfy basic pleading obligations, and their claim for violation of the Electronic Funds Transfer Act ("EFTA") must be dismissed as to all Plaintiffs except plaintiff Brown.

For the foregoing reasons, and as detailed below, the case should be dismissed with prejudice or, in the alternative, stayed to allow for tribal exhaustion of remedies.

## STATEMENT OF FACTS[2]

### A.    The Parties

Plaintiffs are North Carolina residents who sought and obtained consumer installment loans from defendant Western Sky between 2010 and 2012. SAC ¶¶ 71-108.

Western Sky is wholly owned by non-party Martin A. Webb, an enrolled member of the CRST, a federally recognized Indian tribe. *Id.* ¶ 18; SAC Ex. 3 at 2. Its offices are located on the CRST Reservation ("Reservation"), within the geographic boundaries of South Dakota. *Id.* Because the CRST has not yet established any of the model business formation legislation by which entities owned by tribal members may incorporate under tribal law, Western Sky is organized as a South Dakota limited liability company. Declaration of Tawny Lawrence ("Lawrence Decl.") ¶ 4.[3] Nonetheless, Western Sky is

---

[2] Except where otherwise noted, the facts recited are drawn from well-pled allegations in the SAC, extrinsic documents attached and integral to the SAC, and matters of public record of which the court may take judicial notice. *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999); *Wolf v. Richmond Cnty. Hosp. Auth.*, 745 F.2d 904, 908 (4th Cir. 1984).

[3] Matters outside of the pleadings are put forth only in connection to Defendants' arguments premised on the parties' forum-selection and arbitration clauses, and the tribal

licensed by the CRST to conduct business on the Reservation and has been so throughout the relevant time period, and Western Sky's Articles of Organization are filed with the Office of the Secretary of the CRST.  *Id.  See also* SAC Ex. 26.

Defendants WS Funding, CashCall, and Delbert serve various roles related to the loans issued by Western Sky.  WS Funding is a subsidiary of CashCall and organized under Delaware law, with its principal place of business in California.  SAC ¶ 22.  WS Funding purchased loans originated by Western Sky pursuant to an assignment agreement between WS Funding and Western Sky (the "Assignment Agreement"), under which WS Funding assumed all rights of Western Sky relating to the purchased loans.  *Id*. ¶¶ 22, 68.  The Assignment Agreement is "governed solely by the laws and jurisdiction of the [CRST]" subject to the "sole subject matter and personal jurisdiction of the courts of the [CRST] exclusively."  SAC Ex. 6 at 8.

Mr. Reddam is the sole owner of CashCall and Delbert.  SAC ¶ 23.  Both entities service loans purchased by WS Funding.  CashCall is organized under California law and has its principal place of business there; Delbert is organized under Nevada law and has its principal place of business there.  *Id*. ¶¶ 20, 23.

---

exhaustion doctrine.  Such matters may be considered without converting these motions to motions for summary judgment.  *See Dish Network Corp. v. Tewa*, No. CV 12-8077-PCT-JAT, 2012 WL 5381437, at *2 (D. Ariz. Nov. 1, 2012) (tribal exhaustion); *IHFC Properties, LLC v. APA Marketing, Inc.*, 850 F. Supp. 2d 604, 615-16 (M.D.N.C. 2012) (personal jurisdiction); *Deo v. Meier*, No. 5:11-CV-602-FL, 2012 WL 7078039, at *5 (E.D.N.C. July 18, 2012), *rep. and rec. adopted*, 2013 WL 531323 (E.D.N.C. Feb. 12, 2013) (arbitration clause); *Silo Point II LLC v. Suffolk Const. Co., Inc.*, 578 F. Supp. 2d 807, 809 (D. Md. 2008) (forum-selection clause).

Like Western Sky, Payday Financial is also a limited liability company located and operated on the Reservation. *Id*. ¶ 19; Lakota Cash from Payday Financial, LLC Website, http://www.lakotacash.com. No loans at issue in this action were issued by Payday Financial. SAC ¶¶ 71-108. Payday Financial's only connection to Plaintiffs' claims is its one-time status as the sole member of Western Sky. *Id*. ¶ 19.

## B. The Western Sky Application Process

Prospective borrowers completed Western Sky loan applications either online or telephonically with assistance from one of Western Sky's loan agents working on the Reservation or, pursuant to a servicing contract between CashCall and Western Sky, a CashCall operator working off-Reservation (but never in North Carolina). *Id*. ¶ 47; Lawrence Decl. ¶ 6. Prior to April 2012, all initial loan inquiries were handled by CashCall operators pursuant to the same servicing contract. *Id*. ¶ 7. Once completed, the applications were submitted for initial review pursuant to underwriting guidelines formulated by Western Sky. *Id*. ¶ 8.

## C. The Western Sky Loan Agreements

If an application passed Western Sky's initial underwriting review, the prospective borrower was directed, via e-mail, to the Western Sky website to review the terms of the Agreement. *Id*. ¶ 6. Although each of the Agreements differs in certain respects, they all contained (1) a forum-selection clause requiring that all disputes arising from the Agreements be adjudicated within the exclusive jurisdiction of CRST tribal courts; (2) a choice-of-law clause stating that the Agreements and disputes arising from them are governed exclusively by CRST law and not by any individual state's law; (3) an

arbitration clause broadly providing that any disputes arising from the Agreements will be resolved through binding arbitration or, in some circumstances, litigation in the CRST court system; (4) an opt-out clause allowing each borrower to unilaterally opt-out of arbitration; and (5) a class-action waiver.[4]

The forum-selection and choice-of-law clauses are prominently displayed at the outset of each Agreement. They provide, with boldface type in the original:

> **This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.** By executing this Loan Agreement, you, the borrower, hereby acknowledge and consent to be bound to the terms of this Loan Agreement, consent to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation.

SAC Ex. 1 at 2.[5]

The arbitration and opt-out provisions were also prominently displayed. A section of the Agreements entitled, "WAIVER OF JURY TRIAL AND ARBITRATION," puts borrowers on notice that "[u]nless you [the borrower] exercise your right to opt-out of

---

[4] With the Court's approval, the parties agreed to delay briefing on class certification until after a decision is issued on the instant motions. Dkt. 88 ¶¶ 4-5.

[5] The forum-selection and choice-of-law clauses were displayed on page three—rather than the first page—of Plaintiff Johnson's Agreement and provide, in pertinent part, as follows: "By executing this Agreement, you hereby expressly agree that this Agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation. You also expressly agree that this Agreement shall be subject to and construed in accordance only with the provisions of the laws of the Cheyenne River Sioux Tribe. . . . You agree that . . . your execution of this Agreement is made as if you were physically present within the exterior boundaries of the Cheyenne River Indian Reservation." SAC Ex. 2 at 4.

arbitration in the manner described below, any dispute you have with Western Sky or anyone else under this loan agreement will be resolved by binding arbitration." SAC Ex. 1 at 4 (all caps in original). The Agreements define the term "Dispute" in the "broadest possible" manner to include "without limitation, all claims or demands" no matter the "legal or equitable theory . . . and regardless of the type of relief sought." *Id*. Explicitly encompassed by the term are threshold issues concerning the "validity, enforceability or scope" of the arbitration provisions themselves. *Id*. The breadth of issues referred to arbitration is further underscored by a severability clause, which states that "the remainder" of the arbitration clause "shall remain in effect" in the event that "any" provision is held invalid. *Id*. at 5.

To exercise the opt-out right, a borrower was required to provide "written notice" in the form of a "letter or e-mail within sixty (60) days after the date" of loan funding. *Id*. The SAC does not allege that any Plaintiff opted out of the arbitration provision. Other than disputes involving a borrower who opts out of the arbitration provision, the only subset of disputes not covered by the arbitration clause are challenges to the parties' class-action waiver, disputes within the jurisdiction of the CRST small claims court, and actions to confirm or vacate an arbitration award.[6] *Id*.

Borrowers signed their Agreements online and submitted them electronically via Western Sky's website. Before signing their Agreements, each Plaintiff attested to the

---

[6] Even if those disputes excluded from the arbitration provision's coverage were pertinent here, a CRST tribal court—and not the court of Plaintiffs' choosing—is the exclusive venue pursuant to the forum-selection clause. *See* Part II (tribal exhaustion), *infra*.

7

following all-caps statement: "YOU HAVE READ AND UNDERSTOOD THE ARBITRATION SECTION OF THIS NOTE AND AGREE TO BE BOUND BY THE TERMS AND CONDITIONS OF THAT SECTION." *Id.*

The only substantive difference amongst the Plaintiffs' Agreements is their designation of different arbitral fora. Arbitration pursuant to Plaintiff Brown's Agreement—executed in 2012—is to be administered by, and conducted pursuant to the dispute resolution rules of, the American Arbitration Association ("AAA"), JAMS, or any other agreed-upon organization. *Id.* at 4. His Agreement provides him with the option of conducting arbitration on the Reservation or at a location within thirty miles of his residence. *Id.* Plaintiffs do not contend that an arbitral forum provided by AAA or JAMS is unsuitable to resolve Brown's claims. Nor do they claim that Brown has even attempted to engage the dispute resolution mechanism that his Agreement specifies.

The other Agreements—executed before 2012—specify that disputes will be arbitrated on the Reservation or by telephone or video conference, in accordance with the CRST's consumer dispute rules, and before either (at the borrower's choosing) a tribal elder or panel of three members of the CRST tribal council. SAC Ex. 2 at 5. The Plaintiffs whose Agreements are subject to tribal arbitration (the "Non-Brown Plaintiffs") do not allege any attempt to adhere to their arbitration provisions. They instead contend that "[t]he purported arbitration facility of the Cheyenne River Sioux Tribal Nation was not a real arbitration organization but a sham." SAC ¶ 132. They support this contention with reference to the facts of a case currently on appeal to the Eleventh Circuit in which counsel for Plaintiffs here, representing a borrower from Florida, obtained a

8

ruling from a Florida district court where a similar Western Sky tribal arbitration provision was found to be deficient. *Id.* ¶ 169 (citing *Inetianbor v. CashCall, Inc.*, -- F. Supp. 2d --, 2013 WL 4494125 (S.D. Fla. Aug 19, 2013)). Because they have not pursued tribal arbitration on their own, the Non-Brown Plaintiffs do not claim any first-hand knowledge or experience with their contractually designated arbitral forum.

### D. The Final Underwriting Process

The final decision to accept a borrower's loan application was made by Western Sky on the Reservation. From the Reservation, Western Sky employees performed a final underwriting and audit review to verify that the information the prospective borrower provided was correct; if the information was not complete, found to be inaccurate or not in compliance with Western Sky's underwriting guidelines, the Agreement would be rejected. Lawrence Decl. ¶ 8. No loan was funded until it was approved on the Reservation, by Western Sky's audit and underwriting employees. *Id.*

Once Western Sky accepted from the Reservation those Agreements that passed Western Sky's final underwriting review, borrowers received e-mailed acceptance notices advising them that loan proceeds would be electronically disbursed from a Western Sky bank account, at the direction of a Western Sky employee who initiated funding from the Reservation. *Id.* Western Sky was under no obligation to fund a loan unless and until it accepted the Agreement and approved the disbursal of the loan proceeds. *Id.*

### E. Plaintiffs' Second Amended Complaint

Plaintiffs abided by none of the Agreements' choice-of-forum, choice-of-law, and arbitration clauses. They instead commenced this action in March 2013 on behalf of

9

themselves and purportedly on behalf of nationwide and North Carolina subclasses. Subsequently, on August 13, 2013, Plaintiffs filed their First Amended Complaint ("FAC"). Dkt. 47. After Defendants filed and fully briefed motions to dismiss the FAC, Plaintiffs moved to file a second amended complaint. On Defendants' consent, Plaintiffs filed the SAC on January 23, 2014. Dkt. 89.

