IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NUMBER 1:13-CV-00255-WO-JLW

| | |
|---|---|
| **THOMAS BROWN,** *et al.,* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **WESTERN SKY FINANCIAL, LLC,** | ) |
| *et al.,* | ) |
| | ) |
| **Defendants.** | ) |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO DISMISS OR STAY

Plaintiffs hereby respond to the Defendants' omnibus motion filed at Docket 93

requesting that the Court dismiss the Second Amended Complaint ("SAC") or, in the

alternative, stay this action. Defendants' motion should be denied.

## I.    INTRODUCTION.

Plaintiffs are seven North Carolina residents who received internet payday loans

made in North Carolina by CashCall, Inc. ("CashCall") which used Western Sky

Financial, LLC ("Western Sky") as a "front"[1] and a subterfuge to market the loans under

a purported Tribal lending scheme during the time period of 2010-12. Plaintiffs allege

violation of the North Carolina consumer finance statutes, usury and related claims

against CashCall, Western Sky, Payday Financial, LLC ("Payday Financial"), John Paul

---

[1] "Western Sky is nothing more than a front to allow CashCall to evade licensure by state agencies and to exploit Indian Tribal Sovereign Immunity to shield its deceptive business practices from prosecution by state and federal regulators." *In re CashCall, Inc.*, No. 12-308, N.H. Banking Dep't, Cease and Desist Order dated June 4, 2013, p. 10 (attached as Exhibit 5 to the SAC which is filed at Docket 89).

Reddam ("Reddam"), WS Funding, LLC ("WS Funding") and Delbert Services Corporation ("Delbert"). Plaintiffs allege individual claims and also seek to represent putative state and national classes.

Defendants' contention that these loans are lawful has been rejected by multiple courts and enforcement authorities. However Defendants seek to have this Court avoid reaching the merits, by making threshold contentions against jurisdiction.

### ***Defendants' Tribal forum selection clause contention***:

Defendants' first contention is that the forum selection clause in their loan contracts bars bringing a claim here. (Memorandum of Law in Support of Defendants' Omnibus Motion to Dismiss or Stay, filed at Docket 94 ("Def. Mem.") pp. 11-26). However, parties cannot confer subject matter jurisdiction on a Court that does not have jurisdiction.[2] Here, the forum selection clause purports to confer subject matter jurisdiction on a Tribal Court on the Reservation of the Cheyenne River Sioux Tribe (the "Tribe") in South Dakota. In fact, the Tribal Court lacks subject matter jurisdiction. Therefore the forum selection clause fails.

Tribal courts are courts of limited jurisdiction.[3] In this case, a California corporation (CashCall) set up and ran a payday loan website (the Western Sky site), ran

---

[2] *See Brickwood Contractors, Inc. v. Datanet Eng'g, Inc.*, 369 F.3d 385, 390 (4th Cir. 2004) (en banc) ("Subject-matter jurisdiction cannot be conferred by the parties, nor can a defect in subject-matter jurisdiction be waived by the parties."); *Radcliffe v. Purdue Pharma L.P.*, 737 F.3d 908 (4th Cir. 2013) (quoting *Brickwood*).

[3] The Supreme Court has stated that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express

TV ads in North Carolina, and CashCall employees took calls from North Carolina loan applicants. CashCall issued the loans ostensibly through a South Dakota LLC (Western Sky). While Western Sky prominently referenced Tribal law and the Tribal forum on the loan agreement, in fact Western Sky was not organized under Tribal law but under South Dakota law, nor was it owned by the Tribe or any political subdivision of the Tribe. The loans were funded from a reserve account that CashCall replenished. Loans were only marketed and offered to residents of North Carolina, never to residents of the Cheyenne River Sioux Tribe in South Dakota. Customers filled out loan documents by accessing the Western Sky website on their home computers in North Carolina, and loan funds were electronically deposited in their banks in North Carolina. The loan was then immediately "assigned" by the ostensible lender identified by the loan agreement, Western Sky, to the true *de facto* lender, CashCall. Customers were immediately notified of this and never made any loan payments to Western Sky, rather only to CashCall in California. All collection efforts were made by CashCall and if unsuccessful, it sent the loan to CashCall affiliate Delbert for further collection efforts. Delbert was not a Tribal entity either but a Nevada corporation registered in North Carolina as a debt collector.

---

congressional delegation." *Montana v. United States,* 450 U.S. 544, 564 (1981) (citations omitted). As a result, "the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." *Id.* at 565. Tribal jurisdiction in a case involving no Tribal members is presumptively invalid because "efforts by a tribe to regulate nonmembers … are 'presumptively invalid.'" *Plains Commerce Bank v. Long Family Land & Cattle Co*., 554 U.S. 316, 330 (2008) (quoting *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 659 (2001)). Both the Tribe's legislative and court authority are limited. *Strate v. A-1 Contractors,* 520 U.S. 438, 453 (1997) ("As to nonmembers … a tribe's adjudicative jurisdiction does not exceed its legislative jurisdiction").

There is a presumption against Tribal jurisdiction in a case where no Tribal member is a party:[4] none is a party here. A Tribal Court does not have subject matter jurisdiction over small loans made by a California corporation and a South Dakota LLC to North Carolina residents under a business model expressly based on lending in North Carolina and that in fact never made loans to Tribal members on the Reservation (or anyone else in South Dakota).

Typically in a case where a defendant raises a forum selection clause, there is never any issue about the subject matter jurisdiction of the court the defendant seeks to move the case to. Most forum selection clauses simply say that the parties agree that any lawsuits will be brought in the courts of a particular state. Here, however, in keeping with its overall subterfuge of claiming Tribal immunity, the Defendants have tried to specify the Tribal Court of the Cheyenne River Sioux Tribe in South Dakota as the exclusive forum. Because the Tribal Court only has limited jurisdiction, it does not have jurisdiction here. And, it is black letter law that parties cannot confer subject matter jurisdiction upon a Court where none exists.

The loans required payment of upwards of five times of the principle amount, far over North Carolina's usury limit. In North Carolina small loans are closely regulated under the Consumer Finance Act, the usury statutes and other laws which apply to any

---

[4] *Progressive Specialty Ins. Co. v. Burnette,* 489 F.Supp.2d 955, 958 (D.S.D. 2007) ("The agent and the Insurer are non-tribal members. We know that tribal jurisdiction over non-members is 'presumptively invalid.'") (citing *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 659 (2001)). *See also Nevada v. Hicks*, 533 U.S. 353, 358 n.2 (2001) ("we have never held that a tribal court had jurisdiction over a nonmember defendant").

4

small loans made to North Carolina residents. A special statutory provision expressly outlaws any subterfuges and evasions of the law. North Carolina statutes clearly state how it is a paramount public policy to protect State residents from usurious loans, and that any choice of forum clause in a small loan case that seeks to require suit to be brought in another State is invalid.[5]

Even after the North Carolina Attorney General wrote cease-and-desist letters informing Defendants that they were making unlawful payday loans, CashCall continued making the loans and engaging in aggressive collection efforts.[6] In multiple other States, private and public enforcement actions have been brought regarding Defendants' use of the same loan program in those States and their violations of similar small loan laws in those States. Courts have rejected Defendants' Tribal forum, Tribal law and Tribal

---

[5] No evasions: N.C. Gen. Stat. § 53-166(b), titled "Evasions," provides: "The provisions of subsection (a) of this section shall apply to any person who seeks to avoid its application by any device, subterfuge or pretense whatsoever." Paramount public policy: N.C. Gen. Stat. § 24-2.1(g) states: "It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws. Any provision of this section which acts to interfere in the attainment of that public policy shall be of no effect." Forum clause in consumer loan case invalid: N.C. Gen. Stat. § 22B-3 provides: "Except as otherwise provided in this section, any provision in a contract entered into in North Carolina that requires the prosecution of any action or the arbitration of any dispute that arises from the contract to be instituted or heard in another state is against public policy and is void and unenforceable. This prohibition shall not apply to non-consumer loan transactions …." See Dove Air, Inc. v. Bennett, 226 F.Supp.2d 771, 776 (W.D.N.C. 2002) (finding that "the forum selection clause is also unreasonable pursuant to the State's public policy as expressed in N.C. Gen. Stat. § 22B-3").

[6] SAC ¶¶ 78-108 (facts regarding how various Plaintiffs wrote to the Attorney General, who sent cease-and-desist letters to Western Sky or CashCall; however, Defendants ignored these and continued onward), SAC Exs. 7-11 (includes Attorney General letters). Defendants did not finally stop their program until September 2013.

5

immunity arguments. This Court should as well. Nor is there any need to "exhaust" nonexistent Tribal remedies.

In addition, as a second independent basis for voiding the forum selection clause, courts have struck such clauses where their enforcement would be unreasonable.[7] Here, it would be unreasonable to enforce the clause given that the Tribal Court lacks jurisdiction, the Tribal Court lacks any reasonable relation with the matter, and the clause deceptively holds-out the Tribal forum as being proper when in truth, the Tribal lending scheme and dispute resolution procedures were a "front" and a "sham."[8]

In addition, courts have declined to enforce a forum selection clause if doing so would violate an important state public policy. North Carolina has a paramount public policy of enforcing its small loan and usury laws to protect its citizenry. Both the Tribal forum and Tribal choice of law clauses should therefore be voided. When a company's entire business model revolves around offering loans everywhere <u>but</u> on the reservation,

---

[7] *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (stating that the "presumption of enforceability that forum selection and choice of law provisions enjoy is not absolute and, therefore, may be overcome by a clear showing that they are 'unreasonable' under the circumstances") (*quoting Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1974)).

[8] <u>Front</u>: *In re CashCall, Inc.*, N.H. Banking Dep't, Cease and Desist Order dated June 4, 2013, *supra*, at p. 5, filed as SAC Ex. 5, Docket 89-5). <u>Sham</u>: *Jackson v. PayDay Financial, LLC,* No. 11-cv-9288, Slip Op. at 5-6 (N.D. Ill. Aug. 28, 2013) (finding that Western Sky Tribal arbitration scheme "has been apparently devised for the purpose of evading federal and state regulation of Defendants' activities. The intrusion of the Cheyenne River Sioux Tribe into the contractual arbitration provision appears to be merely an attempt to escape otherwise applicable limits on interest rates. As such, the promise of a meaningful and fairly conducted arbitration is a sham and an illusion.") (attached with other unpublished cases at **Exhibit 1**).

and when the company solicits residents of faraway States for those loans, the company is fairly subject to suit in that State and under that State's laws, as many courts and enforcement authorities have found. SAC ¶ 172 and Exs. 4-5, 13, 17-24.

### *Defendants' Tribal arbitration contention*:

Defendants secondly seek to have this Court order the matter to arbitration. (Def. Mem. pp. 27-39). However, as other courts have found,[9] the purported Tribal arbitration process that under the contract the parties agreed to, does not in fact exist. Worse, the loan agreement contains demonstrably false representations in this regard, that a Tribally-sponsored arbitration process exists (in fact the Tribe does not conduct arbitration) and it will be governed by Tribal consumer dispute rules (in fact no such rules exist). Further, when one loan borrower, Mr. Inetianbor in Florida, actually tried to proceed in arbitration, the events that then occurred showed the existence of a profoundly unfair and fraudulent process. Among other things, the facts demonstrated that with the knowledge of CashCall's in-house counsel, Western Sky employee Tawny Lawrence "ghostwrote" a letter sent by the arbitrator to the parties. That ghostwritten letter assured that the arbitrator had no prior connection with any of the parties, when in fact his own daughter was a loan officer for Western Sky. At the one abortive arbitration hearing that occurred, more disturbing facts came to light. To this day CashCall has declined to produce the contract with the arbitrator or disclose what he was paid. When these facts were brought to the attention of the Southern District of Florida, the Court voided the arbitration clause.

---

[9] *Inetianbor v. CashCall, Inc.*, 2013 WL 4494125 (S.D. Fla. Aug 19, 2013); *Jackson, supra,* Slip Op. at 5-6 (N.D. Ill. Aug. 28, 2013).

Subsequently, the Northern District of Illinois likewise found the arbitration provisions to be a "sham."[10]

Ordinary arbitration clauses in commercial and consumer credit documents do not raise these kinds of issues. The facts here reflect a deliberate intent to hold-out a Tribal arbitration facility which did not exist. The facts herein clearly support a finding that the purported arbitration agreement should not be enforced.

### *Defendants' remaining contentions:*

Finally, the Defendants contend that the Court should dismiss certain claims for failure to state a claim. Plaintiffs show below, however, that they have properly alleged the elements of the claims.

Accordingly, Plaintiffs respectfully request that the Court deny the Defendants' motion to dismiss and allow this case to go forward.

## II.     PROCEDURAL POSTURE.

The Complaint was filed March 28, 2013. (Docket 1). This Court allowed filing of a First Amended Complaint by Order of August 12, 2013. (Docket 46). This Court allowed filing of the SAC by its Order of January 17, 2014. (Docket 88).

On February 7, 2014 Defendants filed a consent motion for leave to file a 60-page omnibus opening brief on the instant various motions with a second 20-page brief for the motion pertaining to Reddam and Payday Financial on personal jurisdiction. (Docket 90). This motion remains pending. Plaintiffs are sizing their briefs in accordance with it.

---

[10]*See Inetianbor, supra;* and materials from *Inetianbor* case attached as Ex. 2; *Jackson, supra,* Slip Op. at 5-6.

## III.    BACKGROUND FACTS.

Various States outlaw high-interest small consumer loans, aka "payday loans," under usury and consumer finance laws.  North Carolina is one.  Prior to 1997, payday lending was illegal in North Carolina.  SAC ¶ 33.  A 1992 Attorney General opinion concluded that payday lending violated the Consumer Finance Act (N.C. Gen. Stat. § 53-164, *et seq*.) and the criminal law (N.C. Gen. Stat. § 14-107(b)).  SAC ¶ 33.