Plaintiffs assert twelve claims for relief: (1) a declaratory judgment action seeking to invalidate the arbitration provision, 28 U.S.C. § 2201; (2) violation of the North Carolina Consumer Finance Act, N.C. Gen. Stat. § 53-164, *et seq.*; (3) usury, N.C. Gen. Stat. § 24-1.1; (4) unfair and deceptive trade practices, N.C. Gen. Stat. § 75-1.1 *et seq.*; (5) unjust enrichment, rescission and restitution; (6) alter ego liability; (7) fraudulent conveyance, N.C. Gen. Stat. § 39-23.1, *et seq.*; (8) civil conspiracy; (9) violation of TILA, 15 U.S.C. § 1601, *et seq.*; (10) violation of EFTA, 15 U.S.C. § 1693, *et seq.*; (11) violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*; and (12) violation of the North Carolina RICO Act, N.C. Gen. Stat. § 75D.

All of Plaintiffs' claims are covered by the Agreements' forum-selection, choice-of-law and arbitration clauses and, in any event, cannot be heard in a federal court because they implicate tribal jurisdiction. But even if they could be heard in this Court, many of Plaintiffs' claims fail to state a valid claim for relief.[7]

---

[7] The SAC's blunderbuss reliance on unadjudicated allegations from civil and administrative actions, consent decrees, and settlement materials is not entitled to consideration before this Court. *See Boland v. Consol. Multiple Listing Serv., Inc.*, 868 F. Supp. 2d 506, 518 (D.S.C. 2011) (allegations lifted from consent decree in separate

## ARGUMENT

### I.  The Agreements' Forum-Selection Clause Requires Dismissal under the Doctrine of *Forum Non Conveniens*

This case must be dismissed based on the doctrine of *forum non conveniens* because Plaintiffs have failed to abide by the Agreements' forum-selection clause or to demonstrate the clause's unenforceability.[8]   While the Agreements refer most "Disputes" between the parties to arbitration, a standalone forum-selection clause mandates the parties litigate in a CRST tribal court any dispute not covered by the arbitration provision—*e.g.*, disputes involving a borrower who has opted out of the arbitration provision; claims subject to the jurisdiction of the CRST small claims court; the validity of the class action waiver; actions to compel arbitration or enforce an arbitration award; and any other issues attendant to an arbitration that require judicial resolution.[9]   Thus, to the extent they are properly before any court, Plaintiffs' disputes arising from the Agreements must be adjudicated in a CRST tribal court and nowhere else.  The Court may disregard the forum-selection clause only upon Plaintiffs' showing of "extraordinary

---

proceeding cannot have preclusive effect or be used as evidence, are "unfairly prejudicial" and "serve no real purpose in [the] complaint"); Fed. R. Civ. P. 10(c) (only "written instrument[s]" attached to a pleading may be considered as valid allegation).

[8] Should the Court rule that the SAC can be dismissed for *forum non conveniens*, no further analysis is required of the other bases for dismissal asserted in this memorandum. *See Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007).

[9] Tribal courts are a "permissible venue in which to challenge an arbitration award" under the FAA.  *See First Specialty Ins. Corp. v. Confederated Tribes of Grand Ronde Cmty. of Or.*, Civil No. 07-05-KI, 2007 WL 3283699, at *2 (D. Or. Nov. 2, 2007).

circumstances" militating against its enforcement. Because such circumstances are not present here, the case must be dismissed.[10]

### A. The Doctrine of *Forum Non Conveniens* Controls Enforcement of the Forum Selection Clause

The Supreme Court recently clarified that where, as here, the parties have agreed to a forum-selection clause that supplies a non-federal forum, "the appropriate way" to enforce the parties' agreement "is through the doctrine of *forum non conveniens*." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W.D. Tex.*, 134 S. Ct. 568, 580 (2013). Under this standard, dismissal is required unless "*extraordinary circumstances* unrelated to the convenience of the parties *clearly* disfavor" enforcing the forum-selection clause. *Id*. at 575 (emphasis added).

The presence of a forum-selection clause significantly alters the typical *forum non conveniens* analysis by requiring that a court "consider arguments about public-interest factors *only*," which "will rarely defeat" a *forum non conveniens* motion to enforce a forum-selection clause. *Id*. at 582 (emphasis added). Courts are prohibited from considering private-interest factors such as the "'relative ease of access to sources of proof; availability of compulsory process for attendance of . . . witnesses; possibility of view of premises . . . and all other practical problems that make trial of a case easy,

---

[10] The presence of a judicial forum-selection clause alongside an arbitration clause "presumes availability" of arbitration "but localizes it. . . . because a court plays a role in arbitration proceedings by compelling the arbitration and enforcing any arbitration award." *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 329-30 (4th Cir. 2013).

expeditious and inexpensive.'" *Id.* at 581 n.6 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

In addition, while it is ordinarily the defendant that "bears a heavy burden in opposing the plaintiff's chosen forum," that burden shifts "when the plaintiff has violated a contractual obligation by filing suit in a forum other than the one specified in a valid forum-selection clause." *Id.* at 583 n.8 (internal citation and quotation omitted). Only under "'the most exceptional cases'" should the "'controlling weight'" given to a forum-selection clause not prevail. *Id.* at 581 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 33 (1988)).

### B.    The Forum-Selection Clause Is Enforceable

"[A] federal court interpreting a forum-selection clause must apply federal law in doing so." *Albermarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010).[11]    Under federal law, absent a showing that a forum-selection clause is unreasonable, the parties' choice of forum should be enforced. *See M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972). That rule applies even to forum-selection clauses in consumer contracts of adhesion. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 585 (1991).

---

[11] The fact that a forum-selection clause is now enforced through the doctrine of *forum non conveniens* as opposed to Rule 12(b)(3) does not alter the controlling application of federal law. It is well-established that 28 U.S.C. § 1404(a) "governs the . . . decision whether to give effect to the parties' forum selection clause," *Stewart*, 487 U.S. at 32, and "[s]ection 1404(a) is merely a codification of the doctrine of *forum non conveniens*," *Atl. Marine Constr.*, 134 S. Ct. at 580.

13

Within the Fourth Circuit, a forum-selection clause may be found unreasonable, and therefore unenforceable, only upon a clear showing by the party opposing a forum-selection clause that:

> (1) [its] formation was induced by fraud or overreaching; (2) the complaining party will for all practical purposes be deprived of his day in court because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) [its] enforcement would contravene a strong public policy of the forum state.

*Albermarle*, 628 F.3d at 651 (brackets in original; quotation omitted). As explained below, Plaintiffs allege no plausible facts to support a finding that the forum-selection clause is unenforceable.

### 1. Plaintiffs Have Not Plausibly Alleged that the Forum-Selection Clause Was Induced by Fraud or Overreaching

On the first element—whether the forum-selection clause is a product of fraud or overreaching—Plaintiffs' burden is "to show that the inclusion of the forum-selection clause *itself* was the product of fraud or coercion." *Bassett Seamless Guttering, Inc. v. GutterGuard, LLC*, No. 1:05CV00184, 2006 WL 156874, at *4 (M.D.N.C. Jan. 20, 2006) (emphasis in original). Plaintiffs cannot do so.

Here, Plaintiffs were provided "notice of the forum provision and . . . the option of rejecting the contract with impunity." *Carnival Cruise Lines*, 499 U.S. at 595. The Agreements stated in plain-English that they were subject to the exclusive jurisdiction of the CRST judicial system. The very first line of the Agreement states, in bold type: "**This Loan Agreement is subject solely to the exclusive laws and jurisdiction of the**

**Cheyenne River Sioux Tribe, Cheyenne River Indian Reservation.**" SAC Ex. 1 at 2. The next sentence of each Agreement states that "you, the borrower, hereby acknowledge and consent to . . . the sole subject matter and personal jurisdiction of the [CRST] Tribal Court."[12] *Id.* Far from being buried in fine print at the end of the Agreements, the forum-selection clause was prominently displayed for Plaintiffs to read and consider. Forum-selection clauses such as these are routinely enforced. *See*, *e.g.*, *Phillips Elec. Co. of Durham, Inc. v. Hirani Eng'r & Land Surveying, P.C.*, No. 1:08-CV-197, 2009 WL 3787213, at *4 (M.D.N.C. Nov. 10, 2009) (forum-selection clause enforceable when "located conspicuously in the middle of the first page" of the contract and parties opposing enforcement did "not argue that they lacked notice of this clause"); *Tetrev v. Pride Int'l, Inc.*, 444 F. Supp. 2d 524, 530 (D.S.C. 2006) (forum-selection clause enforceable when "prominently located . . . and . . . printed in [the] same suitable font size as other sections of the contract").

Plaintiffs' various conclusory allegations of fraud and overreaching lack even a tenuous connection to the forum-selection clause itself and are entitled to no consideration. Plaintiffs allege, for example, prior misuse of CRST courts by Defendants but utterly fail to explain how such conduct, even if accepted as true, actually induced Plaintiffs to agree to the contractual choice of forum. SAC ¶¶ 161, 172. Equally unavailing are Plaintiffs' complaints that the Agreements are form contracts replete with inaccurate statements. *See, e.g., id*. ¶¶ 156, 249. Those allegations are not directed

---

[12] As noted *supra*, n. 5, Plaintiff Johnson's Agreement contains substantively identical language on page three.

specifically at the forum-selection clause, fail to support any plausible inference of fraudulent or overreaching conduct, and only underscore Plaintiffs' inability to articulate a proper basis for voiding the clause.

### 2. Whether the Chosen Forum Deprives Plaintiffs of an Opportunity To Participate Is Now Irrelevant

The second element must favor enforcement of the forum-selection clause in light of the Supreme Court's decision in *Atlantic Marine*. A plaintiff was previously required to demonstrate unreasonableness under this element by showing that he or she "would be deprived of an opportunity to participate in the adjudication." *Mercury Coal & Coke, Inc. v. Mannesmann Pipe & Steel Corp.*, 696 F.2d 315, 317 (4th Cir. 1982). Such private interests are no longer germane to the enforceability a forum-selection clause. *See Atl. Marine Constr.*, 134 S. Ct. at 582. Any of Plaintiffs' contentions that go to the second element are irrelevant.

### 3. Plaintiffs Cannot Show Fundamental Unfairness of CRST Law

Under the third element, which addresses the chosen forum's laws and whether they are fundamentally unfair, enforcement of the forum-selection clause is mandated so long as the agreed-upon forum provides "*a* remedy" for the injuries alleged. *Gita Sports, Ltd. v. SG Sensortechnik GmbH & Co. KG*, 560 F. Supp. 2d 432, 440 (W.D.N.C. 2008) (emphasis in original). The unavailability of some or even most of the causes of action or forms of relief under the chosen forum's law is immaterial and insufficient to show fundamental unfairness. *See id.*; *NC Contracting, Inc. v. Munlake Contractors, Inc.*, No.

16

5:11-CV-766, 2012 WL 5303295, at *5 (E.D.N.C. Oct. 25, 2012); *Bassett Seamless Guttering*, 2006 WL 156874, at *6.

Contrary to Plaintiffs' allegations, the CRST courts provide a viable forum for Plaintiffs to seek a remedy on any claims not delegated to arbitration. Recognized by CRST law are "common law causes of action in such areas as contract and tort law." Frank Pommersheim, South Dakota Tribal Court Handbook 19 (rev. ed. 2006), *available at* http://ujs.sd.gov/media/docs/IndianLaw%20Handbook.pdf. "[P]rinciples of law and equity" are honored in addition to "the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, [and] bankruptcy." Declaration of Amanda G. Ray in Support of Omnibus Motion to Dismiss ("Ray Decl.") Ex. 1-B (CRST Code § 16-1-103); *see also O'Neal v. Cheyenne River Sioux Tribe*, 482 F.2d 1140, 1147 (8th Cir. 1973) (interpreting CRST Code to grant CRST courts "power to grant injunctive relief"); *Bank of Hoven v. Long Family Land & Cattle Co.*, 32 Indian L. Rep. 6001, 6002-03 n.3 (CRST Ct. App. 2004) (stating that CRST recognizes a private cause of action for "tortious conduct") (Attached as Ex. 4 to Ray Decl.). Should Plaintiffs prevail on these or other claims recognized by CRST law, they would be able to acquire "money damages, declaratory relief, injunctive relief, extraordinary writs, and execution." Pommersheim, *supra*, at 19. Moreover, the Indian Civil Rights Act, 25 U.S.C. § 1302, requires basic equal protection and due process protections to all

17

litigants.[13]   Accordingly, fundamental fairness will not be undermined by enforcing the forum-selection clause.