Then, the North Carolina General Assembly decided to allow payday lending on a trial basis.  It enacted former N.C. Gen. Stat. § 53-281 allowing the practice of payday lending, otherwise known as deferred deposit check cashing.  SAC ¶ 34.  At that time, the business model of the lenders consisted of offering the loans at brick-and-mortar stores physically located in the State.  The security for the loan came in the form of a postdated personal check from the borrower.  If the borrower did not pay the loan on time, or a fee to extend it, the lender deposited the check.

Former Section 53-281 became effective on October 1, 1997, enacted on a trial basis to determine how payday lending affected customers, and with a "sunset" date of July 31, 2001, later extended by one month.  SAC ¶¶ 35-36.  The law was not renewed, and as it expired, the North Carolina Commissioner of Banks released a memo advising clearly that "there is no lawful basis for 'payday lending'".  By the end of 2001 payday loans were once more unlawful in North Carolina.  SAC ¶¶ 37-39.

Some companies still sought to make unlicensed usurious loans, via "rent-a-charter" arrangements in which they purported to work with an out-of-state bank.  Companies such as Advance America sought to loan under such a business model in

North Carolina, and CashCall sought to do so in States such as West Virginia. However in 2005-08, State regulators and private citizens brought actions contending these "rent-a-charter" arrangements were unlawful attempts to evade State law. SAC ¶ 40; *West Virginia v. CashCall, Inc.,* 605 F.Supp.2d 781 (S.D.W. Va. 2009).

After "rent-a-charter" was attacked, CashCall sought to nonetheless continue to make high-interest loans by moving to a "rent-a-tribe" arrangement. In 2009, CashCall through a subsidiary entered into agreements with Western Sky under which CashCall would take customer calls, maintain a website, fund an account to make the loans, have the loan contract ostensibly issued by Western Sky, then take immediate assignment before a single payment on the loan was made, and make all collection efforts. SAC ¶¶ 41, 67-69 & Ex. 6. CashCall provided the website hosting, reimbursed costs associated with the server, provided Western Sky with a toll-free number and fax number, provided marketing including TV and radio ads, and otherwise subsidized the business. *Id.* CashCall now admits it even took the initial application phone calls from consumers, up through 2012. Tawny Lawrence Dec., Docket 94-2, ¶ 7 ("Prior to April 2012 … all initial loan inquiries were handled by CashCall operators working off-Reservation….").

Once the loan was purportedly "made" by Western Sky, it was immediately ("on a daily basis") assigned to CashCall, which did all the servicing and made all the collection efforts. SAC ¶¶ 67-69 & Ex. 6. CashCall received the vast majority of the revenues and profits. SAC ¶ 67. CashCall indemnified Western Sky for any civil or criminal claims that could arise from the loans. SAC ¶ 68 & Ex. 6.

10

These facts regarding CashCall's actual control were concealed from the public. Instead, the Western Sky website prominently stated how Western Sky was owned by a Cheyenne River Sioux Tribe (the "Tribe") member and falsely stated "is a Native American business…." SAC Ex. 3. The website falsely stated that it was "operating within the boundaries of the Cheyenne River Sioux Reservation." *Id.* Nowhere was CashCall mentioned. CashCall sought to deliberately deceive the public into believing a Tribal immunity protected entity was making the loans, and the Tribal forum, Tribal choice of law and Tribal arbitration clauses all were part of this effort.[11] The facts reflecting the actual relationship between Western Sky and CashCall only came to light after regulators and consumers began initiating actions.

CashCall is not a Tribe-owned or Tribal-law-organized corporation. Rather it is a California corporation with a principal location in Anaheim. SAC ¶ 20 & Ex. 26. Reddam is President and CEO of CashCall and its sole shareholder. SAC ¶ 21. WS Funding is a wholly-owned subsidiary also located in Anaheim and organized under Delaware law. SAC ¶ 22. Delbert acts as a debt collecting arm of CashCall and is incorporated under Nevada law, located in Nevada and owned by Reddam. SAC ¶ 23.

Western Sky is neither owned by the Tribe nor organized under Tribal law. Rather, it is a limited liability company chartered under the law of South Dakota. SAC ¶

---

[11] *State of Minnesota v. CashCall, Inc., et al.,* No. 27-CV-13-12740, Hennepin County District Court, Order dated Sept. 6, 2013, finding that the Western Sky loan agreement and advertising had a tendency to deceive consumers that the business was Tribal-owned or -sponsored. "According to the factual record as it currently exists, these materials did lead Minnesota consumers to actually believe that Western Sky belonged to the tribe itself…." *Id.* at 17-18. This Tribal affiliation language was "deliberately used" and had a tendency to deceive consumers. *Id.* at pp. 18-19. (Order filed at SAC Ex. 21).

18 & Ex. 26. It had as its sole member Payday Financial through February 2011. Kimberly Lawrence Dec., Docket 92-1, ¶ 4. Payday Financial is likewise an LLC chartered under the law of South Dakota. SAC ¶ 19 & Ex. 26.

Nonparty Martin A. Webb is a member of the Tribe. He is the current owner and president of Western Sky. SAC ¶ 18. There is no evidence that he occupies any official or governance position in the Tribe.[12]

Plaintiffs are Thomas Brown, Monica Johnson, Melinda Long, Renee Holmes, Kevin Hayes, Leslie Jan Lydon, and Elizabeth Jackson. They each reside in North Carolina. Each entered into a Western Sky loan from their homes in North Carolina using an Internet connection and phone, and funds were deposited to their bank accounts in North Carolina. SAC ¶¶ 10-17.

The earliest loan was to Ms. Long on October 22, 2010 and the last was to Mr. Brown on July 5, 2012. SAC ¶¶ 71, 78. The Plaintiffs were in economic hardship and saw Western Sky TV ads soliciting them for loans. SAC ¶¶ 71-108. The loan terms required payment of multiple times what was borrowed. As an example Mr. Brown received $2,525 and the loan form stated that he was obligated to pay back $14,102.87. SAC ¶ 71 & Ex. 1. Mr. Brown is a disabled U.S. servicemember on a fixed income and

_____

[12] Mr. Webb is "three thirty-seconds Cheyenne River Sioux by blood." *Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC et al.*, case no. CFR-FY2011-182, Order dated May 22, 2013, p. 5 (attached at SAC Ex. 13). He is not a tribal officer. *Id.* The Tribe did not create or own the Western Sky business. *Id.* at p. 5. The loans were "directed at non-Indians across the country, while specifically avoiding offering loans to Indians on the same reservation." *Id.* at p. 13. "The fact that his businesses have a physical location on the Reservation is purely incidental to the type of business they transact." *Id.* at p. 10.

the onerous loan terms harmed his personal finances. SAC ¶ 73. Because he never had enough money to pay off the loan in a lump sum, he was trapped into making payments of approximately $294/month and on one or more occasions CashCall automatically debited payments from his bank account. SAC ¶¶ 74-75.[13] Mr. Brown falls into the class of North Carolina residents intended to be protected by the small loan and usury laws.[14]

After Plaintiffs got the loans they were immediately informed their loan had been "sold" to WS Funding, LLC and would be "serviced" by CashCall. Thus Mr. Hayes received his loan on October 25, 2010 and received such a notice on October 28, 2010. SAC ¶ 96 & Ex. 9.

The loan agreements defined the "Lender," "we," "us" and "Western Sky" to include Western Sky "and any subsequent holder of this note." SAC Ex. 1, Brown loan agreement at p. 1. The agreements also stated that "we do not have a presence in South Dakota or any other states of the United States." *Id.*, p. 3. This statement was false since CashCall was located in California.

Ms. Long was advised in writing that she had a "CashCall loan" and that she could "modify the terms of your loan with CashCall" and "your CashCall promissory Note and

---

[13] The loan terms were similar for each Plaintiff including the very high interest rates. For example under Ms. Johnson's loan dated August 17, 2011, she received $2,525 and was obligated to pay back $13,985.87. Ms. Long's loan dated October 22, 2010 was for $1000 and she was obligated to pay back $4,056.79. Mr. Hayes' loan dated October 25, 2010 was for $2,525 and he was to pay back $10,829.82. SAC Exs. 2, 7, 9.

[14] *State ex rel. Cooper v. NCCS Loans, Inc*., 624 S.E.2d 371, 378, 174 N.C. App. 630 (2005) (noting that "[u]sury statutes are designed to protect the borrower whose necessity and importunity may place him at a disadvantage with respect to the exactions of the lender[.]") (quoting *Mortgage Co. v. Zion Church*, 219 N.C. 395, 397, 14 S.E.2d 37, 38 (1941)).

Disclosure Statement."  SAC ¶ 84 & Ex. 7.  93.  On September 5, 2012, Delbert wrote to Ms. Holmes seeking to collect on "[y]our CashCall loan."  SAC ¶ 93 & Ex. 8.

Several Plaintiffs complained to the North Carolina Attorney General about the loans.  *E.g.,* SAC ¶ 79 & Ex. 7.  The Attorney General wrote to Defendants advising the loans were unlawful.  *E.g.,* SAC Ex. 7 ("It appears that your company is offering payday loans to North Carolina consumers. You should be aware that payday loans are not authorized in North Carolina … Because of the serious issues raised by the enclosed complaint, we request that you cease and desist from further collection activity on this account.").  Defendants refused to cease and desist and continued making the loans.  *E.g.,* SAC ¶ 82 & Ex. 7.  Defendants did not stop making the loans until late 2013.  Tawny Lawrence Dec., Docket 94-2, ¶ 5 ("Western Sky issued loans to borrowers with North Carolina addresses from March 10, 2010 until September 3, 2013.").

As discussed below, one ground on which to void a forum selection or choice of law clause is if it violates an important State public policy.  During the entire period of time that these loans were made, N.C. Gen. Stat. § 24-2.1(g) stated: "It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws."[15]

---

[15] *State ex rel. Cooper, supra*, 624 S.E.2d 371, 378, 174 N.C. App. 630 (2005) (reflecting how statute has same language in 2003:  "[W]e note that it is a 'paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws.' N.C. Gen.Stat. § 24-2.1 (2003). Defendants' practice of offering usurious loans was a clear violation of this policy."); *Odell v. Legal Bucks, LLC*, 192 N.C. App. 298, 665 S.E.2d 767, 781 (N.C. App. 2008) (same language in 2007: "Further, Defendants' contract with Plaintiff for an illegal advance violated 'the paramount public policy of North Carolina to protect North Carolina resident borrowers

14

With regard to where the loan agreement was made, each Plaintiff saw the TV ad in North Carolina, called the toll-free number from North Carolina, accessed the website from North Carolina and filled out any loan application information and electronically clicked on any buttons meant to represent that they "signed" anything, at their homes in North Carolina.  *See* SAC ¶ 17 & Exs. 1 (Brown Aff.), 2 (Johnson Dec.).   N.C. Gen. Stat. § 24-2.1 states in part:

> (a) For purposes of this Chapter, any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State, or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein.
>
> (b) Any solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a borrower who is a resident of this State, shall be deemed to be an offer or agreement to lend in this State.
>
> (c) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.

Based on available records, Plaintiffs were provided two forms of an arbitration agreement.  The first form was used with earlier borrowers such as Ms. Johnson; the second was used with the last borrower, Mr. Brown.  SAC Exs. 1 (Brown), 2 (Johnson).  Ms. Johnson's form of arbitration agreement stated, in part:

> **Agreement to Arbitrate**. You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the

through the application of North Carolina interest laws.' N.C. Gen.Stat. § 24-2.1(g) (2007). On these facts, we hold that Defendants committed unfair and deceptive trade practices as a matter of law.").

15

> Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

SAC ¶ 131 & Ex. 2. These representations are false: the Tribe does not conduct arbitration, does not have authorized representatives to do so, and does not have any consumer dispute rules. SAC ¶ 132; *Inetianbor*, *supra*; *Jackson, supra*. This form of agreement was also used with Plaintiffs Long and Hayes. SAC Ex. 7, 9.

The later form of agreement used with Mr. Brown again includes the same paragraph entitled, "Agreement to Arbitrate" with the same false statements. SAC ¶ 144 & Ex. 1. This paragraph as with the old version form states the arbitration "shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative…." *Id.*

However, a different paragraph in the Brown form of agreement, inconsistently states that "you shall have the right to select any of the following arbitration organizations to administer the arbitration" and lists AAA, JAMS, or an arbitration organization agreed to by the parties. SAC ¶ 145 & Ex. 1.

In considering whether to order the form's alternative dispute (arbitration) provision to be enforced this Court may consider Defendants' conduct in prior ADR proceedings. CashCall was also found in 2012 to have acted improperly under arbitration clauses in payday loan agreements in West Virginia. SAC ¶ 166 & Ex. 15; *West Virginia v. CashCall, Inc.,* Case No. 08-C-1964, Trial Court Order #1 dated Sept. 10, 2012, ¶¶ 22 ("threats of arbitration"), 36 (CashCall called witness and said arbitration clause meant it

could take her house and car), 60 (threats of arbitration), 62 (false threats), 64 (262 letters threatening arbitration), 66 (threats of arbitration as a collection tactic).[16]

In 2013, Western Sky and Payday Financial were found to have engaged in unlawful dispute resolution practices including contacting consumers' employers falsely claiming a right to garnish wages, and continuing efforts to collect despite cease and desist orders. SAC ¶¶ 163, 167-68 & Exs. 13, 16 (*Maryland Commissioner of Financial Regulation v. Western Sky Financial, LLC, et al.*, case no. CFR-FY2011-182, Opinion and Final Order dated May 22, 2013; *Federal Trade Commission v. Payday Financial, LLC,* Case 3:11-cv-03017-RAL, D.S.D., order filed Sept. 30, 2013).