### 4. North Carolina Public Policy Does Not Void the Forum-Selection Clause

Plaintiffs' allegations that the forum-selection clause is contrary to North Carolina's public policy[14] are foreclosed by the Fourth Circuit's decision in *Albermarle Corp.*, which rejected the idea that a state's "strong public policy [could] countermand . . . the federal policy of favoring a contractual choice of forum." 628 F.3d at 652. "Federal law explicitly regulates the appropriate venue in cases filed in federal court." *Id.* State laws to the contrary are therefore preempted. *Id.*; *accord NC Contracting*, 2012 WL 5303295, at *6. Indeed, *M/S Bremen*, 407 U.S. at 15-18, which requires a presumption in favor of enforcing forum-selection clauses, "would have little effect if states could effectively override the decision by expressing disagreement with the decision's rationale." *Albermarle Corp.*, 628 F.3d at 652.

## II. Alternatively, the Tribal Exhaustion Doctrine Requires Dismissal

CRST tribal courts have at least colorable jurisdiction over this case and, as such, it must be dismissed or stayed so that Plaintiffs may exhaust their remedies before a tribal

---

[13] The time when "[p]ersonal dissatisfaction with using a tribal court" could excuse tribal adjudication has long passed. *Risse v. Meeks*, 585 S.D. 875, 879 (1998) (citing *Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 18-19 (1987)). Plaintiffs' allegations provide no suitable basis to upset the settled conclusion that tribal courts are "appropriate forums for the exclusive adjudication of disputes affecting important personal and property interests of both Indians and non-Indians." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65 (1978).

[14] SAC ¶¶ 109, 114, 118, 121, 157, 193, 195, 202.

court.  Under what is known as the "tribal exhaustion doctrine," federal court abstention is  "mandatory" as a matter of comity if Defendants can establish (a) at least a colorable claim that tribal jurisdiction is appropriate and (b) that Plaintiffs have not first pursued remedies in tribal court before turning to a federal forum.  *See Iowa Mut. Ins.*, 480 U.S. at 18-19; *Nat'l Farmers Union Ins. Cos. v. Crow Tribe of Indians*, 471 U.S. 845, 856 (1985).[15]  Plaintiffs' conclusory allegations that tribal jurisdiction is lacking are nowhere near sufficient to deny a "colorable" claim to tribal jurisdiction, and Plaintiffs' refusal to exhaust tribal remedies is evident by their conduct in this case.  *See Bank of Oklahoma v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1170 (10th Cir. 1992) ("[Plaintiff] cannot simply assert that it is not subject to tribal court jurisdiction; rather, it must actually seek adjudication of this issue in tribal court.").  Both preconditions to invoking the tribal exhaustion doctrine are therefore satisfied: abstention or dismissal is mandatory.

### A. The CRST Tribal Courts Have Jurisdiction Over Disputes Arising from Western Sky's On-Reservation Conduct

CRST jurisdiction reaches non-tribal members such as Plaintiffs when a dispute arises from (1) a consensual commercial relationship with (2) a tribal member and (3) the commercial conduct underlying the dispute occurred on the Reservation.  All three of these elements are satisfied:

---

[15] The tribal exhaustion doctrine is applicable even when, as is the case here, there is no pending concurrent tribal court action.  *See Madewell v. Harrah's Cherokee Smokey Mountains Casino*, 730 F. Supp. 2d 485, 489 (W.D.N.C. 2010) (citing cases).

### 1. Plaintiffs Entered a Consensual Commercial Relationship with Western Sky

Plaintiffs knowingly engaged in commercial transactions with tribal members that were consummated on the Reservation. In the seminal case *Montana v. United States*, the Supreme Court held that:

> A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

450 U.S. 544, 565-66 (1981) (internal citations omitted); *see also id.* at 566 (noting that "agreements or dealings" could constitute a consensual relationship sufficient to "subject [non-Indians] to tribal civil jurisdiction"). Recent cases have affirmed these core principles and upheld tribal court jurisdiction over non-Indians. *See Iowa Mut. Ins. Co.*, 480 U.S. at 18 ("Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty."); *Dolgencorp, Inc. v. Miss. Band of Choctaw Indians*, 732 F.3d 409, 415 (5th Cir. 2013) (upholding tribal jurisdiction over non-Indian company that employed unpaid Indian interns, which "unquestionably [constituted] a relationship of a commercial nature" under *Montana* (internal quotation marks omitted)). Thus, the fact that Plaintiffs are non-Indians is of no import because this dispute centers on their consensual commercial relationships with tribal members.

20

In this case, there can be no question that Plaintiffs entered into the kind of consensual commercial relationship with a tribal member as contemplated in *Montana*. Before taking any affirmative step, a prospective borrower who applied for a Western Sky loan over the Internet would be confronted with a prominent disclosure that Western Sky is "owned wholly by an individual Tribal Member of the [CRST]." SAC Ex. 3 at 2. The Agreements themselves put borrowers on notice that they were engaging in commerce with a tribal member that would be consummated on the Reservation. They make clear that they are "subject solely to the exclusive laws and jurisdiction of the [CRST]," and that Plaintiffs "consent[ed] to the sole subject matter and personal jurisdiction of the Cheyenne River Sioux Tribal Court, and that no other state or federal law or regulation shall apply to this Loan Agreement, its enforcement or interpretation." SAC Ex. 1 at 2. *Cf. Grand Canyon Skywalk Dev., LLC v. Sa' Nyu Wa Inc.*, 715 F.3d 1196, 1206 (9th Cir. 2013) (finding that a clear contractual relationship favors application of tribal law, and that "the first [*Montana*] exception applies equally whether the contract is with a tribe or its members"), *cert. denied*, 134 S. Ct. 825 (2013); *FMC v. Shoshone-Bannock Tribes*, 905 F.2d 1311, 1315 (9th Cir. 1990) (upholding tribal jurisdiction over a non-Indian company operating on tribal land that violated tribal hiring ordinance).

### 2. Western Sky Possesses the Rights and Attributes of a CRST Member

Western Sky's conduct is equivalent to that of a tribal member. Mr. Webb, the sole member of Western Sky, is an enrolled member of the CRST, a federally recognized Indian tribe, and by extension, Western Sky possesses the rights and protections of a

tribal member. Courts have consistently recognized that, as a result of sharing their owners' identities, Indian-owned companies also enjoy the privileges of tribal membership. In *Pourier v. South Dakota Department of Revenue*, for example, the South Dakota Supreme Court concluded that an Indian-owned corporation incorporated under state law was an enrolled member of the tribe for purposes of sovereign immunity.[16] 658 N.W.2d 395 (S.D. 2003), *aff'd in part and vacated in part on other grounds*, 674 N.W.2d 314 (2004), *cert. denied*, 541 U.S. 1064 (2004); *see also Confederated Tribes of Chehalis Reservation v. Thurston Cnty. Bd. of Equalization*, 724 F.3d 1153, 1157 (9th Cir. 2013) (holding that a state's authority to impose taxes on a tribal business "cannot be made to turn on the Tribe's decision to give ownership of the Lodge to its limited liability company for the duration of the lease" (internal quotation omitted)); *Sage v. Sicangu Oyate Ho, Inc.*, 473 N.W.2d 480, 483-84 (S.D. 1991) (holding that state courts lack subject matter jurisdiction because defendant, a non-profit corporation, was "neither an individual Indian person nor an instrumentality of the tribal government").

This proposition is not a novel one, as courts on numerous occasions have recognized that corporations can be imbued with the attributes of their owners and beneficiaries. *See Oti Kaga, Inc. v. S.D. Hous. Dev. Auth.*, 342 F.3d 871, 880-82 (8th Cir. 2003) (corporation permitted to vindicate federal civil rights protections of its Indian owners); *Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc.*, 295 F.3d 1065, 1072 & n.2

---

[16] South Dakota courts address issues of tribal law more frequently than courts in other jurisdictions and their opinions are especially authoritative on such issues. *See, e.g., McGuire v. Aberle*, 826 N.W.2d 353 (S.D. 2013); *J.L. Ward Assocs., Inc. v. Great Plains Tribal Chairmen's Health Bd.*, 842 F. Supp. 2d 1163 (D.S.D. 2012).

(10th Cir. 2002) (corporation had standing to sue under civil rights statutes where it suffered harm as a result of racial discrimination against an owner and employee); *Hudson Valley Freedom Theater, Inc. v. Heimbach*, 671 F.2d 702, 706 (2d Cir. 1982) (holding that theater corporation had standing to assert claim alleging it was discriminated against because it sought to involve the black and Hispanic communities); *Howard Sec. Svcs. v. Johns Hopkins Hosp.*, 516 F. Supp. 508, 512-13 (D. Md. 1981) (permitting a company to bring suit under 42 U.S.C. § 1981 because it was owned by, and interchangeable with, its African-American owner).

Indeed, Congress recognized the Indian status of Indian-owned corporations, regardless of where they are incorporated, in the legislation establishing the Indian Business Development Program, which was intended to "establish and expand profit-making Indian-owned economic enterprises." 25 U.S.C. § 1521. The program's implementing regulations expressly include "Indians, Indian Tribes, Indian Partnerships, corporations, or cooperative associations authorized to do business under State, Federal or Tribal Law." 25 C.F.R. § 286.3. Accordingly, Western Sky, as a company owned by Mr. Webb, an enrolled member of the CRST, benefits from the privileges of tribal membership.[17]

---

[17] That Western Sky is incorporated under South Dakota law does not deprive the company of its tribal member status. *See, e.g., Pourier,* 658 N.W.2d at 404-05 (holding that a business incorporated under South Dakota law and not tribal law was an enrolled member of the tribe for purposes of tax immunity because it was *owned* by an enrolled member of the tribe and *operated* on the reservation); *Giedosh v. Little Wound School Bd., Inc.*, 995 F. Supp. 1052, 1059 (D.S.D. 1997) (finding that school board incorporated as a non-profit corporation under South Dakota law was nevertheless secure in its status

### 3. Western Sky Engaged in On-Reservation Conduct

Western Sky's interactions with Plaintiffs—including the consummation of all loans—constituted on-Reservation activity. "Generally, North Carolina applies the doctrine of lex loci contractus, which means a contract is formed in the place at which the last act was done by either of the parties essential to a meeting of the minds." *Cole v. Champion Enters., Inc.*, 496 F. Supp. 2d 613, 621 (M.D.N.C. 2007).

In this case, the last act took place on the Reservation. Electronically executed Agreements were submitted via Western Sky's website for final audit review and acceptance by Western Sky employees. Lawrence Decl. ¶ 8. Those employees were working in Western Sky's offices on the Reservation. Until an Agreement was accepted by Western Sky employees on the Reservation, no contract existed between Western Sky and a prospective borrower, and Western Sky was under no obligation to fund a loan. Critically, because the final act necessary to consummate each Agreement—Western Sky's acceptance—occurred on the Reservation, the Reservation is the place of contracting.[18] *Cf. DISH Network Serv. L.L.C. v. Laducer*, 725 F.3d 877, 884 (8th Cir.

---

as an "Indian tribe" under Title VII and ADA); *Sage*, 473 N.W.2d at 483-84 (ruling that a non-profit corporation incorporated under South Dakota law and operated by tribal members was still entitled to the benefits of tribal membership).

[18] The framework set forth by the FDIC to determine which state's interest charges apply in the consumer banking context is instructive:

> If an out-of-state branch or branches of an Interstate State Bank in a single host state performs all the non-ministerial functions (approval of an extension of credit, extension of the credit, and disbursal of loan proceeds to a customer) related to a loan, it "makes" the loan to the customer for purposes of the Interstate Banking Statutes and the loan

24

2013) (applying state law to determine whether a tort occurred on- or off-reservation for the purpose of a similar jurisdictional analysis).

## B.     Tribal Jurisdiction Is, At Minimum, Colorable

Plaintiffs do not dispute that they borrowed money from a Reservation-based lender that is owned by an enrolled member of the CRST, and that they did so pursuant to choice-of-forum and choice-of-law clauses implicating the CRST's jurisdiction and laws. Such facts are sufficient to establish a colorable claim to CRST jurisdiction.