In 2013 Defendants used unlawful and abusive practices in an arbitration under a Western Sky loan agreement with provisions materially identical to those herein, that was referred to arbitration by another Federal Court. Abraham Inetianbor received a Western Sky loan in Florida, sued, and was initially ordered to arbitrate. CashCall, working through Webb, approached Tribal member Mr. Robert Chasing Hawk to be the arbitrator. Mr. Inetianbor never agreed for Mr. Chasing Hawk to be the arbitrator. Mr. Inetianbor asked CashCall how much they were paying Mr. Chasing Hawk to be the arbitrator and CashCall would not tell him. They also would not send him a copy of any contract they had with Mr. Chasing Hawk. Mr. Inetianbor found out that Mr. Chasing Hawk's daughter worked for Western Sky. Mr. Chasing Hawk had previously said in a May 1,

---

[16] CashCall has also allegedly used unlawful dispute resolution practices in the past in California. SAC ¶ 162; *The People of the State of California v. CashCall, Inc.*, No. BC420115, Complaint dated August 18, 2009 and "Final Judgment and Permanent Injunction," dated August 24, 2009 (found at SAC Ex. 25).

2013 letter that he had no prior connection to the parties. Mr. Inetianbor also found out that this letter was ghostwritten for Mr. Chasing Hawk to pretend was his own. Mr. Chasing Hawk admitted that Tawny Lawrence wrote the letter. Ms. Lawrence works for Western Sky as a manager. SAC ¶ 169; and Inetianbor materials attached as **Exhibit 2**. These allegations are unrefuted by Defendants whose Declaration of Tawny Lawrence filed at Docket 94-2 fails to address or acknowledge them.

Neither CashCall nor Mr. Chasing Hawk provided Mr. Inetianbor with any rules governing his arbitration. As here, Mr. Inetianbor's loan agreement stated that the Tribe's "consumer dispute rules" applied, but there were no such rules. Mr. Inetianbor had sued CashCall for false information on his credit report, but the arbitration demand CashCall sent to the arbitrator claimed that he owed CashCall more money. Mr. Inetianbor was loaned $2,525.00 and paid back $3,252.65, but CashCall said he owed more. SAC ¶ 169; *Inetianbor* filings attached at Ex. 2.

A "preliminary hearing" in Mr. Inetianbor's arbitration occurred by telephone on Friday, June 21, 2013. The transcript is replete with disturbing statements. SAC ¶ 169 and see Ex. 2. This evidence was placed before Judge Cohn of the Southern District of Florida who subsequently found the arbitration clause void. *Inetianbor v. CashCall, Inc.*, No. 0:13-60066-CIV, 2013 WL 4494125 (S.D. Fla. Aug. 19, 2013).

## IV. ARGUMENT.

Below Plaintiffs show that first, the forum selection clause is unreasonable and should not be enforced. Tribal exhaustion does not apply. The arbitration clause should

not be enforced.  Finally, Defendants' motion to dismiss certain claims under Rule 12(b)(6) should be denied.

### A. <u>The Forum Selection Clause Should Not Be Enforced.</u>

"[A] federal court interpreting a forum selection clause must apply federal law in doing so." *Albermarle Corp. v. AstraZeneca UK Ltd*., 628 F.3d 643, 650 (4th Cir. 2010). Under that law, "the presumption of enforceability that forum selection and choice of law provisions enjoy is not absolute and, therefore, may be overcome by a clear showing that they are 'unreasonable' under the circumstances." *Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (*quoting Bremen v. Zapata Off-Shore Co*., 407 U.S. 1, 10 (1974)).  Upon a showing of appropriate facts, many courts have found forum selection and choice of law clauses invalid where unreasonable under the circumstances.[17]

--------

[17] Specific to payday lending, *see Kucan v. Advance America*, No. 04-CVS-2860, Order filed June 27, 2009, at p. 11 ("The Kentucky choice of law clause contained in the payday loan documents is invalid."); *Hager v. Check Into Cash*, No. 04-CVS-2859, Order filed June 27, 2009, at pp. 11-12 (invalidated Delaware choice of law clause); *McQuillan v. Check 'n Go*, No. 04-CVS-2858, Order filed July 15, 2009, at p. 15 (accord) (attached with unreported cases, Ex. 1).  Generally, *see Mercury Coal & Coke. Inc. v. Mannesmann Pipe & Steel Corp*., 696 F.2d 315, 317 (4th Cir. 1982) (noting "a strong public policy of the forum ... might result in invalidation"); *Dove Air, Inc. v. Bennett,* 226 F.Supp.2d 771, 776 (W.D.N.C. 2002) (forum selection clause invalidated); *High Life Sales v. Brown-Forman Corp*., 823 S.W.2d 493, 495-98 (Mo. 1992) (refusing to enforce forum provision); *Cutter v. Scott & Fetzer Co*., 510 F.Supp. 905, 909 (E.D.Wis. 1981) (declining to enforce forum selection clause because it would defeat underlying remedial purpose of Wisconsin statute); *Lulling v. Barnaby's Family Inns, Inc*., 482 F.Supp. 318, 320-21 (E.D.Wis. 1980) (declining to enforce forum clause in franchise agreement in light of public policy reflected in Wisconsin franchise law); *Wimsatt v. Beverly Hills Weight Loss Clinics Int'l, Inc.,* 32 Cal.App.4th 1511, 38 Cal.Rptr.2d 612 (1995) (declining to enforce Virginia forum selection clause per strong public policy underlying California's franchise statutes); *Kubis & Perszyk Assocs., Inc. v. Sun Microsystems, Inc*., 680 A.2d 618, 146 N.J. 176, 192-93 (N.J. 1996) (franchise dispute; forum selection clauses invalid where "they fundamentally conflict with the

A forum selection that may violate public policy may be found when a State has demonstrated a strong interest in regulating a particular industry or in protecting a certain class of persons. *See High Life Sales v. Brown-Forman Corp*., 823 S.W. 2d 493 (Mo. 1992) (forum selection provision against a liquor distributor violates Missouri statute protecting liquor franchises). Here, consumer lending is closely controlled by North Carolina law and the State has evinced a strong public policy of protecting consumers.

Further, parties cannot confer subject matter jurisdiction on a court that has none, whether by agreeing to a forum selection clause or to any other contractual provisions.

### 1. *Forum clause unenforceable because Tribe lacks jurisdiction.*

The forum selection clause cannot by agreement confer on the Tribal Court subject matter jurisdiction it does not have over these loans made to North Carolina borrowers. SAC ¶ 172. Parties cannot confer subject matter jurisdiction on a court that does not have it. Here, Defendants seek to have the parties confer subject matter jurisdiction on the Tribal Court by having consumers sign contracts purporting to create jurisdiction. However, parties cannot create subject matter jurisdiction by consent.[18]

---

basic legislative objectives of protecting franchisees from the superior bargaining power of franchisors and providing swift and effective judicial relief against franchisors that violate the Act."); *Morris v. Towers Financial Corp*., 916 P.2d 678 (Colo. Ct. App. 1996) (forum clause contravened strong public policy reflected by Colorado Wage Claim Act).

[18] *Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702 (1982) ("For example, no action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant…."); *Sosna v. Iowa*, 419 U.S. 393, 398 (1975) (parties may not by stipulation invoke power of the courts); *Brickwood Contractors, Inc. v. Datanet Eng'g, Inc*., 369 F.3d 385, 390 (4th Cir. 2004) (en banc) ("Subject-matter jurisdiction cannot be conferred by the parties, nor can a defect in subject-matter jurisdiction be waived by the parties."); *Radcliffe v. Purdue*

The agreements state that "[t]he validity, effect and enforceability of this waiver of class action lawsuit and class wide Arbitration is to be determined solely by a court of competent jurisdiction located within the Cheyenne Rivers Sioux Tribal Nation, and not by the arbitrator." SAC Exs. 1-2. However, because the Tribal Court lacks subject matter jurisdiction it cannot be "competent" to hear the dispute. "Subject-matter jurisdiction … imposes nonwaivable structural limits on a court's power to adjudicate a dispute. Thus, a forum-selection clause cannot alter the court's ability to exercise subject-matter

---

*Pharma L.P.,* 737 F.3d 908 (4th Cir. 2013) (quoting *Brickwood*); *Binder v. Price Waterhouse & Co., LLP (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 161 (3rd Cir. 2004) (parties cannot create subject matter jurisdiction by agreement); *Shapo v. Engle*, 463 F.3d 641, 645 (7th Cir. 2006) ("Parties cannot confer federal jurisdiction by agreement."); *Wolf v. Cash 4 Titles*, 351 F.3d 1348, 1357 (11th Cir. 2003) ("Parties cannot, by agreement or otherwise, confer jurisdiction on a court."); *Chicago Typographical Union No. 16 v. Chicago Sun-Times,* Inc., 935 F.2d 1501 (7th Cir. 1991) (jurisdiction cannot be created by contract); *United States v. Burch*, 169 F.3d 666, 668 (10th Cir. 1999) ("Subject matter may not be conferred on a federal court by stipulation…."); *People v. Lopez*, 60 Cal.Rptr.2d 511, 52 Cal.App.4th 233, 245 (1997) ("'the power of the courts to proceed -- i.e., their jurisdiction over the subject matter -- cannot be conferred by the mere act of a litigant…."); *People v. Chadd*, 28 Cal. 3d 739, 757, 170 Cal.Rptr. 798, 621 P.2d 837 (1981) (same); *Akins v. State*, 691 So.2d 587 (Fla. Ct. App. 1997) ("jurisdiction cannot be conferred on the court by agreement of the parties"); *Evans v. State*, 647 So.2d 180 (Fla. Ct. App. 1994) ("The parties cannot, even by stipulation, confer jurisdiction upon a court…."); *Sterling v. State,* 682 So.2d 694 (Fla. Ct. App. 1996) ("a party cannot stipulate to jurisdiction when a court lacks it"); *State v. Trevino*, 556 N.W.2d 638 (Neb. 1998) ("subject matter jurisdiction may not be created by consent or conduct of parties"); *Weeks Constr. v. Oglala Sioux Hous. Auth.*, 797 F.2d 668, 671 (8th Cir. 1986) ("Mere consent to be sued, even consent to be sued in a particular court, does not alone confer jurisdiction upon that court to hear a case if that court would not otherwise have jurisdiction over the suit."); *Nelson v. Dubois,* 232 N.W.2d 54, 57 (N.D.1975) (consent to state court as forum was insufficient to confer jurisdiction if state court lacked subject matter jurisdiction); *Clinic Masters, Inc. v. District Court*, 556 P.2d 473, 475 (Colo. 1976) ("It is true that subject matter jurisdiction cannot be conferred by the parties."); *Ruggieri v. Gen. Well Serv., Inc.*, 535 F.Supp. 525, 528 n.2 (D. Colo. 1982) (noting "subject-matter jurisdiction cannot be consented to by the parties because it relates to the court's inherent power to hear and decide the case").

jurisdiction." Maxwell J. Wright, "Enforcing Forum-Selection Clauses: An Examination of the Current Disarray of Federal Forum-Selection Clause Jurisprudence and a Proposal for Judicial Reform," 44 Loy. L.A. L. Rev. 1625, 1645 (2011).[19]

Tribal law does not regulate these loans. There is no colorable argument that this Court must give up its clear jurisdiction under the Class Action Fairness Act. Western Sky is not owned or operated by a tribe and therefore not an "arm" of the tribe entitled to sovereign immunity. *E.g., Breakthrough Management Group, Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1185 (10th Cir. 2010). The Western Sky company that the contract falsely says is organized under Tribal law is actually a South Dakota LLC.[20]

---

[19] *See also Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1228-29 (9th Cir. 1989) (finding that "a party cannot waive by consent or contract a court's lack of subject matter jurisdiction…. Thus, even if the consent of Stock West was adequate to confer personal jurisdiction onto the tribal court, the question of whether the tribal court has subject matter jurisdiction over the case would still not be resolved."); *Progressive Specialty Ins. Co. v. Burnette,* 489 F. Supp. 2d 955, 957 (D.S.D. 2007) ("Despite claims to the contrary, the parties may not waive or even stipulate to subject matter jurisdiction. That is the rule in any court. The fact that the Tribe has a long-arm statute has nothing to do with questions of subject matter jurisdiction.").

[20] Tribal sovereign immunity precludes suit against a federally recognized Indian tribe except where Congress has abrogated that immunity or the tribe has foregone it. *Kiowa Tribe of Oklahoma v. Manufacturing Technologies, Inc.*, 523 U.S. 751, 754-56 (1998). Tribal sovereign immunity can also protect subdivisions or subordinate entities acting as "arms of the tribe" from state regulation and legal action. *Memphis Biofuels, LLC v. Chickasaw Nation Indus., Inc*., 585 F.3d 917, 920-21 (6th Cir. 2009) (tribally chartered tribe-owned entity); *Native American Distrib. v. Seneca-Cayuga Tobacco Co.,* 546 F.3d 1288, 1292 (10th Cir. 2008) (tribe created, owned and operated tobacco company chartered under tribal law); *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046 (9th Cir. 2006) (tribal casino); *Hagen v. Sisseton-Wahpeton Cmty. Coll.*, 205 F.3d 1040, 1043 (8th Cir. 2000) (tribal community college funded and controlled by tribe); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuch Hous. Auth.,* 207 F.3d 21, 29 (1st Cir.2000) (tribal housing authority was "arm of the tribe"); *Breakthrough Management Group, Inc. v. Chukchansi Gold Casino and Resort*, 629 F.3d 1173, 1181 (10th Cir.