Consistent with the principles of inherent tribal sovereignty and self-governance, tribal courts are vested with exclusive jurisdiction over civil disputes involving the on-reservation conduct of tribal members. *Iowa Mut. Ins. Co.*, 480 U.S. at 145 ("Tribal courts play a vital role in tribal self-government."). As the Supreme Court explained in *Williams v. Lee*, tribal courts "exercise broad criminal and civil jurisdiction which covers suits by outsiders against Indian defendants." 358 U.S. 217, 222 (1959). Codifying this principle, the CRST Code asserts territorial jurisdiction over the entire Reservation and all persons or corporate entities transacting business on the Reservation. *See* Ray Decl. Ex. 1-A (CRST Code §§ 1-4-1, 1-4-3, 1-4-5). The CRST Constitution and By-Laws

---

should be governed by the usury provisions of the host state. If the three non-ministerial functions occur in different states or if some of the non-ministerial functions occur in an office that is not considered to be the home office or branch of the bank, the home state rates may be used.

FDIC General Counsel's Op. No. 11, Interest Charges by Interstate State Banks, 63 Fed. Reg. 27,282, 27,286 (May 18, 1998). *See also* OCC Interpretive Ltr. No. 822, Feb. 17, 1998, *reprinted in* Fed. Banking L. Rep. (CCH) P 81-209 (addressing the same issue in the context of national banks). Under this framework, the Western Sky loans would be deemed to have been "made" on the Reservation—not in North Carolina.

endow tribal courts with exclusive jurisdiction over claims and disputes arising on the Reservation. *See id.* Ex. 2 (CRST By-Laws, Art. V).[19]

Combined with Plaintiffs' voluntary commercial interaction with Western Sky, the CRST Constitution, By-Laws and Code leave no question that CRST tribal courts have at least a "colorable" claim of jurisdiction over this case. Defendants have met their relatively low burden, and Plaintiffs cannot demonstrate that "it is 'plain' that tribal jurisdiction does not exist." *Laducer*, 725 F.3d at 883; *see also Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 34-35 (1st Cir. 2000) (stating that "wholly conclusory" allegation that "tribal forum will prove to be biased in fact and partisan in operation" is insufficient to trigger "exceptions to tribal exhaustion doctrine"). Plaintiffs' claims, which all involve Western Sky loans, must first be adjudicated in a CRST tribunal. Dismissal or issuance of a stay under the tribal exhaustion doctrine is required.[20]

---

[19] The broad scope of tribal jurisdiction was recently affirmed by the CRST Tribal Council, which in a formal Tribal Resolution held that "absent Congressional authorization, states have no authority to regulate the property or activities of the Tribe or its members on the Reservation, including the business activities of enterprises owned by the Tribe or its members." *See* Ray Decl. Ex. 3 (CRST Tribal Resolution No. 350-2013-CR, at 2 (Nov. 12, 2013)).

[20] Under factually similar circumstances, a federal court has required a plaintiff to exhaust tribal court remedies before bringing suit against a company owned by a tribal member and incorporated in Montana. *See Cropmate Co. v. Indian Res. Int'l, Inc.*, 840 F. Supp. 744, 745-48 (D. Mont. 1993). This Court should follow the example of *Cropmate*, which properly reviewed and applied the Supreme Court's precedent on exhaustion.

## III.     Alternatively, the Arbitration Provision Requires Dismissal

In the event outright dismissal under the doctrines of *forum non conveniens* or tribal exhaustion is denied, this Court should dismiss the case because all of Plaintiffs' claims are subject to arbitration.   Under section 2 of the FAA, arbitration agreements such as those here are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."   9 U.S.C. § 2.   Although section 3 of the FAA requires courts to stay litigation of arbitral claims pending arbitration of those claims, "dismissal is a proper remedy when all of the issues presented in a lawsuit are arbitrable." *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001).   *Accord McLaughlin v. Inmar, Inc.*, No. 1:11-cv-983, 2012 WL 7176855, at *2 (M.D.N.C. Feb. 13, 2012).   Here, the FAA requires the court to enforce the arbitration provisions and dismiss the case.[21]

### A.     This Action Is Covered by the Agreements' Arbitration Provisions

The FAA "reflects an emphatic federal policy in favor of arbitral dispute resolution."   *Marmet Health Care Cntr., Inc. v. Brown*, 132 S. Ct. 1201, 1203 (2012) (

---

[21]  In the SAC, Plaintiffs advance a legal argument that "Defendants are barred and estopped from claiming any right to arbitration under the Federal Arbitration Act" because the governing law section of the Agreements states that they are not "subject to the laws of the United States."  SAC ¶¶ 5, 124.  Putting aside the propriety of making legal arguments in a pleading, *cf. Goldman v. Brannon*, No. 5:11-CT-3051, 2013 WL 4454638, at *2 (E.D.N.C. Aug. 16, 2013) (briefing memoranda do not qualify as a "pleading" under Rule 7(a)), it is clear that federal law governs the interpretation of the arbitration provision regardless of what decisional law the parties have chosen to govern their dispute.   *See Hall St. Assocs., LLC v. Mattel, Inc.*, 552 U.S. 576 (2008) (parties cannot contract around the FAA); *Rota-McLarty v. Santander Consumer USA, Inc.*, 700 F.3d 690, 697 n.7 (4th Cir. 2012) ("[G]eneral choice-of-law provision does not displace federal arbitration law if the contract involves interstate commerce.").

citation and quotation omitted).  It "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed."  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (emphasis in original).

In the Fourth Circuit, a party seeking to compel arbitration must establish four elements, all of which are present here: "(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [opposing party] to arbitrate the dispute."  *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).

### 1.    The Elements Necessary To Compel Arbitration Are Satisfied

The SAC and its attached exhibits demonstrate satisfaction of all four elements. The first and fourth elements—the existence of a dispute and the failure by Plaintiffs to arbitrate that dispute—are met by virtue of Plaintiffs' litigation in a court rather than arbitral forum.

The second element—the existence of a written arbitration agreement covering the instant dispute—cannot be challenged: there was an offer, acceptance, and consideration; the arbitration agreements broadly cover "any dispute . . . under th[e] loan agreement"; and Plaintiffs each had sixty days to opt out of arbitration, but chose not to do so.  *See* pp. 7-8, *supra*.

28

Finally, with their relation to loans issued from within the Reservation to North Carolina residents, the transactions at issue are unquestionably connected to interstate or foreign commerce, satisfying the third element.[22]

### 2. The Enforceability and Scope of the Arbitration Provision Are Delegated to Arbitration

Once a party seeking to compel arbitration demonstrates the existence of a written agreement covering the parties' dispute, the "strong federal policy favoring arbitration" puts the burden on "the party opposing arbitration to demonstrate why arbitration should not be ordered." *Wake Cnty. Bd. of Educ. v. Dow Roofing Sys., LLC*, 792 F. Supp. 2d 897, 900 (E.D.N.C. 2011). *Accord Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 92 (2000). Plaintiffs cannot carry their burden.

Plaintiffs mistakenly argue that a variety of state law contract defenses render the parties' arbitration agreement unenforceable. Those defenses are not ripe for consideration here because the Agreements delegate attacks on the enforceability or scope of the arbitration provisions to arbitration—and certainly not to a federal court. The relevant "written provision . . . to settle by arbitration a controversy"[23] that

---

[22] Plaintiffs' contention that they did not sign the Agreements "by hand" is of no significance. SAC ¶¶ 53, 149. The FAA's "written provision" requirement has been uniformly interpreted to account for "e-signatures." *Metro. Regl. Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 722 F.3d 591, 602 (4th Cir. 2013). Plaintiffs' related contention that CashCall lacks authority to enforce the Agreements is contradicted by the Agreements' plain language, which makes clear that the arbitration provision is binding upon [Western Sky], [its] successors and *assigns, and related third parties*." SAC Ex. 6 (emphasis added). Having contracted to service loans on behalf of Western Sky's assign, WS Funding, CashCall is a related third party. *See* SAC ¶ 22.

[23] 9 U.S.C. § 2.

29

Defendants seek to enforce includes a clause that delegates to arbitration "any issue concerning the validity, enforceability, or scope of th[e] loan or the Arbitration agreement." SAC Ex. 1 at 4. Because arbitration provisions are "severable from the remainder of the contract," challenges to a contract as a whole or to non-arbitration portions of a contract "do[] not prevent a court from enforcing a specific agreement to arbitrate." *Rent-A-Cntr., W., Inc. v. Jackson*, 130 S. Ct. 2772, 2778 (2010); *see also Benezra v. Zacks Inv. Research, Inc.*, No. 1:11-CV-596, 2012 WL 1067559, at *3 n.2 (M.D.N.C. Mar. 30, 2012). Thus, where an arbitration agreement "clearly and unmistakably" delegates "threshold issues concerning the arbitration agreement" to arbitration, those issues are not to be decided by the district court absent a showing that the delegation provision *itself*—and not the contract or arbitration provision generally—is invalid. *Rent-A-Cntr.*, 130 S. Ct. at 2777, 2784.

Plaintiffs allege no plausible facts casting doubt on the validity of the delegation clause. Even if accepted as true, Plaintiffs' scattershot contentions that the Agreements or arbitration provision are deficient—*e.g.*, "the parties to the agreement failed to have a meeting of the minds" (SAC ¶ 148); the loans are "criminal" and "void as against public policy" (SAC ¶¶ 121, 154, 157); and the "arbitration clause is an unconscionable provision of a contract of adhesion" (SAC ¶ 156)—are of no moment. These and other of Plaintiffs' allegations speak only to the arbitration provision or Agreements generally and provide no plausible basis to conclude that the delegation clause itself was procured through fraud or similar means. *See, e.g.*, *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440 (2006) (holding that legality of loan agreement is to be resolved in arbitration

30

where parties agreed to arbitrate all disputes arising from the contract); *Jeske v. Brooks*, 875 F.2d 71, 75 (4th Cir. 1989) (holding that unconscionability and lack-of-consideration defenses challenging the entire contract, rather than the arbitration clause itself, are for the arbitrator to decide). Moreover, Plaintiffs' bald allegation, unadorned by *any* plausible factual assertions, of "the unfairness, deceptiveness, and unenforceability of the . . . delegation clause" (SAC ¶ 171) merits no weight. *See, e.g.*, *May v. Nationstar Mortg. LLC*, No. 3:12-CV-43, 2012 WL 3028467, at *10 (N.D. W. Va. July 25, 2012) (rejecting "general assertion" that "*the requirement that the validity and enforceability of the agreement be arbitrated*" is "unconscionable" (brackets omitted; emphasis in original)).

As the parties agreed unequivocally to a broad delegation provision requiring all gateway questions concerning arbitrability to be considered in arbitration—not here in a federal district court—this case must be dismissed.

**B.      The Plaintiffs' Arbitration Agreements Must Otherwise Be Enforced**

**1.      Plaintiff Brown's Agreement Requires Arbitration Before AAA, JAMS, or a Mutually Agreeable Arbitration Administrator**

Even if Plaintiffs' attacks on the arbitration provisions could be heard in this forum, Plaintiff Brown has provided no suitable reason for this Court to set aside the clear language of his Agreement. His Agreement provides that "You agree that any Dispute, *except as provided below*, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement." SAC Ex. 1 at 4 (emphasis added). And, "provided below," in a section entitled "Choice of

Arbitrator," his Agreement states: "[r]egardless of who demands arbitration, you shall have the right to select any of the following arbitration organizations to administer the arbitration: the American Arbitration Association . . .; JAMS . . .; or an arbitration organization agreed upon by you and the other parties to the Dispute." *Id.* This listing of arbitration administrators is properly understood as the "exceptions" to tribal arbitration contemplated in the previous clause. But even if the language is regarded as ambiguous, this Court is required to construe "any doubts concerning the scope of arbitrable issues" in favor of arbitration, including when "the problem at hand is the construction of contract language itself." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Having failed to avail himself of arbitration as provided in his Agreement, Plaintiff Brown's claims must be dismissed.