Under *Montana v. United States*, 450 U.S. 544, 565 (1981), the general rule is that tribal courts may <u>not</u> exercise jurisdiction over non-tribal members: "[T]he inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe." Here, Plaintiffs and Defendants are nonmembers of the tribe. The inherent sovereign powers of the tribe do not extend to them. Nor were any Plaintiffs ever on reservation land nor did Defendants market or make their loans there.

The courts are clear that "efforts by a tribe to regulate nonmembers, especially on non-Indian fee land, are 'presumptively invalid.'" *Plains Commerce Bank*, 554 U.S. at 330 (2008).[21] Nor can Defendants prove that either of the two narrow exceptions to the rule against Tribal jurisdiction applies. It is their burden to prove that there is Tribal jurisdiction and that tribal law applies. *See* (burden is on party asserting Tribal jurisdiction). They cannot do so here anymore than they have in the many other cases brought against them in other states that bar payday loans.

---

2010) (tribal Economic Development Authority owned and operated a casino). Here, however, no tribe has been sued, nor does any tribe own or operate Western Sky.

[21] *See also Strate v. A-1 Contractors*, 520 U.S. 438, 445 (1997) ("Our case law establishes that, absent express authorization by federal statute or treaty, tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances."); *Atkinson Trading Co., Inc. v. Shirley*, 532 U.S. 645 (2001) (tribal court lacked authority to impose tax on nonmember guests of hotel on non-tribal land); *Nevada v. Hicks*, 533 U.S. 353 (2001) (tribal court has no authority to regulate nonmember police officers investigating an off-reservation crime); *Plains Commerce Bank, supra* (tribal court lacked jurisdiction over the sale of non-Indian land by bank to non-Indians); *Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982) ("[A] tribe has no authority over a nonmember until the nonmember enters tribal lands or conducts business with the tribe."). Here, Plaintiffs did not conduct business with the tribe, but rather with South Dakota and California-incorporated companies.

23

The two exceptions are, first: "A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." *Montana*, 450 U.S. at 565. However here, none of the parties is the Tribe or a member of the Tribe. The real lender was California corporation CashCall, and even Western Sky Financial, LLC was actually a South Dakota LLC and not even itself owned by the Tribe. Thus the first exception does not apply.

Second: "A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." 450 U.S. at 566. This exception does not apply either because the loans were marketed and made to North Carolina borrowers who never set foot on the Reservation. In fact Defendants intentionally excluded Tribal members and anyone in South Dakota from their loan program.

Regulatory authority must stem from the tribe's "inherent sovereign power" before tribal jurisdiction attaches. 450 U.S. at 565.[22] Defendants never make their loans to tribal members or anyone on the reservation. SAC ¶¶ 4, 134.

---

[22] The claims are under North Carolina state law, and this Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d). *Compare Garcia v. Akwesasne Housing Authority*, 268 F.3d 76, 80 (2nd Cir. 2001) (declining to apply tribal exhaustion, court noted that plaintiff's "theories of liability are grounded (if anywhere) on federal and state law, not 'tribal law'"); *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 814 (7th Cir. 1993) (it is "necessary to examine the factual circumstances of each case … in order to determine whether the issue in dispute is truly a reservation affair entitled to the exhaustion doctrine" and refusing to require exhaustion

## 2. *Forum clause unenforceable because unreasonable.*

The Tribal-court forum selection clause and related Tribal-law choice of law clause are unreasonable under the circumstances. The subject loan business was set up by California corporation CashCall in an attempt to evade State usury law by creating a deceptive impression that the loans were offered, made and collected by a Tribal lender on a Reservation in South Dakota when that was not the case. The loans were actually marketed, made and collected on by CashCall which set up Western Sky as a "front" for its loans. Defendants took steps to deliberately conceal the true nature of the business from consumers, and the Tribal forum clause is part and parcel of this deception.[23]

North Carolina has a paramount public policy to protect its residents by its small loan laws, and courts have not hesitated to strike forum selection and choice of law clauses in light of strong policies. Numerous courts have declined to find that Tribal law or jurisdiction applies for these loans.[24]

---

where "the dispute does not concern a tribal ordinance as much as it does state and federal law"); *El Paso Natural Gas Co. v. Netzsosie*, 526 U.S. 473, 476-84 (1999) ("The issue is whether the judicially created doctrine of tribal court exhaustion, requiring a district court to stay its hand while a tribal court determines its own jurisdiction, should apply in this case, which if brought in a state court would be subject to removal. We think the exhaustion doctrine should not extend so far.").

[23] *See In re CashCall, Inc.*, Case No. 12-308, Order by State of N.H. Banking Dep't (found that "respondents have taken substantial steps to conceal this business scheme from consumers") (SAC Ex. 5); *Maryland Comm'r of Fin. Regulation v. Western Sky Fin., LLC*, case no. CFR-FY2011-182, Opinion and Final Order (Tribe did not create entities, had no ownership interest, Webb was not Tribal officer, business did not offer loans to anyone in Tribe or in South Dakota) (SAC Ex. 13).

[24] *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial*, 845 F.Supp.2d 1178, 1181 (D. Colo. 2011) (conduct of which plaintiffs

The Fourth Circuit explained in *Allen, supra,* that "[c]hoice of forum and law

provisions may be found unreasonable if … their enforcement would contravene a strong

public policy of the forum state." 94 F.3d at 928. Likewise, the Supreme Court observed

in *Bremen, supra*, 407 U.S. at 15: "A contractual choice-of-forum clause should be held

complained did not involve regulation of Indian affairs on a reservation); *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial*, case no. 11-cv-638, District Court, Denver County, Colo., Order dated April 17, 2012, pp. 7-10 (Western Sky choice-of-forum clause did not overcome state law and citing cases holding that a choice-of-forum clause may be invalid where it conflicts with state public policy); *State of Colorado ex rel. John W. Suthers, Attorney General v. Western Sky Financial*, case no. 11-cv-638, District Court, Denver County, Colo., Order dated April 15, 2013, pp. 6-8, 11-12 (finding that "because Defendants' business activities are conducted off-reservation and because Defendants solicit and advertise their business in Colorado and have, in fact, entered into loan agreements with Colorado citizens, Defendants are not entitled to tribal immunity or federal preemption"); *In the Matter of Cashcall, Inc*., No. 2012-NRR-2003-0154, "Ruling on Whether Loans at Issue are Subject to Iowa Law," Iowa Dep't of Inspections and Appeals, Division of Administrative Hearings, Sept. 26, 2013 (Iowa law applied to the Western Sky loans, not tribal law, and "the contract is formed off the reservation"); *Maryland Comm'r of Financial Regulation v. Western Sky Financial, LLC*, no. CFR-FY-2011-182, Order dated Feb. 15, 2011, p. 13 (finding a "lack of relationship between the Cheyenne River Sioux Tribe and Respondents"); *Maryland Comm'r of Financial Regulation v. Western Sky Financial, LLC et al.*, case no. CFR-FY2011-182, Order dated May 22, 2013 (finding that "all consumer loans made by the Respondents to Maryland consumers are illegal and unenforceable," rejected the argument that Tribal law applied; noting "[t]he fact that his businesses have a physical location on the Reservation is purely incidental to the type of business they transact," noted loans were "directed at non-Indians across the country, while specifically avoiding offering loans to Indians on the same reservation"); *State of Minnesota v. CashCall, Inc., et al.,* No. 27-CV-13-12740, Hennepin County District Court, Order dated Sept. 6, 2013 (Western Sky Tribal affiliation language was "deliberately used" and had tendency to deceive consumers); *State of Missouri ex rel. Chris Koster, Attorney General v. Martin A. Webb, aka Butch Webb, et al*., no. 4:11-cv-01237-AGFl, E.D. Missouri, Order dated March 27, 2012 (rejecting argument that "the forum selection clauses on the loan agreements preclude state law regulation"); *State of Missouri ex rel. Chris Koster, Attorney General v. Martin A. Webb*, no. 11SL-CC01680-1, St. Louis County Circuit Court, Order dated Oct. 15, 2012 (no tribal immunity); *In re CashCall, Inc*., No. 2011-DFI-0041, State of Washington Office of Administrative Hearings, Order dated Jan. 30, 2013 (loans violated usury law and Indian law did not insulate CashCall from liability) (Orders are attached as exhibits to SAC).

unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." The Supreme Court's 2013 decision in *Atlantic Marine* cited *Bremen* with approval reflecting that it is still good law. *Atlantic Marine Constr. Co. v. U.S. Dist. Ct. for W.D. Tex.*, 134 S.Ct. 568, 582 (2013). Here, enforcement would contravene several strong public policies unique to the payday and usury consumer loan context.

North Carolina has a strong public policy to protect its residents from usurious loans as reflected in the Consumer Finance Act, N.C. Gen. Stat. § 53-164 *et seq.*, as well as the usury laws, *see* N.C. Gen. Stat. § 24-2.1(g). The latter statute expressly states: "It is the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws." This public policy is narrowly applicable to the consumer loan context and it is difficult to imagine how it could be more strongly stated. The courts have noted its force. *Cooper v. NCCS Loans, Inc.,* 174 N.C. App. 630, 624 S.E.2d 371, 378 (2005) (citing "paramount public policy" and finding "Defendants' practice of offering usurious loans was a clear violation of this policy"); *Odell v. Legal Bucks, LLC*, 192 N.C. App. 298, 665 S.E.2d 767, 779-82 (2008) (noting "for an unlicensed lender to charge a rate of interest on a small loan greater than the rates permitted is a violation both of the Consumer Finance Act, and of Chapter 24's prohibitions on usury" and contract for an illegal advance violated "the paramount public

policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws").[25]

The forum selection and choice of law clauses violate that paramount public policy by seeking to evade the law. Defendants' conduct violates the Consumer Finance Act and usury statutes. The basis for this public policy applies with particular force here where Defendants have sought to use Tribal affiliation to evade the application of the small loan laws. In fact, the Consumer Finance Act has a special provision meant expressly to prevent such evasions: N.C. Gen. Stat. § 53-166(b), titled "Evasions," provides: "The provisions of subsection (a) of this section shall apply to any person who seeks to avoid its application by any device, subterfuge or pretense whatsoever."

When Defendants began offering their usurious loans in 2010, they were well aware and fairly on notice of North Carolina's strong public policy in favor of protecting its residents by application of the consumer lending laws. In 2009, a North Carolina Superior Court had entered an Order in a case against Advance America observing how "[t]he small loan business is closely regulated under North Carolina law." *Kucan v. Advance America*, No. 04-CVS-2860, Order filed June 27, 2009, at p. 3. This Order found that "[t]he Kentucky choice of law clause contained in the payday loan documents is invalid." *Id.* at p. 11. Similar Orders were also entered against lenders Check Into

---

[25] The Consumer Financial Protection Bureau has noted how the lender licensing laws in North Carolina as in other states "reflect the states' strong public policy that entities seeking to engage in the consumer-lending business with state residents be vetted and supervised by regulators to ensure that they adhere to consumer protection and other laws." *Consumer Financial Protection Bureau v. CashCall, Inc.,* Case No. 1:13-cv-13167, D. Mass., Complaint filed Dec. 16, 2013, at ¶ 13. (**Exhibit 5**).

Cash and Check 'n Go.  *Hager v. Check Into Cash*, No. 04-CVS-2859, Order filed June 27, 2009, at pp. 11-12; *McQuillan v. Check 'n Go*, No. 04-CVS-2858, Order filed July 15, 2009, at p. 15 (both in accord).

In light of all these facts, the forum clause is void and unenforceable as it conflicts with a strongly expressed North Carolina public policy to protect residents and to allow them to avail themselves of those legal protections when dealing with usurious lenders who have deliberately sought to evade those laws.

In addition, North Carolina has a strong public policy to protect residents against forum selection clauses in consumer loan transactions.  N.C. Gen. Stat. § 22B-3 provides:

> Except as otherwise provided in this section, any provision in a contract entered into in North Carolina that requires the prosecution of any action or the arbitration of any dispute that arises from the contract to be instituted or heard in another state is against public policy and is void and unenforceable. This prohibition shall not apply to non-consumer loan transactions or to any action or arbitration of a dispute that is commenced in another state pursuant to a forum selection provision with the consent of all parties to the contract at the time that the dispute arises.

*See Dove Air, Inc. v. Bennett,* 226 F.Supp.2d 771, 776 (W.D.N.C. 2002) (finding "the forum selection clause is also unreasonable pursuant to the State's public policy as expressed in N.C. Gen. Stat. § 22B-3").[26]  The forum selection clause violates this statute.

---

[26] *Compare Morris v. Towers Financial Corp*., 916 P.2d 678, 679 (Colo. Ct. App. 1996) where the court held that a contract's forum selection clause was unenforceable as its enforcement would contravene a strong public policy.  The Colorado Wage Claim Act provided that any employee aggrieved under that act could sue in "any court having jurisdiction over the parties," and "[a]ny agreement, written or oral, by any employee purporting to waive or modify such employee's rights in violation of this article shall be void."  The court determined that the statute, "by its plain language, voids any agreement that constitutes a waiver or modification of an employee's rights" under the act.  *Id.  See also Cerami-Kote, Inc. v. Energywave Corp.,* 773 P.2d 1143, 1147 (Idaho 1989) ("Since

"An agreement which violates a constitutional statute or municipal ordinance is illegal and void." *Marriott Financial Services, Inc. v. Capitol Funds, Inc.*, 288 N.C. 122, 128, 217 S.E.2d 551, 555 (1975); *Carolina Water Service, Inc. of North Carolina v. Town of Pine Knoll Shores*, 145 N.C. App. 686, 689, 551 S.E.2d 558, 560 (2001) ("An agreement which cannot be performed without violation of a statute is illegal and void."), *disc. rev. denied*, 354 N.C. 360, 556 S.E.2d 298 (2001). Additionally, nonperformance may be excused if performance is rendered impossible by the law. *UNCC Properties, Inc. v. Greene*, 111 N.C. App. 391, 397, 432 S.E.2d 699, 702 (1993), *cert. denied*, 335 N.C. 242, 439 S.E.2d 163 (1993).