> ## 2. The Non-Brown Plaintiffs' Agreement Requires Arbitration Before a Tribal Elder or a Panel of Three Tribal Council Members

Nor can the Non-Brown Plaintiffs establish a basis for setting aside their arbitration agreements. Those Agreements state that, "except as provided below," arbitration "shall be conducted by the [CRST] Nation by an authorized representative in accordance with its consumer dispute rules." *See*, *e.g.*, SAC Ex. 7 at 4 (Non-Brown Agreement). The Non-Brown Agreements go on to define "below" who may serve as the arbitrator, specifying that "Arbitration shall be conducted in the [CRST] Nation by your choice of either (i) a Tribal Elder, or (ii) a panel of three (3) members of the Tribal Council . . . ." *Id.* at 5. Despite this clear requirement for arbitration, Plaintiffs allege not even an attempt to abide by this provision, and Defendants' records reflect nothing to the

32

contrary. Plaintiffs instead unabashedly try to exempt themselves from the arbitration provision by alleging that CRST arbitration is a "sham" and the CRST "has no 'consumer dispute rules' governing arbitration." SAC ¶ 132.

Even if, contrary to well-settled Supreme Court precedent, this Court was permitted to ignore the delegation clause and consider Plaintiffs' labeling of the arbitration provision as a "sham," *see* pp. 29-31, *supra*, Plaintiffs' name-calling would be entitled to no weight because they put forth no plausible allegations to support their conclusion that Western Sky inserted the arbitration provision with a nefarious intent to deceive consumers. The SAC's sweeping allegation of deception is based on two opinions involving a single, never-completed arbitration in which a court refused to enforce the arbitration provision because the designated arbitral forum was found to be wanting. SAC ¶ 169 (citing *Inetianbor*, 2013 WL 449125); *id.* ¶ 171 (citing *Jackson v. Payday Financial, LLC*, No. 11-C-9288, 2012 WL 2722024 (N.D. Ill. July 9, 2012)).[24] At minimum, an allegation that Defendants engaged in fraudulent conduct aimed at Plaintiffs in *this* case must be based on more than *someone else's* attempt to arbitrate in an entirely *separate* case.

Nor does the absence of any specified arbitration rules render the Non-Brown Agreements unenforceable. The fact that an arbitrator might "employ different rules" from what a contract contemplates is immaterial because rules of arbitral procedure

---

[24] Defendants vigorously dispute the conclusions drawn by the district courts in *Inetianbor* and *Jackson* and are challenging them on appeal. *See Inetianbor v. CashCall, Inc.*, No.13-13822 (11th Cir.); *Jackson v. Payday Fin. LLC*, No. 12-2617 (7th Cir.).

cannot be deemed material to the parties' decision to arbitrate. *Green v. U.S. Cash Advance Ill., LLC*, 724 F.3d 787, 790-91 (7th Cir. 2013). Which rules govern does not "affect the desirability of arbitration, from either a lender's perspective or a customer's." *Id.* at 790. The absence of consumer dispute rules does not mean that no law will govern the substance of the parties' arbitral dispute. To suggest otherwise, as Plaintiffs do, ignores that the Agreements are explicitly "governed by . . . the laws of the [CRST]." SAC Ex. 7 at 4 (Non-Brown Agreement).

Notwithstanding the fatal frailty of Plaintiffs' excuse for not abiding by their arbitration provisions, in order to avoid needless litigation over how Plaintiffs' claims ought to be litigated, Defendants do not object to reforming the Non-Brown Plaintiffs' arbitration provisions so that, like Plaintiff Brown's arbitration provision, disputes would be resolved before AAA, JAMS, or any other agreed-upon organization.[25]

## C. The Non-Brown Plaintiffs' Allegations Regarding the Availability of CRST Arbitration Are Irrelevant Under FAA Section 5

The SAC's contention that CRST arbitration is a "sham" is also unavailing because Section 5 of the FAA requires this Court to appoint a substitute arbitral forum[26] whenever the contractually-designated forum is unavailable for "any . . .

---

[25] Defendants' willingness to arbitrate each individual Plaintiff's dispute under either mutually-agreeable or court-selected arbitral forum rules readily distinguishes this case from *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999) and *Murray v. United Food and Commercial Workers Int'l Union*, 289 F.3d 297 (4th Cir. 2002), where the Fourth Circuit invalidated arbitration agreements that gave one party overwhelming influence over the rules of arbitration and selection of arbitrators.

[26] Any arguments about the "forum" apply equally to the unavailability of the "consumer dispute rules" because a forum may conduct arbitration pursuant to any rules the parties wish. *See* p. 33, *supra*.

reason." 9 U.S.C. § 5. Its mandate "allows judges to supply details in order to make arbitration work." *Green*, 724 F.3d at 793; *see also Wolverine Fire Prot. Co. v. Atl. Marine Constr. Co.*, No. 2:08cv75, 2008 WL 1847 512, at *2 (E.D. Va. Apr. 24, 2008) ("The FAA . . . operates to provide the terms of arbitration on which the contract is silent."). And, various courts within the Fourth Circuit have done so. *See, e.g., Montgomery v. Applied Bank*, 848 F. Supp. 2d 609, 614 (S.D. W. Va. 2012) (compelling arbitration pursuant to Section 5 because "AAA is unable or unwilling to serve as an administrator"); *McNeil v. Haley South, Inc.*, No. 3:10cv192, 2010 WL 3670547, at *5 (E.D. Va. Sept. 13, 2010) (compelling arbitration pursuant to Section 5 "despite the fact that [arbitration agreement] does not establish a specific set of applicable rules and procedures").

The Non-Brown Plaintiffs may argue that the non-discretionary nature of Section 5 is not absolute where an unavailable forum is explicitly referenced as "exclusive" or "clearly integral" to the parties' arbitration agreement. *See, e.g.*, *Khan v. Dell Inc.*, 669 F.3d 350, 353-57 (3d Cir. 2012); *Reddam v. KPMG, LLP*, 457 F.3d 1054, 1060-61 (9th Cir. 2006), *overruled on other grounds by Atl. Nat'l Trust LLC v. Mt. Hawley Ins. Co.*, 621 F.3d 931 (9th Cir. 2010). The Fourth Circuit has not yet considered the issue and, in the absence of any binding precedent, this Court need not accept any invitation to read an "integral part" exception into Section 5. It should instead follow the Seventh Circuit's recent decision in *Green v. U.S. Cash Advance Illinois, LLC* and find no such exception. That opinion, which is the most recent Court of Appeals' decision on the issue, held that a designated arbitral forum's status as "integral" can never be a bar to abrogate Section

5's command that district judges "supply particulars" where an arbitral forum is unavailable. *Green*, 724 F.3d at 792. Given the absolute language of Section 5 that "a judge can appoint an arbitrator when for 'any' reason something has gone wrong," *id.* at 791, the Seventh Circuit was "skeptical" of any argument that "allow[s] a court to declare a particular aspect of an arbitration clause 'integral' and on that account scuttle arbitration itself." *Id.* That same skepticism is warranted here. Accordingly, if this Court finds that the designated arbitral forum is unavailable for any reason, it must follow the non-discretionary command of Section 5 and enforce the arbitration provision.

But even if the Court recognizes an integral part exception to Section 5, there is no reason to withhold enforcement of the Non-Brown Plaintiffs' arbitration provisions on such a basis. The rule in circuits that have found an integral part exception to Section 5 is that a contractual forum is integral only if the agreement explicitly labels the chosen forum as "exclusive" or the forum is "clearly integral," which is not the case here. *See Khan*, 669 F.3d at 353-57; *Reddam*, 457 F.3d at 1060-61.[27]

Nowhere in the Non-Brown Plaintiffs' Agreements is it "expressly stated" that a tribal arbitral forum is "exclusive" or that the parties intended the arbitration provision to

---

[27] Plaintiffs may rely on *Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000), which states that an arbitral forum is "integral" if it was more than "an 'ancillary logistical concern'" to the parties. *Brown*'s approach exclusively relied on dicta from a Northern District of Illinois case that the Seventh Circuit recently rejected. *Green*, 724 F.3d at 792. Even assuming *Brown* remains good law (which Defendants contest) and it is applicable here, Plaintiffs allege no facts to suggest the designation of tribal arbitration was anything but "an ancillary logistical concern." *See, e.g.*, *Brown*, 211 F.3d at 1222-23; *Selby v. Deutsche Bank Trust Co. Americas*, No. 12cv1562, 2013 WL 1315841, at *12 (S.D. Cal. Mar. 28, 2013); *Diversicare Leasing Corp. v. Nowlin*, No. 11-CV-1037, 2011 WL 5827208, at *7 (W.D. Ark. Nov. 18, 2011).

36

be void if the contractual forum is unavailable. *See Reddam*, 457 F.3d at 1060-61; SAC Ex. 7. To the contrary, the Agreements contain a severance clause making clear that the parties had no intention for their arbitration agreement to self-destruct if the designated forum is unavailable. *See Fellerman v. Am. Ret. Corp.*, No. 03:09-CV-803, 2010 WL 1780406, at *5 (E.D. Va. May 3, 2010) (finding that severance clause providing "that any clause rendered invalid or unenforceable shall not affect the remainder of the agreement" required enforcement of arbitration agreement even if designated AAA arbitration is unavailable); *see also Jones v. GGNSC Pierre LLC*, 684 F. Supp. 2d 1161, 1167 (D.S.D. 2010) ("The severance provision indicates that the intention was not to make the NAP integral, but rather to have a dispute resolution process through arbitration."). Thus, even assuming an integral part exception to Section 5 exists, a substitute arbitral forum must be appointed because the plain language of the arbitration provision cannot be interpreted to express "the parties' *unambiguous* intent not to arbitrate their disputes if [the selected forum] is unavailable." *Khan*, 669 F.3d at 357 (emphasis added).

Indeed, far from alleging that the designated arbitral forum was central to their decision to enter the Agreements, the Non-Brown Plaintiffs contend that the arbitration provision was simply part of a standard adhesion contract over which no negotiation—or focus on the arbitral forum—occurred. SAC ¶¶ 155, 156; *Jones*, 684 F. Supp. 2d at 1168 (arbitration forum not integral where "Court is mindful that the arbitration agreement is a standard form . . . not negotiated by the parties"). This lack of significance that the Non-Brown Plaintiffs attach to the designated arbitral forum is underscored by their lack of *any* effort to arbitrate in the forum which they might now claim was "integral" to their

decision to enter the Agreements.  Rather than plead any plausible facts to suggest that "the parties would not have agreed upon arbitration absent the selected forum," *Jones*, 684 F. Supp. 2d at 1166, Plaintiffs have fought tooth and nail to avoid arbitrating their claims.

### D.     The Court Should Otherwise Refrain from Entertaining a Pre-Arbitration Attack on Arbitrator Bias and Corruption

Assuming for the sake of argument that the arbitration clause does not "clearly and unmistakably" delegate threshold issues to arbitration (which it does) or that Section 5 does not alternatively compel appointment of a substitute arbitrator where the designated arbitrator or forum is unavailable (which it does), Plaintiffs' allegations of bias and corruption are entitled no weight for two principal reasons.

First, Section 2 of the FAA preempts bias defenses that are not applicable to all contracts.  That section permits challenges to arbitration clauses "only upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2; *see AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1741 (2011) (FAA preempts "defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue").  By challenging the arbitration provision on the basis that the agreed-upon arbitral forum is biased, Plaintiffs have put forth a defense that is not applicable to "any contract."

Second, to the extent claims of bias are permitted, the FAA allows them only *after* an arbitration award has been issued.  *See* 9 U.S.C. § 10(a)(1)-(2); *Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 541 (1995) (rejecting pre-arbitration

38

attack on arbitral forum-selection clause based on "mere speculation that the foreign arbitrators might apply [foreign] law"); *Burlington Ins. Co. v. Trygg-Hansa Ins. Co., AB*, No. 1:99CV334, 2002 WL 855911, at *1 (M.D.N.C. Apr. 19, 2002) ("[T]he Federal Arbitration Act . . . [does not] contain[] any provision for judicial review of an arbitrator's qualifications *prior to* issuance of an award." (emphasis added)). With no arbitration award having yet been issued in this dispute, Plaintiffs' allegations of bias and corruption should be ignored.

## IV. Alternatively, Several of Plaintiffs' Causes of Action Fail to State A Claim Upon Which Any Relief Can Be Granted

Setting aside Plaintiffs' general failure to abide by the forum-selection and arbitration provisions of the Agreements or to exhaust tribal remedies, much of the SAC should be dismissed for the independent reason of failure to state a claim under Rule 12(b)(6). In evaluating whether a complaint can survive a motion to dismiss for failure to state a claim, a court accepts well-pled factual allegations as true but need not consider "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). To avoid dismissal, a plaintiff must do more than demonstrate "a sheer possibility that a defendant has acted unlawfully." *Id.* at 679. Rather, a plaintiff must plead sufficient facts to permit a plausible inference that a legal violation occurred. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th Cir. 2011) (citing *Iqbal*, 556 U.S. 679).