The loan agreements were entered into in North Carolina. N.C. Gen. Stat. § 24-2.1 states in part:

> (a) For purposes of this Chapter, any extension of credit shall be deemed to have been made in this State, and therefore subject to the provisions of this Chapter if the lender offers or agrees in this State to lend to a borrower who is a resident of this State, or if such borrower accepts or makes the offer in this State to borrow, regardless of the situs of the contract as specified therein.
>
> (b) Any solicitation or communication to lend, oral or written, originating outside of this State, but forwarded to and received in this State by a

---

we determine that this forum selection clause violates the public policy expressed in I.C. § 29-110, we conclude that the Florida courts would refuse to enforce the clause."). *See also State of Georgia v. Western Sky Financial, et al.*, Civil Action No. 2013-CV-234310, Fulton County, Georgia, Amended Complaint filed Aug. 5, 2013, ¶ 48 ("Defendants' Loan Agreement contains forum selection and choice of law clauses providing that the laws and jurisdiction of the Cheyenne River Sioux Tribe apply to any dispute arising out of the agreement. As such, the Loan Agreement violates O.C.G.A. § l6-17-2(c)(l), which prohibits any provision in a loan agreement by which the laws of a state other than Georgia govern the terms and enforcement of the agreement or designate a court for the resolution of disputes other than a court of competent jurisdiction in the county in which the borrower resides.").

borrower who is a resident of this State, shall be deemed to be an offer or agreement to lend in this State.

(c) Any solicitation or communication to borrow, oral or written, originating within this State, from a borrower who is a resident of this State, but forwarded to, and received by a lender outside of this State, shall be deemed to be an acceptance or offer to borrow in this State.

The contracts were executed here, thereby distinguishing cases in which contracts were executed elsewhere.[27]

In *Newman ex rel. Wallace v. First Atlantic Resources Corp.*, 170 F.Supp.2d 585, 593 (M.D.N.C. 2001), this Court held that the FAA may preempt Section § 22B-3 with regard to an arbitration clause, but the FAA lacks that effect for a forum clause as it purports to specify a <u>court</u> forum. Further the *Newman* Court indicated that a forum clause can be voided for unfairness, noting that "unfairness does not result from compliance with the forum-selection clause" in that case. 170 F.Supp.2d at 593.

In addition, North Carolina public policy is not to enforce illegal and criminal contracts. Here, the loan agreements contain demonstrably false statements meant to support an enterprise that was a "front" and a "sham." *See In re CashCall, Inc.*, supra, N.H. Banking Dep't (Western Sky a "front" for CashCall) (SAC ¶ 67 & Ex. 5); *Jackson, supra*, Order at 5-6 ( "The intrusion of the Cheyenne River Sioux Tribe into the contractual arbitration provision appears to be merely an attempt to escape otherwise

---

[27] *Compare Key Motorsports v. Speedvision Network, L.L.C.*, 40 F.Supp.2d 344, 349 (M.D.N.C. 1999) (forum selection clause applied where contract was made in Connecticut not North Carolina). Here, the contract was never signed by any Defendant, and Plaintiffs' conduct occurred in North Carolina. Defendants intentionally marketed the loans by TV ads into North Carolina homes and made their website interactive so that a borrower could "enter into" the loan in his or her home.

applicable limits on interest rates. As such, the promise of a meaningful and fairly conducted arbitration is a sham and an illusion.") (SAC ¶ 171).

Making loans without a license is a misdemeanor. N.C. Gen. Stat. § 53-166 (Consumer Finance Act violation is a Class 1 misdemeanor). Courts have refused to give effect to forum clauses in a contract tainted with illegality. *See Snider v. Lone Star Art Trading Co.*, 672 F.Supp. 977, 983 (E.D. Mich. 1987) (finding "it would be unfair to enforce … a [forum selection] clause where the entire contract was tainted with fraud").

Defendants cite *Albermarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643 (4th Cir. 2010) (Def. Mem. 18). However *Albemarle* stated just like other cases that a forum clause can be overcome where "enforcement would be unreasonable and unjust." *Id.* at 649-50 (quoting *Bremen*, 407 U.S. at 15). The court specifically stated that "a forum selection clause may be found unreasonable if … [its] enforcement would contravene a strong public policy of the forum state." *Id.* at 651 (quoting *Allen, supra*).

Further, in *Albemarle*, the facts are different. The party opposing the clause sought to rely on a South Carolina statute that purported to make all forum clauses permissive and to impose the state rules of civil procedure in Federal Court. *Id.* at 651-52 (quoting S.C.Code Ann. § 15-7-120(A)). The court observed that "this statute makes all forum selection clauses permissive and … would purport to impose South Carolina procedural rules on a federal court," which was therefore why it was "preempted by federal law." *Id.* at 652. The North Carolina statutes do not have similar language.

Further, the *Albemarle* court stated that it "can find virtually no evidence to indicate that S.C.Code Ann. § 15-7-120(A), overriding exclusive forum selection clauses

32

in favor of applying state procedural rules for venue, manifests a strong public policy of South Carolina. We could find no South Carolina court that has so held." *Id.* at 652. By contrast, North Carolina's small loan laws do manifest a "paramount" public policy, *see* N.C. Gen. Stat. § 24-2.1(g), as courts have expressly held. *See Cooper, supra,* 624 S.E.2d at 378 (citing "paramount public policy" and finding "practice of offering usurious loans was a clear violation of this policy"); *Odell, supra,* 665 S.E.2d at 779-82 (noting "the paramount public policy of North Carolina to protect North Carolina resident borrowers through the application of North Carolina interest laws").

Other decisions have rejected claims that Tribal law applies to these loans, and have consistently applied State law. *E.g., Colorado ex rel. Suthers v. Western Sky Financial, LLC, supra,* Order dated April 15, 2013 (finding defendants violated Colorado lending law, and that "because Defendants' business activities are conducted off-reservation and because Defendants solicit and advertise their business in Colorado and have, in fact, entered into loan agreements with Colorado citizens, Defendants are not entitled to tribal immunity or federal preemption.") (SAC Ex. 18).[28]

The facts in this matter resemble the *Dove Air* case in that there is evidence of unequal bargaining power and overreaching as well as of false statements in the contract itself. *See* 226 F.Supp.2d at 774 (forum clause unreasonable where facts showed unequal bargaining power and overreaching). That court noted that the plaintiff was experiencing

---

[28] Defendant also cites *NC Contracting, Inc. v. Munlake Contractors, Inc.*, No. 5:11-CV-766, 2012 WL 5303295 (E.D.N.C. Oct. 25, 2012) (Def. Br. 18). However that court as well stated that the validity of a forum selection clause "may be overcome by a clear showing that the provision is unreasonable under the circumstances" including where its "enforcement would contravene a strong public policy of the forum state."

financial problems, of which defendant was aware.  *Id.* at 774-75.  Likewise, Plaintiffs were in adverse financial circumstances when they sought the loans.  Indeed Defendants' very business model deliberately targets such individuals.

The *Dove* court noted the presence of false statements in the agreement: the agreement referred to a purchasing entity which did not exist.  *Id.*  The court found that "[t]he language of the agreement supports Plaintiffs' arguments of overreaching." *Id.* at 775.  In other words, the defendant in *Dove* leveraged its superior bargaining power vis-à-vis a financially weak person to obtain an agreement that contained false statements.

Just as in *Dove*, the agreement here includes false statements.  It states: "By executing this agreement, you hereby expressly agree that this agreement is executed and performed solely within the exterior boundaries of the Cheyenne River Indian Reservation, a sovereign Native American Tribal Nation."  SAC Ex. 1, p. 3 in paragraph titled, "Governing Law."  That is a false statement.  Defendants loaned the money by depositing it into Plaintiffs' bank accounts in North Carolina.  Plaintiffs made payments from North Carolina.  They did not go to South Dakota.  Rather they were enticed by Defendants' website in North Carolina.  Defendants electronically debited money from North Carolina banks.  There are no "exterior boundaries of the … Reservation" in North Carolina.  This false statement seeks to force Tribal jurisdiction by a pretense that the customer was on the reservation.[29]

---

[29] In this regard a 2006 Tribal Court handbook limits jurisdiction to "claims and disputes arising on the reservation." SAC ¶ 127 & Ex. 12.

34

Another false statement is the prominent assertion in the agreement that "Neither this Agreement nor Lender is subject to the Laws of the United States."  SAC Ex. 1, p. 1. Defendants in this case have raised a host of United States laws in an effort to shield themselves from suit, while previously seeking to chill consumers from suit by misrepresenting that no laws of our country apply.   Clearly it was overreaching for Defendants to claim no U.S. laws applied.

Another false statement is that Western Sky is "a lender organized under and authorized by the laws of Cheyenne River Sioux Tribe and Indian Commerce Clause of the Constitution of the United States of America."  SAC Ex. 1, p. 1. The "Indian Commerce Clause" is a grant of Constitutional authority to Congress, not to any private entity or tribe.[30]  Western Sky is an LLC organized under South Dakota law not "organized under ... the laws of Cheyenne River Sioux Tribe" as the contract states.  *See* SAC Ex. 26 (corporate records), and records filed at Docket 37-4 through 37-24.

Another false statement is that the Tribe offers arbitration; in fact it does not.  *See Inetianbor, supra* (noting that Judge Demery of the Tribal Court wrote that the Tribe "does not authorize arbitration"); *Jackson, supra*.

---

[30] The "Indian Commerce Clause" states that Congress shall have the power "[t]o regulate commerce with foreign Nations, and among the several States, and with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. It allows Congress to legislate regarding Indian tribes. *See United States v. Lara*, 541 U.S. 193, 200 (2004).  In the FTC case the Court noted how defendants there tried to falsely use the "Indian Commerce Clause" to support wage garnishment.  *Federal Trade Commission v. Payday Financial LLC*, No. 3:11-cv-03017-RAL (D.S.D. Order dated Sept. 30, 2013), at p. 19.

Other courts have invalidated forum selection clauses based on facts showing overreaching and unfair and unreasonable conduct.[31]  There is ample case authority supporting voiding the clause on the basis.  Further, there is prior evidence of Defendants' misuse of the Tribal forum, in using it to file false wage garnishment claims against consumers.  *See* SAC Ex. 16 (Order from *FTC v. Payday Financial LLC*, *supra*, pp. 17-22; Court found use of unlawful wage assignment clauses).

Defendants also insist that under the Tribal law there is no usury limit.  If so, as another independent basis to strike the clause, "the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy."  *Allen*, 94 F.3d at 928.  *See Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 637 n.19 (1985) (noting that in the

---

[31] *See Cox v. Dine-A-Mate, Inc.*, 129 N.C. App. 773, 501 S.E.2d 353, 355 (N.C. Ct. App. 1998) (affirming trial court's finding "that the forum selection clause in the agreement was the product of unequal bargaining power and that enforcement of the clause would be unfair and unreasonable"); *Bell Atl. Tricon Leasing Corp. v. Johnnie's Garbage Serv.*, 113 N.C. App. 476, 480-81, 439 S.E.2d 221, 224-25 (N.C. Ct. App. 1994) (enforcement of forum clause unreasonable where there was "no bargaining over the terms of the contract," parties were "far from equal in bargaining power," contract was "one page pre-printed form," "there was no place for defendant to sign or initial" the clause, and it was not explained to him); *High Life Sales v. Brown-Forman Corp.*, 823 S.W.2d 493, 497 (Mo. 1992) ("Many courts have refused to enforce a forum selection clause on the grounds of unfairness if the contract was entered into under circumstances that caused it to be adhesive."); *Preferred Capital, Inc. v. Sarasota Kennel Club*, No. 1:04 CV 2063, 2005 WL 1799900 (N.D.Ohio July 27, 2005) (clause unenforceable where a "product of fraud or overreaching"); *Preferred Capital, Inc. v. Aetna Maint. Inc.,* No. 1:04CV2511, 2005 WL 1398549 (N.D.Ohio June 14, 2005) (same); *SRH, Inc. v. IFC Credit Corp.*, 619 S.E.2d 744, 746 (Ga. Ct. App. 2005) (accord); *Jelcich v. Warner Bros, Inc.*, 1996 WL 209973, *2 (S.D.N.Y. Apr. 30, 1996) (refusing to enforce forum clause when employer bullied employee who was not a sophisticated businessperson); *Kolendo v. Jerell, Inc.*, 489 F.Supp. 983, 986 (S.D.W.Va. 1980) (refused to enforce forum clause where unequal bargaining power between employer and employee); *Colonial Leasing Co. of New England v. Best*, 552 F.Supp. 605, 607-08 (D. Or. 1982) (adhesive forum selection clause not enforced).

event the "choice-of-forum and choice-of-law clauses operated in tandem as a prospective waiver of a party's right to pursue statutory remedies for antitrust violations, we would have little hesitation in condemning the agreement as against public policy"); *Vimar Seguros y Reaseguros v. M/V Sky Reefer*, 515 U.S. 528, 540 (1995) (same); *Jitterswing, Inc. v. Francorp, Inc.*, No. ED93045, 2010 WL 933763, *1-2 (Mo. App. Mar. 16, 2010) ("We find that in enforcing the forum selection clause in the contract between Jitterswing and Francorp would create an unfair result…. If required to bring its claim in Illinois, Jitterswing would be without recourse, as this is a tort claim created by a Missouri statute and the courts of Illinois would be without jurisdiction."); *Fairfield Lease Corp. v. Liberty Temple Universal Church of Christ, Inc*., 221 N.J.Super. 647, 653, 535 A.2d 563 (N.J. Super. 1987) ("Provisions requiring litigation in a foreign country or another state, especially where plaintiff would be disadvantaged by the law of the foreign forum, have been held unenforceable.").  Plaintiffs do not concede that Tribal law would allow these usurious loans.  However the Court need not reach that issue, as it is clear the Tribal Court lacks jurisdiction, the forum clause is voided by North Carolina public policy and statute, and the clause is unreasonable under the circumstances.