Rule 9(b)'s heightened pleading standard applies to Plaintiffs' conspiracy claims premised on fraud and their fraudulent conveyance claim. *Menasco, Inc. v. Wasserman*,

886 F.2d 681, 684 (4th Cir. 1989); *Thimbler, Inc. v. Unique Solutions Design, Ltd*., No. 5:12-CV-695-BR, 2013 WL 4854514, at *7-8 (E.D.N.C. Sept. 11, 2013). Under the rule, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Plaintiffs "must, at minimum, describe the time, place, and contents of the false representations, as well as the identity of the persons making the misrepresentation and what [they] obtained thereby." *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 379 (4th Cir. 2008) (quotation omitted).

A.    **Plaintiffs Fail to State Any Claim Against Payday Financial**

Plaintiffs' undifferentiated allegations against "Defendants" are insufficient to state any claim against Payday Financial. Plaintiffs allege that Payday Financial is the sole member of Western Sky and that, upon information and belief, Payday Financial "marketed and made payday loans throughout the United States, including . . . in North Carolina." SAC ¶¶ 19, 70. Other than these limited references, Plaintiffs fail to allege that Payday Financial was in any way involved in the marketing or servicing of any loan upon which Plaintiffs sue.

Numerous lower courts have held that undifferentiated allegations against lumped-together defendants cannot state a claim for relief. *See, e.g., Boykin Anchor Co*., *Inc. v. AT&T Corp.*, No. 5:10-CV-591, 2011 WL 1456388, at *4 (E.D.N.C. Apr. 14, 2011); *Delumen v. One West Bank FSB*, No. WMN-10-2758, 2011 WL 256195, at *3 (D. Md. Jan. 26, 2011); *Yost v. City of Charleston*, No. 2:09-2024-PMD, 2009 WL 4162274, at *3-4 (D.S.C. Nov. 24, 2009). Plaintiffs' collective reference to "Defendants" therefore

cannot serve as a basis for "draw[ing] a reasonable inference that [Payday Financial] is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Nor is Plaintiffs' mere *ipse dixit* that "[a]ll Defendants named in this complaint share liability because they entered a conspiracy" sufficient to state a claim against Payday Financial. SAC ¶ 218. In the absence of any specific allegations of an agreement entered into, or action taken in furtherance of, a conspiracy by Payday Financial, Plaintiffs' bald claims of conspiracy cannot survive a motion to dismiss. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-57 (2007); *Chubirko v. Better Bus. Bureau*, No. 3:09-CV-502-FDW-DLH, 2011 WL 446888, at *4, *5 (W.D.N.C. Feb. 10, 2011); *Gibson v. America's Servicing Co.*, No. 5:10-CV-342-FL, 2010 WL 4974552, at *2-3 (E.D.N.C. Nov. 30, 2010). Accordingly, all claims against Payday Financial should be dismissed.

### B. Plaintiffs' State Law Claims Are Based On Inapplicable Law

Should this Court reach the merits, it must dismiss all claims premised on North Carolina law because the governing law of the Agreements is CRST law.

### 1. North Carolina's Choice-of-Law Rules Apply

A federal court must apply the conflict-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). The North Carolina conflict-of-law rules are fairly straightforward: "The parties' choice of law is generally binding on the interpreting court as long as they had a reasonable basis for their choice and the law of the chosen State does not violate a fundamental policy of the state of otherwise applicable law." *Behr v. Behr*, 46 N.C. App. 694, 696 (1980) (adopting and paraphrasing

41

Restatement (Second) of Conflict of Laws § 187 (1971)); *see also Tanglewood Land Co., Inc. v. Byrd*, 299 N.C. 260, 262 (1980).

Once a court has determined the two jurisdictions relevant to the conflict-of-law analysis, it must determine whether the application of the chosen forum's law would violate a fundamental policy of the forum in which the contract was made. *See* Restatement (Second) of Conflict of Laws § 187(2)(b); *Cable Tel. Servs., Inc. v. Overland Contracting, Inc.*, 154 N.C. App. 639, 643 (2002) (applying Section 187 of the Restatement); *Broadway & Seymour, Inc. v. Wyatt*, 944 F.2d 900, at *3 (4th Cir. 1991) (unpublished opinion) (same). *Only if* a fundamental policy of the contracting forum is violated must the court then weigh the relative interests of the competing forums. *See id.* Even then, the court may disregard the parties' choice-of-law agreement *only if* the interests of the forum in which the contract was made are materially greater than those of the forum chosen by the parties. *Id.*

### 2. The Choice-of-Law Clause Is Enforceable

There is no serious question that the parties had a "reasonable basis" for choosing CRST law to govern the Agreements given that Western Sky, a party to all of the Agreements, had its principal place of business within the Reservation. *See* pp. 3-4, *supra*; *Torres v. McClain*, 140 N.C. App. 238, 241 (2000) (location of the parties' domicile is a reasonable basis for choosing a jurisdiction).

Further, for all but Plaintiffs' usury claim (which is discussed below), it is readily apparent that the parties' chosen law does not conflict with the "otherwise applicable law," because here those two bodies of law are the same—*i.e.*, CRST law. In North

42

Carolina, the "state of otherwise applicable law" is typically the state in which the contract was "made." *See, e.g.*, *Cable Tel. Servs., Inc.*, 154 N.C. App. at 643; *see also Fast v. Gulley*, 271 N.C. 208, 211 (1967); *Cocke v. Duke Univ.*, 260 N.C. 1, 8 (1963). As noted above (pp. 23-24), under North Carolina law, a contract is typically "made" in the jurisdiction where "the last act [is] done by either of the parties [that is] essential to a meeting of minds." *Bundy v. Commercial Credit Co.*, 157 S.E. 860, 862 (1931). That last act is almost always the acceptance by one party of the other party's offer. *See, e.g.*, *Liberty Fin. Co. v. N. Augusta Computer Store, Inc.*, 100 N.C. App. 279, 285 (1990).

Plaintiffs do not plead that the Agreements were not "made" on the Reservation. Even accepting Plaintiffs' allegations as true (which Defendants dispute), the facts would be as follows:

- Defendants intentionally solicited loan applications from North Carolina residents through the use of television advertisements and Internet websites viewable by residents of this state. SAC ¶¶ 47-48, 63.

- While they were physically located in North Carolina, these residents, including Plaintiffs, decided to apply for a loan and submitted a loan application through the Western Sky website. *Id*. ¶¶ 17, 47-48, 53.

- The Western Sky website communicated the information to a server located in California. *Id*. ¶ 64.

- Western Sky then considered the application and decided whether to approve or reject it. *Id*. ¶ 48. (The SAC is silent about where this acceptance took place.)

- Western Sky communicated the approval or denial of the application to the North Carolina residents by phone or email. *Id*. ¶¶ 47, 48.

- Western Sky electronically transferred loan funds from an unstated location to the Plaintiffs' bank accounts in North Carolina. *Id*. ¶¶ 17, 49, 55.

43

Despite its prolixity, the SAC is silent on the critical matter of where the "last act necessary for a meeting of the minds" occurred. Without any factual allegations that might cast doubt on the recitations in the Agreements, the Court should assume, as the Plaintiffs apparently do, that the Agreements were made on the Reservation and the "otherwise applicable law" is that of the CRST. Thus, as it concerns all but Plaintiffs' usury claim, the parties' chosen law and otherwise applicable law are the same and there can be no conflict. For this reason, no further analysis is required with respect to all of Plaintiffs' North Carolina law claims except usury.

### 3. As to the Usury Claim, the CRST's Interest in this Case Outweighs North Carolina's

Although the parties' chosen law conflicts with the "otherwise applicable law" for purposes of North Carolina's usury statute, CRST law still controls because the CRST's interest in enforcing its laws to this case predominates North Carolina's. Under the North Carolina usury statute, the General Assembly has departed from the traditional view of the "last act" and a contract is deemed "made" in North Carolina if *either* the offer or the acceptance occurred in this State. N.C. Gen. Stat. § 24-2.1(a). With the relevant "offer" in this case having occurred in North Carolina, the Agreements are deemed to be "made" in North Carolina. North Carolina law, which imposes an interest rate cap of 16% on consumer loans of less than $25,000, is the "otherwise applicable law." N.C. Gen. Stat. § 24-1.1.

Plaintiffs allege that the Agreements are usurious under CRST law. SAC ¶ 128 (citing now-defunct CRST Code § 3-4-52, setting maximum interest rate of 24% on

44

consumer loans and providing for criminal penalties). That is incorrect. *See* Declaration

of Steven Emery ¶¶ 9-13. The cited 1978 provision from the CRST Law and Order Code

was superseded in 1997, when the CRST adopted its Uniform Commercial Code

("UCC"). *See id.* Under CRST UCC § 16-3-112, the interest rate of a loan is that which

was negotiated by the parties to the loan and stated in the loan agreement. Ray Decl. Ex.

1-C; Emery Decl. ¶ 10. Thus, there is currently no interest-rate rate cap for consumer

loans under CRST law.[28]

Any potential conflict between North Carolina and CRST law is not determinative,

however, when, as is the case here, the interests of North Carolina are not materially

greater than contracted-for law. *See Cable Tel. Servs.,* 154 N.C. App. at 643. The

CRST's interest in applying its laws to businesses that are run by and provide

employment to tribal members is significant in light of the limited economic

opportunities and high unemployment on the CRST reservation. *Cf. Attorney's Process

& Investigation Servs., Inc. v. Sac & Fox Tribe of Miss. in Iowa*, 609 F.3d 927, 939-40

(8th Cir. 2010) (upholding tribal court jurisdiction when private company interfered with

---

[28] Even if there were a genuine dispute as to whether the loans were illegal under CRST law (which there is not), it is the exclusive right of the CRST—not of Plaintiffs—to construe and to enforce CRST law. *See California v. Miami Nation Enters.*, -- Cal. Rptr. 3d --, 2014 WL 216318, at *11 (Ct. App. 2d Dist. 2014) (declining to resolve dispute over whether online consumer loans by tribal entities violated tribal law because "for a state court to adjudicate" that question "would offend all notions of tribal sovereignty"); *Basil Cook Enters. v. St. Regis Mohawk Tribe*, 117 F.3d 61, 66 (2d Cir. 1997) (recognizing "exclusive responsibility of Native American tribes to construe their own law" and "parallel responsibility of [non-tribal] courts to abide by those constructions"); *R.J. Williams Co. v. Ft. Belknap Hous. Auth.*, 719 F.2d 979, 982 (9th Cir. 1983) (holding that dispute arising on reservation "involve[d] a genuine issue of tribal ordinance construction which must be left to the tribal court for resolution").

on-reservation casino that was the "Tribe's economic engine"). On a Reservation experiencing 88% unemployment and largely dependent on federal assistance, successful litigation against Western Sky will further impoverish the CRST's members. *See* U.S. Dep't of the Interior, Bureau of Indian Affairs, Office of Indian Servs., Am. Indian Population and Labor Force Rep. 8 (2005), *available at* http://www.bia.gov/cs/groups/public/documents/text/idc-001719.pdf (88% unemployment rate on Reservation); U.S. Census Bureau, Small Area Income and Population Estimates, Poverty Rate, All Ages (2012) (county comprising Reservation is fourth poorest county in the U.S. with a poverty rate of 46.6%), *available at* http://www.census.gov/did/www/saipe/data/highlights/2012.html.[29]

Even beyond these tangible financial implications, the CRST also has a vested interest in preserving its right of self-governance from undue state interference. *Cf. Gila River Indian Community v. Waddell*, 967 F.2d 1404, 1410 (9th Cir. 1992) ("That a tribe plays an active role in generating activities of value on its reservation gives it a strong interest in maintaining those activities free from state interference."). This interest is especially high given that the state seeking to regulate the CRST's members is located over a thousand miles away, and in no way borders the Reservation.[30]

---

[29] Consideration of matters of public record does not transform this motion to dismiss for failure to state a claim into one for summary judgment. *See supra* n.3.