## B.  The Case Is Not Subject to Tribal Exhaustion.

Where all parties to a dispute are non-tribal members, tribal jurisdiction is presumptively invalid.  *See Progressive Specialty Ins. Co. v. Burnette,* 489 F.Supp.2d 955, 958 (D.S.D. 2007) ("The agent and the Insurer are non-tribal members.  We know that tribal jurisdiction over non-members is 'presumptively invalid.'") (citing *Atkinson Trading Co. v. Shirley*, 532 U.S. 645, 659 (2001)).  No parties to this case are the Tribe or

Tribal members.  Defendants must overcome a presumption against Tribal jurisdiction and cannot do so.  *See also Nevada v. Hicks*, 533 U.S. 353, 358 n.2 (2001) ("we have never held that a tribal court had jurisdiction over a nonmember defendant"); *FTC v. Payday Financial, LLC*, 935 F.Supp.2d 926 (D.S.D. 2013) ("Indian tribes generally lack legal authority over people who are not tribal members.") (citing *Plains Commerce Bank v. Long Family Land & Cattle Co*., 554 U.S. 316, 328 (2008)).

In *Plains Commerce Bank*, the Supreme Court considered a case involving the same Cheyenne River Sioux Tribal Court involved herein.  An off-reservation bank had entered into a lending relationship with a family including some tribal members, and a South Dakota corporation formed by the family.  *Id.* at 321.  After the family defaulted on the loan, the bank received a deed to land in the reservation.  The bank leased the land back to the family, but the family could not make lease payments.  *Id.* at 321-22.  The bank sold the land to non-Indian purchasers.  *Id.* at 322.  The family sued the bank in tribal court for breach of contract and other claims.  The bank contested jurisdiction, but the tribal court found it had jurisdiction.  A jury trial resulted in a verdict for the family and the tribal court nullified the sale to the non-Indian purchasers.  *Id.* at 322-23.  The bank appealed, in a case that went ultimately to the Supreme Court.  The Supreme Court found that the tribe's jurisdiction did not extend to nullifying a sale of non-trust land between the bank and non-tribal members: "The general rule that tribes do not possess authority over non-Indians who come within their borders."  *Id.* at 317 (emphasis added).

The Court noted only two narrow situations where a tribe may exercise jurisdiction over non-Indians.  First, "[a] tribe may regulate, through taxation, licensing,

38

or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements."  Second, a tribe may exercise "civil authority over the conduct of non-Indians on fee lands within the reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe."  *Id.,* 554 U.S. at 329-330 (citing *Montana v. United States,* 450 U.S. 544 (1981)).

Here, with the Tribe not owning Western Sky, with Western Sky being a South Dakota LLC, and with no Tribal member a party, there is no Tribal jurisdiction.  Because there is no Tribal jurisdiction, there is no need to exhaust Tribal remedies.[32]

---

[32] *See Nevada v. Hicks*, 533 U.S. 353, 369 (2001) (rejecting exhaustion where case involved nonmembers; doctrine should not apply in cases where the tribal court does not have jurisdiction); *Strate v. A-1 Contractors*, 520 U.S. 438, 459-60 & n.14 (exhaustion not applicable to non-member parties; requirement "would serve no purpose other than delay"); *Hornell Brewing Co. v. Rosebud Sioux Tribal Court,* 133 F.3d 1087, 1091 (8th Cir. 1998) (exhaustion of remedies not appropriate in case brought against non-members – law does not "allow Indian tribes to exercise civil jurisdiction over the activities or conduct of non-Indians occurring outside their reservations"); *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 483-84 (1999) (exhaustion inapplicable; it is a prudential doctrine only); *Christian Children's Fund, Inc. v. Crow Creek Sioux Tribal Court,* 103 F.Supp. 2d 1161 (D.S.D. 2000) (exhaustion not required – "there is no exhaustion requirement because the tribal court simply lacks authority to adjudicate disputes arising from such conduct."); *BNSF Ry. Co. v. Ray,* 138 Fed. Appx. 970 (9th Cir. 2005) (exhaustion not required where tribal court did not have jurisdiction); *Burlington N. R.R. Co. v. Red Wolf,* 196 F.3d 1059 (9th Cir. 1999) (same); *Weter v. Archambault*, 232 F.3d 899 (table), No. 99-35638, 2000 WL 1028973, at *1 (9th Cir. July 26, 2000) (injunction against further tribal court proceedings where no tribal jurisdiction); *Ford Motor Co. v. Todecheene*, 221 F. Supp. 2d 1070, 1087-88 (D. Ariz. 2002) (enjoining tribal court where its jurisdiction was "clearly lacking" and would result in delay), *aff'd,* 394 F.3d 1170 (9th Cir. 2005), *withdrawn on other grounds*, 488 F.3d 1215; *MacArthur v. San Juan Cty.,* 309 F.3d 1216, 1224 & n.7 (10th Cir. 2002) (party has "federal right to be free from tribal court interference").

Exhaustion is "a matter of comity, not as a jurisdictional prerequisite." *Iowa Mut.*

*Ins. Co. v. LaPlante*, 480 U.S. 9, 16 n.8 (1987); *Madewell v. Harrah's Cherokee Smokey*

*Mountains Casino*, 730 F.Supp.2d 485, 489 (W.D.N.C. 2010) ("This 'tribal exhaustion

doctrine' is not jurisdictional in nature, but rather is a matter of comity."). Because the

exhaustion rule does not impair jurisdiction, and instead is "analogous to principles of

abstention articulated in *Colorado River Water Conservation Dist. v. United States*, 424

U.S. 800 (1976)," *LaPlante,* 480 U.S. at 16 n.8, the doctrine must be interpreted narrowly

in light of the "virtually unflagging obligation of federal courts to exercise the

jurisdiction given them." *Garcia v. Akwesasne Housing Authority*, 268 F.3d 76, 80 (2nd

Cir. 2001) (*citing Colorado River*, 424 U.S. at 817).

Here, tribal law does not apply, rather, it is the small loan laws of the states where

Defendants make their loans that apply. Absent jurisdiction, the issue is closed.

*Compare Fidelity and Guaranty Ins. Co. v. Bradley*, 212 F.Supp.2d 163 (W.D.N.C. 2002)

("There are two issues before this Court: (1) <u>Does the Tribal Court have jurisdiction</u> and;

(2) if so, should this Court abstain from exercising its jurisdiction in favor of the doctrine

of tribal exhaustion." Emphasis added).[33]

---

[33] In *Fidelity and Guaranty Ins. Co.*, the court found tribal exhaustion where it was
clear the tribal court had jurisdiction and the facts involved a contract for work on tribal
land for the tribe. *See id*. at 165: "The Tribal Court clearly has jurisdiction over the
dispute at issue; a dispute … <u>on tribal land and for the benefit of the Tribe</u>." (Emphasis
added). Here, by contrast, the dispute arises over usurious loans issued to North Carolina
consumers. In *Tom's Amusement Co., Inc. v. Cuthbertson,* 816 F.Supp. 403, 405
(W.D.N.C. 1993), the facts involved "a contract dispute between two non-Indians
operating a gaming establishment <u>on the Eastern Band of Cherokee Indian Reservation
pursuant to a gaming license and ordinances established by the Tribe. The Defendant
contracted with Plaintiff as a disclosed agent of the Tribe.</u>" (Emphasis added). Here,

The Tribe has no jurisdiction over disputes between a California company (CashCall) that used a South Dakota corporate entity (Western Sky) to make loans to borrowers who did not reside on the tribe's reservation. Exhaustion of tribal remedies is not required. Regulation of this lending is not an important part of tribal sovereignty especially when the loans were never even made on the Reservation.[34]

## C. **The Arbitration Agreement is Unenforceable.**

Arbitration "is a matter of contract." *American Express Co. v. Italian Colors Restaurant*, No. 12-133, 2013 WL 3064410, U.S. Supreme Court slip op., June 20, 2013, p. 3; *Rent-A-Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010) (noting "fundamental principle that arbitration is a matter of contract"). The initial inquiry is to determine whether the parties entered into a "valid" arbitration agreement; the Court must

---

neither the tribe nor any agent contracted with the Plaintiffs and Defendants made loans to North Carolina consumers. Other cases are distinguishable. *Lexington Ins. Co. v. Data Aire, Inc.*, No. 2:12cv97, p. 3 (W.D.N.C. April 29, 2013) (allowing exhaustion, court found, "the parties do not dispute that the case involves property located within the reservation boundaries; property, moreover, which is involved in tribal gaming"); *Madewell v. Harrah's Cherokee Smokey Mountains Casino*, 730 F.Supp.2d 485, 488 (W.D.N.C. 2010) (events occurred on tribal property).

[34] *Compare Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9 (1987) ("Tribal authority over the activities of non-Indians <u>on reservation lands</u> is an important part of tribal sovereignty" (emphasis added)); *Krempel v. Prairie Island Indian Community*, 125 F.3d 621, 622 (8th Cir. 1997) (tribal court remedies "must be exhausted before a federal district court should consider relief in a civil case regarding <u>tribal-related activities on reservation land</u>." Emphasis added).

be "satisfied that the making of the agreement for arbitration … is not in issue." *See id.*;

9 U.S.C. § 2 & § 4.[35]

Because the purported choice of law provision is unenforceable, North Carolina

law applies.[36] "In North Carolina the burden rests upon the party seeking to compel

arbitration to prove the existence of an agreement to arbitrate." *Capps v. Blondeau*, 719

S.E.2d 256 (N.C. Ct. App. 2011).

---

[35] "A court may compel arbitration of a particular dispute only when the parties have agreed to arbitrate their disputes and the scope of the parties' agreement permits resolution of the dispute at issue." *Muriithi v. Shuttle Express, Inc.,* No. 11-1445, slip op. at p. 7 (4th Cir. April 1, 2013). *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S.Ct. 2847, 2855-56 (2010) ("Where the dispute at issue concerns contract formation, the dispute is generally for courts to decide."). "[P]ublic policy favoring arbitration does not come into play unless a court first finds that the parties entered into an enforceable agreement to arbitrate." *Evangelistic Outreach Ctr. v. Gen. Steel Corp*., 181 N.C. App. 723, 726, 640 S.E.2d 840, 843 (2007). "Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." *Arrants v. Buck*, 130 F.3d 636, 640 (4th Cir. 1997) (citing *Adamovic v. METME Corp*., 961 F.2d 652, 654 (7th Cir. 1992) (stating that "the federal policy favoring arbitration does not give [courts] license to compel arbitration absent an agreement to do so")). "Courts decide whether there is an agreement to arbitrate according to common law principles of contract law." *Id.* (citing *Whiteside v. Teltech Corp.*, 940 F.2d 99, 101 (4th Cir. 1991)).

[36] *See Winston v. Academi Training Center, Inc*., 2013 WL 989999 (E.D.Va. March 13, 2013) (NC law applied, choice of law provision unenforceable), and discussion of forum selection clause *infra*. The choice of law provision purporting to apply Tribal law fails because it is unreasonable and violates North Carolina law and its "paramount" public policy of protecting borrowers. The Tribal law provisions in the agreement have overreaching and false statements and other decisions regarding Western Sky loans have found that the law of the state where the borrowers received the loans controlled. *See Cable Tel. Servs., Inc. v. Overland Contr'g, Inc.,* 154 N.C. App. 639, 642-43, 574 S.E.2d 31, 33-34 (2002) (choice of law provisions will not be enforced where "application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of a particular issue"); *Cox v. Dine-A-Mate, Inc.,* 129 N.C. App. 773, 501 S.E.2d 353, 356 (1998) (finding that "application of New York law would be a violation of North Carolina public policy"); *Kucan v. Advance America, supra; Hager v. Check Into Cash, supra; McQuillan v. Check 'n Go, supra* (voiding choice of law clauses).

An arbitration contract is subject to defenses that are generally applicable to all contracts including generally applicable contract defenses. 9 U.S.C. § 2; *AT&T Mobility LLC v. Concepcion,* 131 S.Ct. 1740, 1746 (2011); *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996) (arbitration provision may be found unenforceable based on "generally applicable contract defenses, such as fraud, duress, or unconscionability"); *Murray v. United Food and Commercial Workers Int'l Union*, 289 F.3d 297 (4th Cir. 2002) (finding arbitration agreement unenforceable); *Hooters of America, Inc. v. Phillips*, 173 F.3d 933 (4th Cir. 1999) (same).

The Western Sky arbitration clause is unenforceable, because it contains false statements whose falsity was known to Defendants but not to Plaintiffs, and because it cannot be performed. Accordingly no contract was formed or, it is unenforceable based on mistake or impossibility of performance. The "Agreement to Arbitrate" is as follows:

> **Agreement to Arbitrate.** You agree that any Dispute, except as provided below, will be resolved by Arbitration, which shall be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative in accordance with its consumer dispute rules and the terms of this Agreement.