[30] A strong federal interest "of promoting tribal self-sufficiency and economic development," *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 143 (1980), reinforces the CRST's interest in seeing its laws applied here. *See also* Ray Decl. Ex. 3 (CRST Tribal Resolution No. 350-2013-CR, at 2 (Nov. 12, 2013)) (reaffirming that "absent Congressional authorization, states have no authority to regulate the property or

46

In contrast to the significant tribal interests, the interests of North Carolina in policing contracts formed on the Reservation are particularly low. Though the United States Supreme Court has acknowledged that state interests may be affected by tribal activities, such acknowledgments have been in the context of reservations *contained within the states* seeking to impose their regulations. *See, e.g.*, *California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 220 (1987) (rejecting California's efforts to regulate bingo based on asserted interest in "preventing the infiltration of the tribal games by organized crime"). *See also E. Band of Cherokee Indians v. N. Carolina Wildlife Res. Comm'n*, 588 F.2d 75, 77 (4th Cir. 1978) (holding that state laws that attempt to impinge upon the right of tribes to make their own laws and govern their own affairs are "impermissible"). Without this geographical nexus, a state has little basis for asserting that the loans do anything more than affect the individual state residents who voluntarily enter into them. Balancing the interests, North Carolina's desire to regulate loans that its residents voluntarily entered into out-of-state does not materially outweigh the tribal interests in revenue and self-governance.

### C. Plaintiffs Otherwise Fail to State Claims under North Carolina Law

#### 1. The Fraudulent Conveyance Claim Fails Because Plaintiffs Are Not Creditors and Their Claim Does Not Comply with Rule 9

Plaintiffs' claim for fraudulent conveyance is insufficient because the SAC does not allege that Plaintiffs are creditors. North Carolina's Uniform Fraudulent Transfer Act, N.C. Gen. Stat. § 39-23.1, *et seq.*, "allows *a creditor* to bring a civil action against a

activities of the Tribe or its members on the Reservation, including the business activities of enterprises owned by the Tribe or its members").

debtor for certain transfers made by the debtor." *Thimbler*, 2013 WL 4854514, at *7 (emphasis added). Without any indication or allegation that Plaintiffs are creditors of any Defendant, Plaintiffs cannot state a claim for fraudulent conveyance.

In any event, even if the SAC could be interpreted to allege that Plaintiffs are creditors, the remaining elements of a claim for fraudulent conveyance are not satisfied under Rule 9. Plaintiffs put forth no facts as to "(1) the property subject to the [allegedly fraudulent] transfer, (2) the timing and, if applicable, frequency of the transfers and (3) the consideration paid with respect thereto." *Ivey v. First–Citizens Bank & Trust Co. (In re Whitley)*, No. 12-02028, 2013 WL 486782, at *13 (Bankr. M.D.N.C. Feb. 7, 2013) (stating this rule as applied to the Bankruptcy Code, and noting its "similar[ity] in form and substance," *id.* at *12, to North Carolina's fraudulent transfer statute at N.C. Gen. Stat. § 39-23.4(a)(1)). Moreover, Plaintiffs' allegations related to intent "consist[] of nothing more than the bare assertion that [defendants] conducted a transfer . . . 'with the intent to hinder, delay or defraud Plaintiff[ ].'" *Id.* at *8. This claim must be dismissed.

### 2.    Plaintiffs Fail to State a Claim for Civil Conspiracy

Plaintiffs' claim for civil conspiracy should also be dismissed. To state a claim for civil conspiracy, a plaintiff must allege "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Elliott v. Elliott*, 200 N.C. App. 259, 264 (2009). "[T]he *evidence of the agreement must be sufficient to create more than a suspicion or conjecture*." *Dickens v. Puryear*, 302 N.C. 437, 456 (1981) (emphasis added). Civil

48

conspiracy is different from criminal conspiracy in that criminal conspiracy punishes the agreement, while civil conspiracy compensates for damaging *conduct* done in furtherance of the agreement. *Casey v. Grantham*, 239 N.C. 121, 135 (1954). Dismissal of a civil conspiracy claim is required when the plaintiff fails to "sufficiently allege[] wrongful overt acts" or relies solely on "[t]he repeated use of the words combined, conspired, and agreed." *Elliot*, 200 N.C. App. at 266 (quotation omitted).

Plaintiffs allege here that "Western Sky upon information and belief organized and instituted a sophisticated business enterprise in an effort to evade the fact that payday loans[31] are now illegal"; "[a]ll Defendants named in this complaint share liability because they entered into a conspiracy to violate North Carolina law"; "Defendants entered into an agreement to do an unlawful act . . . which agreement resulted in injury to the Plaintiffs and class members;" and "the actions hereinabove alleged were taken in furtherance of such conspiracy." SAC ¶¶ 42, 217-219. These allegations fail for the reasons outlined in *Dickens* and *Elliott*. While the SAC alludes to a vague agreement, it fails to assert any specific facts supporting the existence of such an agreement. The SAC instead relies on conclusory allegations that Defendants conspired to injure Plaintiffs, which are not sufficient to state a plausible claim for relief.

---

[31] Further indicating the SAC's threadbare nature, Plaintiffs allege no facts to support their labeling of the loans in this case as "payday loans." *Cf. Dale v. Comcast Corp.*, 498 F.3d 1216, 1221 n. 9 (11th Cir. 2007) ("'Payday loans' are generally small-dollar, short-term, high interest loans *secured by a check given to the payday lender in the amount of the cash advance plus interest*." (emphasis added)).

49

### 3. Plaintiffs Fail to State a North Carolina RICO Claim

Plaintiffs' claim for violation of the North Carolina Racketeer Influence and Corruption Organizations Act ("NC RICO") fails because Plaintiffs fail to identify any predicate acts to establish a pattern of racketeering activity by Defendants. *Southwood v. The Credit Card Solution et al.*, No. 7:09-CV-81-F, 2012 U.S. Dist. LEXIS 152146, at *44 (E.D.N.C. Oct. 23, 2012) (dismissing NC RICO claim and rejecting later attempt to identify predicate act not identified in complaint itself).

The NC RICO statute provides a private right of action for "[a]ny innocent person who is injured or damaged in his business or property by reason of any violation of G.S. 75D-4 involving a pattern of racketeering activity." N.C. Gen. Stat. § 75D-8(c). "Racketeering activity" in turn means "to commit, to attempt to commit, or to solicit, coerce, or intimidate another person to commit an act or acts *which would be chargeable by indictment if such act or acts were accompanied by the necessary mens rea or criminal intent under . . . Chapter 14 of the General Statutes*[,] . . . [a]ny conduct involved in a 'money laundering' activity[,]" and conduct qualifying as "racketeering activity" under its federal definition in 18 U.S.C. § 1961(1). N.C. Gen. Stat. § 75D-3(c)(1) (emphasis added).[32] A "pattern of racketeering activity" is defined as "engaging in at least *two incidents* of racketeering activity that have the same or similar purposes,

---

[32] Although making an unlawful debt for a usurious rate where the usurious rate is at least twice the enforceable rate can form the basis for a federal RICO claim, *see* 18 U.S.C. §§ 1961(6), 1962(a), North Carolina law does not incorporate that provision of the federal statute. The exclusion of usury from the predicate acts that may establish liability under the NC RICO statute is consistent with its decision not to criminalize usury except where secured by real property, as discussed briefly below.

50

results, accomplices, victims, or methods of commission or otherwise are interrelated by distinguishing characteristics" within a four-year period. N.C. Gen. Stat. § 75D-3(b) (emphasis added). Such a pattern must include "*at least one act* of racketeering activity *other than* (i) an act [of mail fraud or wire fraud] indictable under 18 U.S.C. § 1341 or U.S.C. § 1343, or (ii) an act . . . involving fraud in the sale of securities." N.C. Gen. Stat. § 75D-8(c) (emphasis added).

Plaintiffs' NC RICO claim fails because they have not specified any predicate acts under Chapter 14 of the General Statutes, any acts of money laundering, or any federal predicate acts under 18 U.S.C. § 1961(1). Plaintiffs only refer generally to "criminal acts of usury" or to the making of "usurious and criminal loans to North Carolina residents." SAC ¶ 255. But usury in North Carolina is criminal—and therefore "indictable"—only if the alleged usurious loan is secured "in whole or in part by a security instrument on real property, other than a first security instrument on real property." N.C. Gen. Stat. §§ 24-12, 24-17. Plaintiffs do not allege that any of the loans at issue are secured by real property. SAC ¶¶ 71-108. Thus, no criminal act is alleged that could form the basis for a NC RICO claim. *See Cullen v. Emanuel & Dunn, PLLC*, No. COA11–921, 731 S.E.2d 274 (Table) at *8-9 (N.C. Ct. App. Aug. 21, 2012) (affirming judgment on the pleadings because there was no support for the allegation that an attorney's allegedly false statement could be "a basis for an independent NC RICO action").

Nor can Plaintiffs' allegation that Defendants used "agreements containing *false and fraudulent statements and omissions*" form the basis for a NC RICO claim. SAC ¶ 255 (emphasis added). These allegations, which are subject to Rule 9, fail because they

51

lack any allegation specifying the time, place, and content of the alleged fraudulent activity that forms the basis of this claim. *Menasco*, 886 F.2d at 684.

Finally, Plaintiffs have not alleged that they "complied with the statute by 'concurrently notify[ing] the Attorney General in writing of the commencement of the action.'" *Synergy Fin., L.L.C. v. Zarro*, 329 F. Supp. 2d 701, 714 (W.D.N.C. 2004) (citing plaintiffs' failure to notify the Attorney General pursuant to N.C. Gen. Stat. § 75D–8(c) and dismissing plaintiffs' NC RICO claim). Thus, even if Plaintiffs' other allegations were sufficient, the SAC fails to allege sufficient facts to state a plausible North Carolina RICO claim. This claim must be dismissed.

### D. Plaintiffs' Federal Claims Are Deficient

#### 1. Plaintiffs Fail to State a Federal RICO Claim

The Federal RICO statute provides a private right of action to "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. §1964(c). Section 1962, in turn, makes it unlawful, *inter alia*, for a person (1) to use "income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt" to acquire an interest in or establish or operate an enterprise in or affecting interstate commerce, 18 U.S.C. § 1962(a); (2) "to conduct or participate, directly or indirectly, in the conduct of [an] enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt," 18 U.S.C. 1962(c); and (3) to conspire to violate any of the above, 18 U.S.C. § 1962(d). Plaintiffs allege a nationwide RICO conspiracy premised on racketeering activity and collection of

52

an unlawful debt. SAC ¶¶ 234-51. These allegations fail to state a claim upon which relief can be granted.

### a. Plaintiffs Inadequately Allege Predicate Racketeering Acts

To state a claim based on racketeering activity, a plaintiff must allege: "(1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Morley v. Cohen*, 888 F.2d 1006, 1009 (4th Cir. 1989) (quoting *Sedima, S.P.L.R. v. Imrex Co.*, 473 U.S. 479, 496 (1985)). As to the fourth element, racketeering activity, Plaintiffs allege violation of EFTA and acts of mail and wire fraud. SAC ¶¶ 240, 248.

Plaintiffs' RICO claim premised on the violation of EFTA fails as a matter of law. EFTA, 15 U.S.C. § 1693n, is not included among the exhaustive list of RICO predicate crimes under 18 U.S.C. § 1961(1) and cannot serve as the basis for liability under RICO.