SAC Exs. 1-2, p. 3. This agreement contains multiple misrepresentations. First, the Tribe does not conduct arbitrations. Second, there are no "consumer dispute rules." Therefore, the arbitration agreement is false and unenforceable. All of the available Plantiffs' arbitration agreements have this language. *See* SAC Exs. 1 (Brown), 2 (Johnson), 7 (Long), 9 (Hayes).

Ms. Johnson's agreement has a further contradiction. After it states that "Arbitration … shall be conducted by the Cheyenne River Sioux Tribal Nation by an

authorized representative," it later states that it will be conducted by "a panel of three Tribal Elders." SAC Ex. 2, pp. 3-4. Obviously an arbitration cannot be done both by <u>an</u> authorized representative and <u>three</u> Tribal Elders.

Mr. Brown's agreement includes the same "Agreement to Arbitrate" paragraph found in the other Plaintiffs' contracts with the false statements that the Tribe conducts the arbitration and that its "consumer dispute rules" apply. It is therefore equally unenforceable. SAC Ex. 1, p. 3.

The Brown agreement has a further contradiction as well. It goes on to say that the arbitration will be conducted by AAA, JAMS or some unspecified organization. Obviously an arbitration cannot occur where it "<u>shall</u> be conducted by the Cheyenne River Sioux Tribal Nation by <u>an</u> authorized representative" (SAC Ex. 1 p. 3), but also "<u>shall</u>" be conducted by the AAA, JAMS, or a party-agreed arbitrator. (*Id.*, p. 3). Thus, the parties never agreed on an arbitrator or performable provisions.

Both the Brown and the Johnson forms of arbitration agreements are plagued with false, contradictory, confusing and misleading terms. *Compare NAACP of Camden County E. v. Foulke Mgmt Corp.*, 24 A.3d 777 (N.J. Super. Ct. App. Div. 2011) (finding "the disparate arbitration provisions in this case were too confusing, too vague, and too inconsistent to be enforced"). The facts taken together evidence an agreement that fails for lack of formation, lack of meeting of the minds, and is otherwise unenforceable.

Defendants claim that the *Inetianbor* and *Jackson* rulings make no difference because the FAA requires appointment of a substitute arbitrator when the designated forum is unavailable. Def. Mem. pp. 34-38. This argument is incorrect, first because of

44

the outright misstatements in the agreement as noted above. The FAA states that

arbitration agreements are to be treated like other contracts and is not meant to form a

contract where none exists. 9 U.S.C. § 2, titled "Validity, irrevocability, and enforcement

of agreements to arbitrate," states:

> A written provision in any maritime transaction or a <u>contract</u> evidencing a transaction involving commerce to settle by arbitration a controversy thereafter <u>arising out of such contract</u> or transaction, or the refusal to perform the whole or any part thereof, or an <u>agreement in writing</u> to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, <u>shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract</u>.

(Emphasis added). Clearly, then, an arbitration agreement can be unenforceable for the

same "grounds … as exist in law or in equity for the revocation of any contract."

Further, the substitute arbitrator provision at 9 U.S.C. § 5 provides:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

Here, the "method" in the agreement cannot be performed. The agreements specify rules

(the nonexistent "consumer dispute rules") and an arbitrating authority (the Tribe, which

does not arbitrate) which cannot be enforced. Note how this FAA provision states that

when conditions exist that do trigger naming a substitute arbitrator, he will still "act

45

under the said agreement" – an agreement shown to be unenforceable. The egregious circumstances existent in this case are not what the FAA drafters meant to protect.

In effect Defendants ask the Court to rewrite the contract. However, the proper approach is not to rewrite a defective agreement but decline to enforce it. *See Winston v. Academi Training Center, Inc.,* 2013 WL 989999 (E.D.Va. March 13, 2013) (same).

Further, courts have found that even where FAA Section 5 could otherwise apply, it should not apply where the offensive provisions are "integral" to the agreement. Here, the provisions in question were integral and Defendants cannot use FAA Section 5 to form an arbitration agreement where the parties never reached an enforceable agreement. *See Inetianbor* Order, Aug. 19, 2013, p. 3 (provisions were integral); prior *Inetianbor* Order from April 1, 2013 (same); *Crossman v. Life Care Centers of America, Inc*., 738 S.E.2d 737, 740 (N.C. Ct. App. 2013) ("By requiring the selection of AAA arbitrators, the Agreement sought to employ an organization that refuses to be so employed. This requirement constitutes an integral and material provision of the Agreement. Accordingly, we hold that the Agreement is unenforceable as impossible to perform.").[37]

_____

[37] *See also Carideo v. Dell, Inc*., No. C06-1772JLR, 2009 WL 3485933, at *5 (W.D. Wash. Oct. 26, 2009) (agreement specifying NAF forum that was corrupt and unavailable, was unenforceable); *Carr v. Gateway, Inc*., 918 N.E.2d 598, 603 (Ill. Ct. App. 2009) (same); *In re Salomon Inc. Shareholders' Derivative Litig*., 68 F.3d 554 (2nd Cir. 1995) ("Although the federal policy favoring arbitration obliges us to resolve any doubts in favor of arbitration, we cannot compel a party to arbitrate a dispute before someone other than the NYSE when that party had agreed to arbitrate disputes only before the NYSE and the NYSE, in turn, exercising its discretion under its Constitution, has refused the use of its facilities to arbitrate the dispute in question."); *National Iranian Oil Co. v. Ashland Oil, Inc*., 817 F.2d 326, 333-35 (5th Cir.) (where agreement show intent that procedures of particular forum govern, court need not compel arbitration if forum is unavailable), *cert. denied*, 484 U.S. 943 (1987); *Dover Limited v. A.B. Whatley,*

In other cases where courts have appointed a substitute arbitrator there was no evidence that the defendant who drafted the arbitration clause deliberately designed a misleading clause specifying nonexistent rules and misrepresenting a Tribe's power to arbitrate as here. *Compare Torrence v. Nationwide Budget Finance*, No. COA12-453 (N.C. Ct. App. Feb. 4, 2014) (allowing substitute arbitrator where National Arbitration Forum stopped doing consumer arbitrations). Here, even <u>at the time Defendants drafted their clause</u>, the Tribe did not perform arbitrations and it had no consumer rules and the Defendants made their other misrepresentations in the contract. The facts are far more egregious than in cases that allowed a substitute arbitrator.

"[A]rbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582 (1960). Plaintiffs did not agree to submit a matter to arbitration under no rules or *ad hoc* rules and not by the Tribe nor under the corrupt process revealed by the *Inetianbor* developments. CashCall knew the arbitration in *Inetianbor* was being supervised by a Federal Court, yet still engaged in

---

*Inc.*, 2006 WL 2987054 (S.D.N.Y. Oct. 18, 2006) (agreement provided that the rules of the NASD controlled but NASD would not arbitrate); *Grant v. Magnolia Manor-Greenwood, Inc.*, 678 S.E.2d 435 (S.C. 2009) (where AHLA had become unavailable as an arbitrator, court declined to appoint a new arbitrator because "there would no longer be a meeting of the minds between the parties"); *QuickClick Loans, LLC v. Russell,* 943 N.E.2d 166, 168-173 (Ill. Ct. App. 2011) ("exclusive administrators" chosen in arbitration agreement "not available," thus, "external events to the parties' agreement have foreclosed the arbitration of the parties' claims" and "the arbitration agreement between the parties was impossible to enforce"); *Bedford Hlth. Props., LLC v. Estate of Davis*, 50 So.2d 362, 366 (Miss. Ct. App. 2010) (where "chosen forum for arbitration is unavailable," no "valid agreement to arbitrate" existed).

disturbing misconduct.  The facts also reflect an unconscionable agreement, which is another basis to void under the FAA.  Arbitration clauses are voidable "upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  *See Brewer v. Missouri Title Loans*, 364 S.W.3d 486, 492 (Mo.), *cert. denied*, 81 U.S.L.W. 3161 (2012) (arbitration agreement between a consumer and a title company was unconscionable; court recognized that traditional state law defenses (including unconscionability) could be applied to arbitration agreements like other contracts).

In *Hooters of America, Inc.*, 39 F.Supp.2d 582, 606-07 (D.S.C. 1998), the district court noted that the purported arbitration rules did not exist; "the court finds the Rules were essential and material terms of the arbitration agreement. In the absence of a meeting of minds on those issues, the court finds no enforceable arbitration contract."[38] The Fourth Circuit, affirming, noted: "In this case, the challenge goes to the validity of the arbitration agreement itself.  Hooters materially breached the arbitration agreement by promulgating rules so egregiously unfair as to constitute a complete default of its contractual obligation to draft arbitration rules and to do so in good faith."  173 F.3d at 938 (4th Cir. 1999).  *Hooters* is clear precedent that rules do matter. Here, the consumer

---

[38] The existence of proper, fair, real "consumer dispute rules" is important given the adhesive nature of the contract, the disparity in bargaining power, and the false statements in the agreement.  The reference to "consumer dispute rules" causes a reasonable consumer to believe the arbitration will proceed under rules that will afford some measure of protection; this is not the case if they do not exist.  The FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Volt Information Sciences, Inc. v. Bd. of Trs. of the Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989) (citations omitted).  Here, it is impossible to enforce the agreement according to its terms.

rules promised by the agreement do not exist. Further, the experience of Mr. Inetianbor in his case uncovered an unfair and corrupt arbitration process.

The nonexistence of the consumer dispute rules also means Defendants' argument that the question of arbitrability is delegated to the arbitrator must be rejected. (Def. Mem. pp. 2, 29-31). There is no valid contract to effect a delegation. Further, there is no clear and unmistakable evidence that the issue was delegated since there is no evidence that the rules that would govern the arbitrator even exist. *Compare First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995).

Further the parties did not come to a meeting of the minds. Ms. Johnson's agreement states that arbitration "shall be conducted by the Cheyenne River Sioux Tribal Nation <u>by an authorized representative</u>," but then states that it will be conducted by "<u>a panel of three Tribal Elders</u>." SAC Ex. 1, pp. 3-4. Mr. Brown's contract states that "[a]rbitration … <u>shall</u> be conducted by the Cheyenne River Sioux Tribal Nation by an authorized representative" but then states that "you <u>shall</u> have the right to select any of the following arbitration organizations to administer the arbitration" and lists AAA, JAMS, or an arbitration organization agreed to by the parties. SAC Ex. 2, p. 3. "Shall" is mandatory: the statements cannot be reconciled. (All underlined emphases added).

The same facts reflecting no agreement on an enforceable agreement also show unconscionability which is a common-law defense. While the agreement describes being governed by tribal consumer rules, none exist. *Compare Hooters,* 173 F.3d at 936 (noting that "[n]o employee, however, was given a copy of Hooters' arbitration rules"). What tribal laws can be located state that jurisdiction is limited to persons on the

49

reservation.  The agreements state that Western Sky is a tribal organization which is false and that the Tribe will conduct arbitration which is false.  Unlike in other cases, this Court also has a window into an actual arbitration under the contract via *Inetianbor*, which facts led that court to strike the clause.

Defendants had a duty to act in good faith. *See Hooters*, 173 F.3d at 940 (citing Rs. 2nd of Contracts § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")); *Virginia Vermiculite, Ltd. v. W.R. Grace & Co*., 156 F.3d 535, 542 (4th Cir. 1998) (noting "contractual discretion is presumptively bridled by … the covenant of good faith implied in every contract") (quoting Steven J. Burton & Eric G. Anderson, Contractual Good Faith 46-47). Good faith "emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party." Rs. 2nd of Contracts § 205 cmt. a.  Bad faith includes the "evasion of the spirit of the bargain" and an "abuse of a power to specify terms." *Id.* cmt. d.  The agreement tries to deprive North Carolina residents of the protections of our State's small loan laws reflecting a "paramount" public policy.  N.C. Gen. Stat. § 24-2.1(g).  The facts show bad faith.

### E. Defendants Rule 12(b)(6) Motion Should Be Rejected.

Defendants' Rule 12(b)(6) motion should be rejected.  Each defense contention is addressed in the order presented.

### 1. Plaintiffs State A Claim Against Payday Financial.

Payday Financial was the sole member of Western Sky during some of the pertinent times.  Payday Financial admits that it was the sole member of Western Sky

through February 1, 2011. (Kimberly Lawrence Dec., Docket 92-1, ¶ 4). Melinda Long received loans from Western Sky prior to that time. (SAC ¶ 78, alleging October 2010 loan). Likewise Kevin Hayes received a loan in October 2010. (SAC ¶¶ 95-96). Payday Financial was thus the sole member of the Western Sky LLC during some of the pertinent times and Plaintiffs are entitled to discovery to determine the scope of its active involvement and control over the tortious conduct.

Evidence developed in the FTC's case against Western Sky reflects that that Payday Financial participated in the original formation of Western Sky. *See* D.S.D. Case No. 3:11-cv-03017-RAL, filing dated Jan. 31, 2013, p. 2 (**Exhibit 3**). Payday Financial and Western Sky shared the same physical offices. *Id.*, p. 5. Payday Financial offered loans over the internet and has stated it offered loans through Western Sky. *Id.*, p. 6. It provided loans across the United States, and helped collect on loans. *Id.,* p. 8.

Defendants insist that Payday Financial is a "wholly distinct corporate entity" from Western Sky and baldly state that this action does not involve Payday Financial loans. Lawrence Dec., Docket 92-1, ¶¶ 5, 10. However, Ms. Lawrence does not address the findings of the District of South Dakota Federal Court by order filed September 30, 2013, that Payday Financial had made loans throughout the United States, filed collection actions against borrowers and used unlawful wage garnishment packets between 2009-11 that contained deceptive representations. SAC ¶ 168 & Ex. 16.