Mail and wire fraud can serve as RICO predicate offenses, but Plaintiffs' allegations as to those predicate offenses are insufficient for several reasons. *First*, Plaintiffs provide no well-pled facts to support their conclusion that Defendants mailed or wired any fraudulent statement. Plaintiffs instead circularly reason that "Defendants . . . committed multiple acts of mail and wire fraud" because "the loan agreement contains false statements on its face, and the business was a scheme to defraud." SAC ¶ 248. This contention—that fraud was committed because the Agreements contained fraudulent statements—relies on precisely the type of "labels and conclusions" that cannot support a claim under any pleading standard. *Iqbal*, 556 U.S. at 678. *Second*, Plaintiffs' allegations do not comply with Rule 9 because Plaintiffs fail to "clearly identify[]" in this multi-defendant case "which Defendant played which role." *Davis v. Wilmington Fin.,*

53

*Inc.*, Civil No. PJM 09-1505, 2010 WL 1375363, at *3 (D. Md. Mar. 26, 2010). *Third*, without alleging that they actually read any particular false statement in connection with deciding to apply for a Western Sky loan, Plaintiffs have provided no plausible basis to conclude that "they detrimentally relied in some way on the fraudulent mailing [or wiring], and that the mailing [or wiring] was a proximate cause of the alleged injury to their business or property." *Chisolm v. TranSouth Fin. Corp.*, 95 F.3d 331, 337 (4th Cir. 1996); *see also Foster v. Wintergreen Real Estate Co.*, 363 Fed. App'x 269, 273 n.5 (4th Cir. 2010) (noting that "the elements of wire fraud are similar [to mail fraud]").[33]

### b. Plaintiffs Inadequately Allege Unlawful Collection of a Debt

Plaintiffs also contend that all Defendants are liable under RICO based on Defendants' purported "collection of unlawful debt." 18 U.S.C. § 1962(c). The statute defines an "[u]nlawful debt" as one "[1] which is unenforceable under State or Federal law in whole or in part . . . because of the laws relating to usury, and . . . [2] which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

"The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability seems to have been an explicit recognition of the evils of loan sharking, and there is no indication that Congress was taking aim at legitimate banking institutions."

---

[33] This failure to plead reliance or proximate cause cannot be read as a mere oversight, given that Plaintiffs take the position that the Agreements are contracts of adhesion to which they paid little or no attention. SAC ¶¶ 155, 156.

*Sundance Land Corp. v. Community First Fed. Savings & Loan Assoc.*, 840 F.2d 653, 667 n.19 (1988). This intended limitation of the statute likely explains why "'collection of an unlawful debt' is rarely alleged in civil [RICO] cases, and even more rarely successfully alleged." Gregory P. Joseph, Civil RICO: A Definitive Guide 159 (3d ed. 2010) (original brackets omitted).

A claim based on a "collection of unlawful debt" differs from one based on "a pattern of racketeering activity" insofar as a plaintiff need only demonstrate a single predicate act of unlawful debt collection as opposed to a pattern of acts. *See United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991). Despite this distinction, a plaintiff must still adequately plead several elements, including that:

> [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] the debt was incurred in connection with the "business of lending money . . . at a [usurious] rate," . . . [3] the usurious rate was at least twice the enforceable rate . . . [4] as a result of the above confluence of factors, it was injured in its business or property.

*Sundance Land Corp.*, 840 F.2d at 666 (quoting *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 248 (2d Cir.), *cert. denied*, 473 U.S. 906 (1985)).[34] These elements demonstrate that a "civil RICO action is not simply an action to recover

---

[34] While the Fourth Circuit has not yet weighed in on the issue, the majority of jurisdictions to have considered the pleading requirements for a civil RICO claim based on the "collection of an unlawful debt" follow the Second Circuit's approach in *Durante Bros. & Sons*, 755 F.2d at 248, which was adopted by the Ninth Circuit in *Sundance Land*, 840 F.2d at 666. *See, e.g., Malley-Duff & Assocs., Inc. v. Crown Life Ins. Co.*, 792 F.2d 341, 348 (3d Cir. 1986). District courts within the Fourth Circuit have also embraced *Durante Bros. & Sons*. *See, e.g., Sterling v. Ourisman Chevrolet of Bowie, Inc.*, 943 F. Supp. 2d 577, 587 (D. Md. 2013).

excessive interest or to enforce a penalty for the overcharge." *Durante Bros. & Sons*, 755 F.2d at 248. Indeed, as made clear by inclusion of the fourth element, a plaintiff pleading a predicate act of unlawful debt collection must still comply with RICO's statutory standing requirement by demonstrating causation and injury. *Id.*

Plaintiffs primarily cannot state a claim premised on collection of an unlawful debt because the loans are not unenforceable under "state or federal laws relating to usury." As discussed above, *see* pp. 41-46, North Carolina's usury laws do not apply to the loans and the federal government does not have a usury cap. But even assuming that state usury law could govern the loans, Plaintiffs have only pled that the loans are unenforceable under North Carolina law. Plaintiffs put forth *no* well-pled allegations regarding the unenforceability of Western Sky loans in states other than North Carolina, and Plaintiffs cannot sustain their cause of action on behalf of a nationwide, non-North Carolina class without doing so. Plaintiffs' failure to plead details regarding the enforceability of non-North Carolina loans cannot be excused. Their nationwide RICO claims should be dismissed with prejudice.[35]

The SAC also fails to satisfy RICO's standing requirement for at least two of the named Plaintiffs. *See Durante Bros. & Sons*, 755 F.2d at 248. "[I]t is clear that a civil RICO complaint is vulnerable to a motion to dismiss if it fails to allege either an adequate injury to business or property, or an adequate causal nexus between that injury and the

---

[35] There is no reason to assume that a loan unenforceable under North Carolina usury law is necessarily unenforceable under another state's law. Some states have no usury limitations while others do not render an imperfectly issued loan unenforceable or uncollectable. *See, e.g.*, Colo. Rev. Stat. § 5-5-201; Haw. Rev. Stat. §§ 478-5, 412:9-303.

predicate acts of racketeering alleged." *Brandenburg v. Seidel*, 859 F.2d 1179, 1187 (4th Cir. 1988), *overruled on other grounds by Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706 (1996). For Plaintiffs Brown and Johnson, no allegations have been made that payment on the underlying loans resulted in damage to their business or property as a result of Defendants' conduct. *Godfredson v. JBC Legal Grp. P.C.*, 387 F. Supp. 2d 543, 551-52 (E.D.N.C. 2005) (dismissing RICO claim when "Plaintiffs did not make any payments on the disputed debts, nor . . . alleged any damage to their business or property as a result of the defendants' conduct"). The SAC alleges that Brown "was trapped into making payments of nearly $300 per month" for a loan of $2,600, but does not explain how many of those payments he made or how much he would have paid if the loans had interest rates in line with North Carolina's interest-rate caps. SAC ¶ 74. For Johnson, the SAC alleges her loan required her "to make monthly payment at a nominal APR of 139% / effective APR of 273%, resulting in total payments . . . of $13,985.87," but contains no averment that she actually made any such payments. *Id.* ¶ 77. Without sufficient allegations of injury, Brown and Johnson's RICO claims based on unlawful collection of a debt must independently be dismissed for lack of statutory standing.

### c. Plaintiffs Inadequately Allege a RICO Conspiracy

To plead a conspiracy to violate any provision of § 1962(a), (b) or (c), Plaintiffs "must describe in detail the conspiracy, including the identity of the co-conspirators, the object of the conspiracy, and *the date and substance of the conspiratorial agreement*." *Walters v. McMahen*, 795 F. Supp. 2d 350, 355-56 (D. Md. 2011) (quotation marks omitted; emphasis added). The conclusion that a RICO conspiracy has been perpetrated

57

must be supported by facts demonstrating that the defendants "agreed that another coconspirator would commit [either] two or more acts of racketeering" or the collection of an unlawful loan. *United States v. Pyrba*, 900 F.2d 748, 760 (4th Cir. 1990), *cert. denied*, 498 U.S. 924 (1990). An agreement among coconspirators can be supported by direct evidence or inferred from the facts and circumstances. *United States v. Norris*, 749 F.2d 1116, 1121 (4th Cir. 1984), *cert. denied*, 471 U.S. 1065 (1985), *abrogated on other grounds by United States ex rel. Berge v. Bd. of Trustees*, 104 F.3d 1453 (4th Cir. 1997).

Plaintiffs allege knowledge of a conspiracy to violate state usury laws by "Defendants" on the basis that "*they* [Defendants] have been banned and sanctioned in multiple states." SAC ¶ 239 (emphasis added). But nowhere do Plaintiffs distinguish between what and when any particular defendant knew of any putative predicate RICO acts. *Cf.* pp. 40-41, *supra* (undifferentiated allegations as to a group of defendants are insufficient to state a claim). Nor do Plaintiffs put forth any well-pled allegations regarding the date and content of any agreement among the parties. The SAC instead assumes that the Defendants assented to an agreement based on a presupposition that Defendants have always acted as one. This circular reasoning is patently insufficient to "to raise a reasonable expectation that discovery will reveal evidence of [an] illegal agreement" into which each Defendant entered. *Twombly*, 550 U.S. at 556.

## 2. Plaintiffs Fail to State a TILA Claim

Plaintiffs' TILA claim fails, too. Aside from vaguely asserting that the interest rates disclosed in the Agreements were "miscalculated," Plaintiffs allege misrepresentation of the applicable interest rate on the basis that it is higher than "the

maximum allowable interest rate for a loan less than $10,000 under North Carolina law."

SAC ¶¶ 223-24.  These allegations are insufficient to state a claim under TILA because

TILA does not penalize a lender for charging an interest rate that is accurately disclosed

even though it is higher than a state's usury cap.  If that were the case, then TILA would

provide North Carolina borrowers with a cause of action any time they were legally

issued a loan from a nationally chartered bank at an interest rate higher than North

Carolina's.  *See Marquette Nat'l Bank v. First of Omaha Serv. Corp.*, 439 U.S. 299, 318

(1978) (holding that 12 U.S.C. § 85 permits "'exportation' of interest rates").  That is not

the case, however, because TILA "does not generally govern charges for consumer

credit," 12 C.F.R. § 226.1 ("Regulation Z"), or "tell banks how much interest they may

charge," Comptroller of the Currency, Truth in Lending Act: Comptroller's Handbook 7

(Dec. 2010).  Plaintiffs therefore cannot state a TILA claim against any Defendant.[36]

### 3.    The Non-Brown Plaintiffs Fail to State an EFTA Claim

The Non- Brown Plaintiffs' EFTA claim must also be dismissed.  EFTA and its

implementing regulation prohibit a creditor from conditioning credit on the

preauthorization of electronic fund transfers.  15 U.S.C. §§ 1693, *et seq*., 12 C.F.R. §

204.10(e).  The statute provides for private enforcement but requires that "any action . . .

be brought . . . within one year from the date of the occurrence of the violation."  15

---

[36] The TILA claim against Delbert, Payday Financial, and Mr. Reddam should also be dismissed because the SAC does not allege that those defendants qualify as a creditor or assignee subject to liability under TILA.  SAC ¶¶ 23, 71-108; *Havrick v. Am. Home Mortg. Servicing, Inc.*, No. 2:12-cv-3077, 2013 WL 3283523, at *3-4 (E.D. Cal. June 27, 2013) (dismissing TILA claim because complaint "inappropriately lumps all Defendants together without specifying the basis for their liability").

U.S.C. § 1693m(g). Where a recurring electronic debit is established as a means of paying for a loan, "the one-year limitations period beg[ins] when the first recurring transfer took place, not when [the creditor] arranged it." *Wike v. Vertrue, Inc.*, 566 F.3d 590, 593 (6th Cir. 2009).

With the original complaint in this action having been filed on March 28, 2013, only a recurring transfer that began on or after March 28, 2012 can serve as the basis for a cause of action under EFTA. The SAC alleges only that Plaintiff Brown initiated a recurring transfer of funds to repay a Western Sky loan within the limitations period. SAC ¶ 25(c). Accordingly, the Non-Brown Plaintiffs' EFTA claims should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss or, in the alternative, to stay pending tribal exhaustion of remedies should be granted.

This the 10th day of February, 2014.

**WOMBLE CARLYLE SANDRIDGE & RICE, LLP**

/s/ Hayden J. Silver III
Hayden J. Silver III (NC State Bar No. 10037)
Email: jsilver@wcsr.com
Raymond M. Bennett (NC State Bar No. 36341)
Email: rbennett@wcsr.com
150 Fayetteville Street, Suite 2100
Raleigh, North Carolina 27601
Telephone: (919) 755-2188
Fax: (919) 755-6099

**JENNER & BLOCK LLP**

/s/ Brian J. Fischer
Brian J. Fischer (NY State Bar No. 4118568)
Katya Jestin (NY State Bar No. 2854073)
Neil M. Barofsky (NY State Bar No. 2757946)
Email: bfischer@jenner.com
Jenner & Block LLP
919 Third Avenue
New York, New York 10022
Telephone: (212) 891-1629
Fax: (212) 891-1699

*Attorneys for Defendants*