Plaintiffs have alleged that upon information and belief, Payday Financial "marketed and made payday loans throughout the United States, including … in North

Carolina." SAC ¶¶ 19, 70.  Taken together, Plaintiffs have alleged adequate facts to be allowed to proceed with their claim as to Payday Financial.

### 2.  North Carolina Law Applies.

Defendants claim that Tribal law governs, therefore the claims based on North Carolina law should be dismissed.  In fact, for the reasons discussed above, North Carolina law applies.  It is clear that North Carolina lending law applies to these loans and that the Tribal choice of law provision is unenforceable and would violate North Carolina public policy.

Defendants contend the contracts were "made" on the Reservation.  (Def. Mem. 42-43).  In fact, that is neither true factually (each Plaintiff entered into any loan agreement in their home in North Carolina) nor legally (by operation of North Carolina statutes, these consumer loans are deemed made in North Carolina).

Defendants also contend that the Tribe's interest in applying its laws outweighs North Carolina's interests.  Yet these were loans that by design were never made to anyone on the Reservation.  Instead they were marketed by TV ads in North Carolina and were made to North Carolina residents.  Just as other courts have rejected contentions that Tribal law applies to these loans, so too should this Court.

### 3.  Plaintiffs State a Claim for Fraudulent Conveyance.

Plaintiffs' claim for fraudulent conveyance is sufficiently alleged.  Plaintiffs are creditors because they each paid monies to Defendants on the loans, and under the Consumer Finance Act Defendants are not entitled to keep any of those payments.  *See*

N.C. Gen. Stat. § 53-166(d) (a party in violation "shall have no right to collect, receive or retain any principal or charges whatsoever with respect to such loan").

Plaintiffs alleged a claim for fraudulent conveyances at paragraphs 210-215 of the SAC. The factual basis for the claim was that "Upon information and belief, Reddam and/or entities under his control, received funds from the operations of the enterprise in North Carolina. The Defendants are liable for the return of all such funds." (*Id.* ¶ 211).

There are two bodies of law that obligate Defendants to return these funds. First, N.C. Gen. Stat. § 53-166(d) provides in part:

> Additional Penalties. – Any contract of loan, the making or collecting of which violates any provision of this Article, or regulation thereunder, except as a result of accidental or bona fide error of computation is void, *and* the licensee or *any other party in violation shall not collect, receive, or retain any principal or charges whatsoever with respect to the loan*.

(Emphasis added). Defendants are "parties in violation." Second, liability arises under N.C. Gen. Stat. § 39-23.1, *et seq.*, and specifically under § 39-23.5(a) and 39-23.4(a).

N.C. Gen. Stat. § 39-23.5(a) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

When determining whether a person is a "debtor" and is "insolvent," the law takes into account a contingent claim such as the claim asserted by Plaintiffs in the instant case. *See* N.C. Gen. Stat. § 39-23.2(a) (definition of "insolvent") and § 39-23.1(3) and (5) (definitions of "debt" and "claim"). *See* 15A Strong's North Carolina Index 4th

Fraudulent Transfers § 2; N.C. Gen. Stat. § 53-166(d); N.C. Gen. Stat. § 39-23.1 *et seq.* (setting forth elements of fraudulent conveyance claim); *Underwood v. Stafford*, 270 N.C. 700, 704, 155 S.E.2d 211, 214 (1967) (fraudulent conveyance claim where plaintiff alleged companies conveyed assets to avoid judgment creditor collecting on claim); 15A Fletcher Cyc. Corp. § 7408 (noting that fraudulent conveyance claim may lie where company transfers funds to avoid paying potential liability in case).

The Western Sky business operation took money from North Carolina borrowers. The persons who received dividends, distributions or other transfers of these funds are liable to the North Carolina borrowers. Further, Plaintiffs make more than bare assertions of an intent to defraud. Plaintiffs have alleged a detailed chronology under which Defendants deliberately set up a sham Tribal lending business in an effort to evade the application of North Carolina law and make usurious loans. After Plaintiffs sued, Defendants shut down the Western Sky business and Plaintiffs are accordingly justifiably concerned about the fate of the business's assets and revenues. Accordingly the claim should be allowed to proceed.

### 4.    Plaintiffs State a Claim for Civil Conspiracy.

Plaintiffs have alleged a detailed, multi-year scheme by Defendants to set up Western Sky as a front to allow usurious loans under the purported rubric of Tribal immunity. Plaintiffs have attached the actual 2009 agreements CashCall and Western Sky entered into to create a pretense that a Tribal lender was making the loans, when actually CashCall was taking the calls, running the website, funding the arrangement and taking all the loan payments. (SAC Ex. 6). North Carolina recognizes civil conspiracy

54

either as a self-standing claim or a method of pleading multiple-defendant liability, and the claim is proper here. Defendants entered into an agreement between two or more individuals (CashCall and Western Sky), in order to do an unlawful act (make usurious loans), which resulted in injury inflicted by one or more of the conspirators (each Plaintiff was monetarily damaged) and pursuant to a common scheme (the internet lending scheme). The elements of a civil conspiracy are: "(1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme." *Privette v. University of North Carolina*, 96 N.C.App. 124, 139, 385 S.E.2d 185, 193 (1989); *Norman v. Nash Johnson & Sons' Farms, Inc.*, 140 N.C.App. 390, 416, 537 S.E.2d 248, 265 (2000) (in order to state a claim for civil conspiracy, a complaint must allege a conspiracy, wrongful acts done by certain of the alleged conspirators, and injury); 5 Strong's North Carolina Index 4th Conspiracy § 1 (citing cases). Plaintiffs have properly alleged the elements.

Plaintiffs allege that Defendants during the pertinent times jointly and severally conspired to institute a system of subterfuge lending in North Carolina in a deliberate effort to avoid the applicable usury and consumer lending laws. An agreement existed between the Defendants to do an unlawful act or to act in an unlawful way, and, as a result of acts done in furtherance, damage occurred to the Plaintiffs. Defendants are accordingly liable, jointly and severally, for the acts of each done in furtherance of their unlawful agreement. (SAC ¶¶ 216-219). These allegations meet the elements of civil

conspiracy. *See also State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 184 N.C. App. 613, 646 S.E.2d 790 (2007) (allowing civil conspiracy claim).[39]

### 5. Plaintiffs State a North Carolina RICO Claim.

Plaintiffs' claim under the North Carolina Racketeer Influence and Corruption Organizations Act ("NC RICO") is proper. Plaintiffs do identify predicate acts, specifically, the numerous usurious loans, as well as the acts of setting up the deceptive loan scheme. N.C. Gen. Stat. § 75D-8(c).

Defendants contend that North Carolina law did not make their acts criminal. However, making small loans without a license is a Class 1 misdemeanor under the Consumer Finance Act. N.C. Gen. Stat. § 53-166. Plaintiffs expressly allege violation of the Consumer Finance Act. SAC Count II. N.C. Gen. Stat. § 53-166 is a different statute than the usury statutes Defendant cite at Chapter 24. Accordingly Plaintiffs have adequately alleged criminal acts that could form the basis for a NC RICO claim.

Further, Plaintiffs have adequately alleged that Defendants used "agreements containing false and fraudulent statements and omissions" to form another basis for a NC RICO claim. Specifically, Plaintiffs have alleged and in some cases attached the specific Western Sky loan agreements Defendants gave them which had specific misrepresentations described in the Complaint.

Defendants are correct that Plaintiffs had not formally notified the Attorney General concurrent with filing the action. Def. Mem. p. 52; *see* N.C. Gen. Stat. § 75D-

---

[39] Defendants also argue they did not make "payday loans." Def. Br. p. 49. Plaintiffs however have attached copies of Attorney General cease-and-desist letters to Defendants stating precisely that these were payday loans. SAC ¶¶ 81, 103 & Exs. 7, 10.

8(c).  Plaintiffs apologize for the oversight and are accordingly now notifying the

Attorney General as reflected by the correspondence attached hereto, and respectfully

request that the Court allow their NC RICO claim to continue.  (**Exhibit 4**).  The statute

does not say the claim must be dismissed if this notification is late, and the case cited by

Defendants also cited other grounds for dismissing the claim.  *See Synergy Fin., L.L.C. v.*

*Zarro*, 329 F.Supp.2d 701, 714 (W.D.N.C. 2004).

### 6.  Plaintiffs State a Federal RICO Claim.

Defendants claim that they cannot be liable under RICO for "collection of

unlawful debt," 18 U.S.C. § 1962(c), because they were "legitimate banking institutions."

Def. Br. pp. 54-55.  Plaintiffs beg to differ.  Plaintiffs have alleged in detail their basis for

claimant that Western Sky was not a legitimate banking institution and further, Plaintiffs

have alleged that Defendants made loans are well over "twice the enforceable rate." 18

U.S.C. § 1961(6).  If Defendants had wanted to avoid this exposure they could have set

their interest rates lower; instead they were requiring customers to pay up to five or more

times what they borrowed.  These loan terms were egregious and it was because CashCall

was plainly aware of the illegality that it sought to arrange the Tribal lending subterfuge.

Defendants also repeat their claim that "North Carolina's usury laws do not apply

to the loans."  Def. Mem. p. 55.  As discussed above, North Carolina law does apply.

Further Defendants contend that the class claims related to States aside of North Carolina

should be dismissed, however class certification is not yet before the Court.  All that is

before the Court is the adequacy of the named Plaintiffs' claims and they all reside in

North Carolina and allege viable North Carolina law claims.

Defendants also contend that Plaintiffs Brown and Johnson have failed to adequately allege injury. However, each has alleged making payments on the loans and under North Carolina law those loans were void and all funds have been improperly kept by Defendants. Mr. Brown made approximately three payments of $294 each. SAC Ex. 1 (Brown Affidavit). Ms. Johnson paid approximately $4000 on the loan of $2,525. SAC Ex. 2 (Johnson Declaration).

Plaintiffs also adequately plead the conspiratorial agreement. In fact they attached the 2009 written agreements to the complaint that detail the conspiracy to set up Western Sky as a front for CashCall. SAC Ex. 6. Further Plaintiffs allege how Defendants deliberately continued marketing, making and collecting on the loans even after States began to bring cease-and-desist actions and after the North Carolina Attorney General sent cease-and-desist letters. These allegations are sufficient.

### 7. Plaintiffs State a TILA Claim.

Mr. Brown's TILA claim flows from the plain language of the Act and should be allowed. TILA requires lenders to provide accurate disclosures of the annual percentage rate for loans. 12 C.F.R. §§ 226.18(e) & 226.22(a)(1)&(2). The disclosure must be based on the actual legal obligation, 12 C.F.R. §§ 226.5(c) & 226.17(c)(1). However, Defendants were not making loans based on any real legal obligation and their loan disclosures were inaccurate. TILA disclosures must be made in a clear and conspicuous manner. Yet right above the supposed "TILA box" on the loan contracts was the statement, "Neither this Agreement nor Lender is subject to the laws of the United States." (See SAC Ex. 2). It is not clear to a reasonable consumer for a lender to on the

58

one hand provide a purported TILA credit disclosure while on the other hand expressly denying TILA applies, in one and the same loan document.

Defendants contend that "TILA does not penalize a lender for charging an interest rate that is accurately disclosed even though it is higher than a state's usury cap" because if TILA did, then lenders making loans under higher rates allowed to nationally chartered banks would violate the statute. Def. Mem. p. 59. However, Defendants' loans were not valid under the federal laws applicable to federally chartered banks. Accordingly the claim should be allowed.

### 8. The EFTA Claim.

Defendants ask that the EFTA claim be dismissed for all Plaintiffs aside from Mr. Brown in light of the statute of limitations. Plaintiffs only intended the claim to be brought for Mr. Brown as indicated by SAC ¶ 231 (expressly alleging that Mr. Brown has EFTA claim because his relevant facts fell within one-year statute of limitations at 15 U.S.C. § 1693m(g)). Plaintiffs agree the EFTA claim is only brought by Mr. Brown.

## CONCLUSION

Wherefore, Plaintiffs respectfully request that the Court deny the Defendants' omnibus motion. A proposed Order is attached.

Respectfully submitted, this the 6th day of March, 2014.

/s/ John S. Hughes
Aaron F. Goss (N.C. Bar No. 40251)
John S. Hughes (N.C. Bar No. 22126)
Mona L. Wallace (N.C. Bar No. 09021)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
agoss@wallacegraham.com
jhughes@wallacegraham.com
mwallace@wallacegraham.com

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2014, I electronically filed the foregoing PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO DISMISS OR STAY with the Clerk of Court using the CM/ECF system which will send notification of such to all counsel of record.

This the 6th day of March, 2014.

/s/ John S. Hughes
Aaron F. Goss (N.C. Bar No. 40251)
John S. Hughes (N.C. Bar No. 22126)
Mona L. Wallace (N.C. Bar No. 09021)
WALLACE & GRAHAM, P.A.
525 N. Main St.
Salisbury, NC 28144
704-633-5244 Telephone
agoss@wallacegraham.com
jhughes@wallacegraham.com
mwallace@wallacegraham.com

**LIST OF EXHIBITS**

1. Unpublished cases.

2. Selected filings from *Inetianbor.*

3. Filings from D.S.D. Case No. 3:11-cv-03017-RAL.

4. Letter to NCAG per N.C. Gen. Stat. § 75D-8(c) regarding NC RICO claim.

5. *Consumer Financial Protection Bureau v. CashCall, Inc.,* Case No. 1:13-cv-13167, D. Mass., Complaint filed Dec. 16, 2013, at ¶ 13.

6. Proposed order.